# Exhibit A



**BANK OF SAIPAN**
CHALAN KANOA OFFICE

P.O. Box 690
Saipan, MP 96950
U.S.A.
(670) 235-6261-5
Fax (670) 235-1802
Telex 682-BANKSPN

March 15, 2002

Mr. Takeo George
Acting Administrator
NMI Retirement Fund
P.O. Box 501247
Saipan, MP 96950

Dear Mr. George:

I am pleased to supply you with the information you requested supporting our compliance with Public Law 12-61.

In support of CNMI Retirement Fund deposits, Bank of Saipan shall pledge assets from the following as collateral for 100% of Northern Mariana Islands Retirement Fund deposits:

| | |
|---|---|
| U.S. Government Securities held by D.A. Davidson | $5,390,480 * |
| Loans originated by Bank of Saipan back by CNMI (CDA) guaranty | $6,638,881 ** |

- Market value as of February 22, 2002. As you know, the value will fluctuate on a day to day basis.
- Balance as of February 28, 2002.

Please advise if you require additional information.

Sincerely,

BENIGNO R. FITIAL
Acting President/CEO


PLAINTIFF EXHIBIT

EXHIBIT A

# Exhibit B



**BANK OF SAIPAN**
CHALAN KANOA OFFICE

FAXED

P.O. Box 690
Saipan, MP 96950
U.S.A.
(670) 235-6261-5
Fax (670) 235-1802
Telex 682-BANKSPN



RECEIVED
APR 1 1 2002
MPLA

April 08, 2002

Ms. Christy Lazaro
Comptroller
Marianas Public Land Authority
P.O. Box 500380
Saipan, MP 96950

Dear Ms. Lazaro:

I am pleased to supply you with the information you requested supporting our compliance with Public Law 12-61.

In support of Marianas Public Lands Authority deposits, Bank of Saipan has the following as collateral for 100% of Marianas Public Lands Authority deposits:

    U.S. Government Securities held by
    D.A. Davidson                    $5,259,238.00*
    Loans originated by Bank of Saipan
    back by CNMI (CDA) guaranty    '$6,281,177.00**

* Market value as of March 18, 2002. As you know, the value will fluctuate on a day to day basis.
** Balance as of March 18, 2002.

Please advise if you require additional information.

Sincerely,

BENIGNO R. FITIAL
President/CEO

**EXHIBIT B**

PLAINTIFF
EXHIBIT
P

# Exhibit C

RECEIVED MAY 0 2 2002

000022

**CONFIDENTIAL:**

**PRIVILEGED ATTORNEY-CLIENT COMMUNICATION**

# BANK OF SAIPAN

## SHARE PURCHASE/LOAN CONTROVERSY

---

### OPINION AND RECOMMENDATIONS

### OF INDEPENDENT COUNSEL

**MARCH 12, 2002**

Prepared by
Mair, Mair, Spade & Thompson
A CNMI Professional Corporation
Suite 4-B Horiguchi Building, Garapan
P.O. Box 7917, S.V.R.B.
Saipan, MP 96950
(670) 233-2089 Voice
(670) 233-5206 Facsimile

RECEIVER'S - 000494
RECEIVER'S - 000753

EXHIBIT
u

Ex. G - 1

EXHIBIT C-1

# BANK OF SAIPAN
## SHARE PURCHASE/LOAN CONTROVERSY

## OPINION AND RECOMMENDATIONS OF INDEPENDENT COUNSEL

### BACKGROUND

As we are all now aware, Mr. B. Douglas Montgomery, the putative purchaser of shares of the Bank of Saipan ("the Bank"), his associate Mr. DuSean Berkich and former Bank President and CEO Tomas Aldan have, over the past several weeks, undertaken to engage in highly irregular and inappropriate banking transactions in the Bank's name and under color of the Bank's authority, despite the fact that the sale of the Bank has not been consummated.

These practices included the making of several unauthorized loans and the creation of an International Affairs Department within the Bank. The broad outlines of these activities were aptly summarized in Special Administrator Benigno Fitial's March 5, 2002 letter to Mr. Jesse S. Palacios, CNMI Acting Director of Banking (which is attached as Appendix A). These activities were only recently discovered and brought to the attention of the Bank's Board of Directors ("the Board").

Upon learning of these developments, the Board promptly met to address the situation. On February 27, 2002, a Special Meeting of the Board was convened during which the Board Appointed Mr. Fitial as Special Administrator, with broad authority to investigate and remedy the situation. The Board also appointed Independent Counsel, David Mair of the law firm of Mair, Mair, Spade & Thompson, P.C., to advise the Board and the Special Administrator in this regard, with the assistance of the Law firm of Calvo & Clark, LLC.

This report summarizes the preliminary findings and recommendations of Independent Counsel.

1

RECEIVER'S - 000495
RECEIVER'S - 000754

Ex. G - 2

**EXHIBIT C-2**

## INDEPENDENT COUNSEL'S CHARGE

The Minutes of the Board's February 27, 2002 Special Meeting specify the scope of Independent counsel's charge as follows: Independent counsel is to investigate and advise as to:

(a) whether the recent loans to B. Douglas Montgomery, Sweven Systems, Tomas B. Aldan, and Tinian Dynasty were improper;

(b) whether funds from the Bank's treasury were used to finance the purchase of Bank shares by Mr. Montgomery;

(c) whether any other transfer of funds, or any other transactions, have taken place involving Mr. Montgomery;

(e) whether the Bank's recent change of investment and managers from Morgan Stanley to another firm was improper;

(f) whether the bank should provide any information to any law enforcement agencies such as the FBI or the CNMI Attorney General's Office; and

(g) any other actions the Bank and/or its Board of Directors should take to protect the Bank, and its depositors, directors and shareholders. Attorney Mair shall act at the direction of the Board of Directors, and Calvo and Clark, LLP shall render assistance to Attorney Mair as needed with respect to the above.

Subsequently, the Board received a report from the Special Administrator concerning items (b) and (c). The Board has also tasked its auditor to review the loan and cash flow documentation. Accordingly, this Report focuses on items (a), (e), (f) and (g), as enumerated above.[1]

---

[1] The Minutes of February 27, 2002 Board Meeting omitted any Item "(d)". For continuity purposes, this Analysis refers to the items as enumerated in the minutes.

2

RECEIVER'S - 000496 RECEIVER'S - 000755

Ex. G - 3

**EXHIBIT C-3**

## OPINION AND RECOMMENDATIONS OF COUNSEL

### 1. Were the Suspect Loans Improper?

ANSWER: Yes.

It is plain that, by any standard, the suspect loans were improper.

#### a. The Aldan and Montgomery Loans.

The provisions of the CNMI Banking Code (Title 4, CMC, et. seq.) make it undeniably clear that the loan to Mr. Aldan was made in violation of the Banking Code and is, therefore, unlawful. 4 CMC § 6804. Section 6813 provides that the illegal loan by Aldan to himself is a felony, punishable by imprisonment for not more than two years and/or a fine of up to $25,000.

Additionally, under the circumstances, the loan proceeds held in Douglas Montgomery's account may be considered an "indirect" loan which was also made in violation of the statute which applies to direct and indirect loans. Section 6813, discussed above, applies with equal force to Mr. Montgomery, as one undertaking to act as an employee of the Bank, subjecting him to criminal liabilities, including imprisonment.

Civil penalties are also imposed upon Aldan, an officer of the Bank, and Montgomery, an employee and agent of the Bank, under Section 6701, discussed in greater detail in Section 6 (a), below.

In addition to civil and criminal penalties, it should be noted that the subject loans are also offensive to the Bank's own internal regulations. *Bank Of Saipan Loan Policy* Section 2.4 regulates "insider loans." According to that provision, all extensions of credit to executive officers must be approved by a two-thirds vote of the Board of Directors.

Moreover, the act of keeping the loans secret is a serious breach of trust, justifying immediate termination of the Officer pursuant to Section 2.4d, which provides as follows:

> Any officer or Director (or related interests) involved secretly in an insider loan transaction in which that individual stands to benefit financially is subject to immediate dismissal.

3

RECEIVER'S - 000497

RECEIVER'S - 000756

Ex. G - 4

EXHIBIT C-4

Withholding such information is also unlawful under Section 6805 of the Banking Code, which states:

> §6805. Unlawful Concealment of Transactions. - It is unlawful for an officer, director, employee, attorney or agent of a bank to conceal or endeavor to conceal any transaction of the bank from any officer, director or employee of the bank or any official or employee of the department to whom it should properly be disclosed.

Given this language in the Bank's own loan underwriting guidelines and Section 6805, which makes such acts criminal, we strongly counsel prompt termination of Mr. Aldan. It also makes sense to officially terminate Mr. Montgomery, without in any way conceding that his self-appointment was legitimate, to the extent that he undertook to act as an employee of the Bank.

    b.    The Sweven and Tinian Dynasty Loans.

We do not yet know the full story concerning the Sweven Systems, Inc and Tinian Dynasty loans. Therefore, we cannot say at this juncture that those loans were improper on the basis that they were "insider" loans. However, those loans were nevertheless improper because they were not underwritten as required by Bank regulations, which require Board approval, through the loan committee, for all loans above $250,000. *Bank of Saipan Loan Policy, Credit Approval Authority*—Appendix A.

    2.    **Were Funds from the Bank's Treasury used to Finance the Purchase of Bank Shares by Mr. Montgomery?**

ANSWER: Yes.

As indicated above, we have not independently assessed this issue. We rely upon the Special Administrator's affirmative finding in this regard. The pending audit by the bank's independent auditor should reveal the scope and details of the inquiry.

    3.    **Have Any Other Transfers of Funds or Transactions Taken Place Involving Mr. Montgomery?**

ANSWER: Yes.

//

4

RECEIVER'S - 000498
RECEIVER'S - 000757

Ex. G - 5

EXHIBIT C-5

As above, we have not independently assessed this issue. We rely upon the Special Administrator's affirmative finding in this regard. The pending audit by the bank's independent auditor should reveal the scope and details of the inquiry.

4. **Was the Bank's Recent Change of Investment Managers from Morgan Stanley to Another Firm Improper?**

ANSWER: Yes.

Mr. Montgomery and his cabal acted without the authority of, and without notice to, the Board in switching investment managers from Morgan Stanley to a firm called D.A. Davidson. Making such a significant change without notice to the Board was unquestionably improper.

It appears that the cash transferred to Davidson might have flowed out almost as quickly as it flowed in, as this account appears to be the source of partial funding for the Sweven loan.

We cannot, at this time, speak to the credentials of the new investment manager. However, the Board clearly has authority to restore Morgan Stanley if it so chooses, and to divest from Davidson. We recommend that the Board resolve to send Davidson a letter expressly informing them that Montgomery, Berkich, Aldan, and others who might have dealt with Davidson, have no authority to act on behalf of the Bank; and that any Bank investments placed through the firm should be liquidated immediately.

5. **Should the Bank Provide Information to Law Enforcement Agencies?**

ANSWER: Yes.

The Bank should continue to report to and cooperate with the Director of Commerce and Labor, who serves as the Director of Banking (the "Director"), as well as law enforcement authorities concerning this controversy. CNMI law requires the Bank to make disclosure of certain relevant information concerning the Bank's activities to the Banking Director.

Moreover, to the extent that the Bank becomes aware of additional improper or illegal activities being conducted by Messrs. Montgomery, Berkich, Aldan or others in their regime, this information should be brought to the attention of law enforcement authorities as well, lest the Board members be accused of being in complicity with those actions, pursuant to 4 CMC § 6701. (See discussion below.)

5

RECEIVER'S - 000499
RECEIVER'S - 000758

Ex. G-6

EXHIBIT C-6

Finally, in order for the Directors to avoid criminal liability under the Banking code they are each required to notify the Director of their dissent from the illegal acts of the Bank employees.

6. **What Other Actions Should the Bank and the Board of Directors take to Protect the Bank, its Depositors, Directors and Shareholders?**

ANSWER: Multiple measures, as detailed below:

This inquiry is the central focus of this analysis because the issues are critical and the resolution of those issues heavily depends upon the interpretation of statutes or case authorities. Before discussing what should be done, it is important to assess the downside risks faced by the actors.

 a. **Exposure of Directors and Officers.**

The CNMI Banking Code contains specific provisions respecting the liability of officers and directors of a Commonwealth bank and extend such liabilities to employees, agents and the attorneys of such bank:

> §6701. Liability of Officers, Directors, Employees and Agents. An officer, director, employee, agent or attorney or a bank is responsible for an act or omission of the institution declared to be a criminal offense under this division whenever he or she knowingly and wilfully participates in authorizing, executing, ratifying, or concealing such act, or in authorizing or ratifying such omission or, having a duty and realizing the duty exists to take the required action, omits to do so. A director shall be presumed to participate in any action of which the Director has knowledge taken or omitted to be taken by the board of which he or she is a member, unless the director dissents from it in writing and promptly notifies the board of the dissent. Every person by applying or operating a bank under this division consents to the jurisdiction of the Commonwealth Trial Court for purposes of this section.[2]

//

---

[2] 4 CMC § 6701.

6

RECEIVER'S - 000500
RECEIVER'S - 000759

Ex. G - 7

EXHIBIT C-7

A good faith exception to liability exists, but it applies only to the Banking Director and his staff, not to bank officers, directors, employees, agents or attorneys. 4 CMC §6702. ("any act done or omitted in good faith in performing the functions of his office.")

In this particular case, loans made to employees and an officer, as well as to "allegedly" disinterested third parties of the Bank (Tinian Dynasty and Sweven Systems) are potentially harmful to the depositors of the Bank. Moreover, the directors were not informed of, nor did they approve or thereafter ratify such loans.

As discussed herein as well as in our February 28, 2002 letter to Mr. Fitial, the loans to Messers. Aldan and Montgomery (indirectly) were in violation of Section 6804 of the CNMI Banking Code which provides as follows:

§6804. Unlawful Gratuity or Compensation; Transactions of Persons Connected with Commonwealth Bank

(a) It is unlawful for an affiliate of a bank or for an officer, director or employee of a bank or affiliate of a bank:

\* \* \*

(2) To have any interest, directly or indirectly in the proceeds of a loan . . . made by the bank, unless the loan . . . is expressly authorized by this division or by rule of the board and approved and is approved in advance by vote of two-thirds of all the directors of the bank, any interested director or trustee taking no part in such vote.

\* \* \*

For the violation of this statute, the Banking Code imposes criminal sanctions upon the violating individual as well as the directors, officers, employees, agents or attorneys of the Bank, as follows:

7

RECEIVER'S - 000501

RECEIVER'S - 000760

Ex. G - 8

**EXHIBIT C-8**

### §6813. Criminal Sanctions, Violations of Rules and Orders.

\* \* \*

(b) Knowing and willful violation of this division by an individual shall be a misdemeanor if the amount involved is less than $1,000. Knowing and willful violations where the sum involved exceeds $1,000 shall be a felony. An individual convicted of a misdemeanor under this division shall be imprisoned for not more than six months, or fined not more than $1,000, or both. An individual convicted of a felony under this division shall be imprisoned for not more than two years or fined not more than $25,000 or both. Any prohibited act or offense against this law not otherwise specified is a misdemeanor.

(c) An officer, director, employee, agent or attorney of a bank shall be responsible for an act or omission of the institution declared in this division to be unlawful whenever, knowing that such act or omission is unlawful, he or she participates in authorizing, executing, ratifying or concealing the act, or in authorizing or ratifying an omission or, having a duty to take the required action, omits to do so.

A director shall be deemed to participate in any action of which the director has knowledge taken or omitted to be taken by the board of which he or she is a member unless the director dissents therefrom in writing and promptly notifies the Director of Commerce and Labor of his or her dissent.

\* \* \*

(e) Unless otherwise provided in this division, <u>it is no defense to a criminal prosecution hereunder that the defendant did not know the facts establishing the criminal character of the act or omission charged if he or she could and should have known the facts in the proper performance</u> of his or her duty. (emphasis added)

8

RECEIVER'S - 000502

RECEIVER'S - 000761

Ex. G - 9

EXHIBIT C-9

b.  Minimizing Director Liability.

The above-referenced statutory provisions raise alarming concerns of virtual guilt by association. However, there are things which can be done to minimize exposure to civil and criminal liability.

  i.  Expressly Dissent (In Writing) to Acts of Aldan and Montgomery.

The directors' obligation under the Banking Code, and the recommended course of action to take in order to limit their liability for the unauthorized transactions, is to *expressly declare* exception to them. Applying Section 6701 of the Banking Code, each director must dissent *in writing* in order to avoid liability for the unauthorized acts.

Moreover, in order to escape *criminal* liability for unlawful actions, Section 6813 requires the directors to "promptly notify" the Banking Director that he expressly dissents from the unlawful acts. We strongly recommend that the Directors comply with these provisions in order to minimize their exposure to liability, particularly criminal liability, for the improper and illegal loans.

As you may know, Director Palacios has expressly requested that the directors dissent from the subject transactions. Although Mr. Fitial's March 5, 2002 letter to Mr. Palacios stated that each of the ten nominated directors dissented, we recommend that each director sign and submit his or her own statement of dissent. We would be pleased to draft a suitable notice of dissent upon request of any director.

  ii.  Bring Action Against Montgomery for Declaratory Judgment that Stock Transfer Agreement is Null and Void and for Damages.

The harm that would result to the Bank, its shareholders, depositors and all who have an interest in the safety and prosperity of the Bank by the transfer of the shares of stock sold by the Calvos and the JLH Pacific Trust should serve as the basis for a lawsuit against Douglas Montgomery and others who conspired to defraud the Bank. The Bank, through its directors, and the individual shareholders should, therefore, resolve to bring a suit on behalf of the Bank and the shareholders to declare the stock purchase agreement null and void.

The Bank as well as its shareholders should be named as plaintiffs. The suit should also seek damages against the purchasers for fraud and all other actionable conduct of Montgomery and his co-conspirators. Of course, it must be recognized that the

9

prospect of actually recovering either compensatory or punitive damages would seem remote, particularly if the wrongdoers are imprisoned. In that event, limited criminal restitution might be only solace.

   iii. *Transfer Proceeds from Sale to Trust Account at Bank Pending Outcome of Declaratory Relief Action.*

In the interim period following the filing of the lawsuit, each of the respective selling shareholders who received compensation should be encouraged to place the proceeds of the stock sale into an escrow or trust account deposited in the Bank.

By placing the sale proceeds into an escrow account, we believe that the affected shareholders, who in some cases are also directors of the Bank, would be acting in the best interests of the Bank by safeguarding assets which could be characterized as having been improperly "loaned" to Bank insiders.

Should it be determined, during the pendency of the declaratory judgment suit, that portions of the amounts received by the Calvos and the JLH Pacific Trust are Bank assets, the money would be readily available to be paid to the Bank. On the other hand, if it is determined that none of these proceeds were paid from the Bank treasury, the amounts will, similarly, be available to the particular shareholders as damages against the purchasers.

Perhaps more importantly, by placing these amounts in escrow, in addition to expressly denouncing the improper loans, the directors' civil and criminal liabilities under the Banking Code would be minimized, if not eliminated.

We note that, pursuant to the law of agency, those who retain the fruits of a fraudulent transaction risk a finding that they, and potentially the Bank, impliedly ratified actions taken by Bank officers and agents. It is well settled that "implied ratification" may hold where one accepts or retains the proceeds or benefits flowing from the unauthorized act of an officer or agent. See, 10 Am. Jur. 2d *Banks and Financial Institutions*, section 386 (1997). This implication applies notwithstanding any express dissent from such fraudulent act.

Cases and authorities establish that bank directors are not generally held liable by imputation for the misdeeds of bank officers if it can be shown that the officer's wrongdoing was for the officer's own benefit, adverse to the interests of the directors or the Bank. *See* Vail National Bank v. Finkelman, 800 P.2d 1342, 1345 (Colo. App. 1990); *citing* Restatement (Second) of Agency, Section 282(1) (1958).

10

RECEIVER'S - 000504

RECEIVER'S - 000763

Ex. G-11

**EXHIBIT C-11**

See also, American National Bank v. Miller, 229 U.S. 517, 522, 33 S.Ct. 883, 884 (1913) (Acts of bank president not imputed to bank where bank had no interest to conceal true facts).

In short, to the extent that directors are seen as benefiting from the subject transactions, there is a greater probability that such directors and the Bank will be held to answer for the misdeeds of the wrongdoers.

Moreover, it is significant that the Bank has represented to the public that the existing shareholders have remained the same and that the sale is no longer in the cards. Retention of the sale assets is inconsistent with that pronouncement, as well as other efforts by the Bank to sever itself from the discredited individuals and the transactions they attempted to consummate.

We recommend that the shareholders who received sale proceeds deposit those proceeds in trust or escrow, preferably in a account held by the Bank, pending the outcome of the declaratory relief action. If and when the sale is invalidated, the cancelled shares can be reissued, and then the shares given to Mr. Montgomery can be voided.

    iv.    **Refrain from Taking Hasty Action to Cancel or Call-in Loans Absent Clear Proof that the Borrowers Themselves Engaged in Fraud.**

As stated above, certain loans were improperly or even illegally made. The question then arises whether the Bank can declare such loans void and demand return of the principal amount advanced. The answer is that loans granted in disregard of lending criteria or even contrary to statutory requirements are generally valid and enforceable nonetheless. See 10 Am. Jur. 2d Banks, section 685 (1963). This means that such loans can be enforced by the Bank and even sued upon for recovery in the event of default. However, it also means that the Bank cannot, absent actionable fraud on the borrower's part, void the loan and demand repayment.

A loan that exceeds a bank's lending limit is not void, even if the loan is violative of statute. If the borrower is without knowledge of a lending limit violation, the bank must perform its agreement to the borrower even though the loan might exceed the statutory limit. See Ann Graham, *Banking Law*, section 28.08 (Matthew Bender 1997); National Farmer's Organization, Inc. v. The Kinsley Bank, 731 F.2d 1464, 1467 (10th Cir. 1984) (citing Kansas law); Labor Discount Center, Inc. v. State Bank & Trust Co. of Wellston, 526 S.W.2d 407 (Mo. App. 1975).

11

RECEIVER'S - 000505

RECEIVER'S - 000764

Ex. G-12

**EXHIBIT C-12**

In short, while the Bank can sue to recover loan proceeds where the borrower committed fraud; the loan commitment must be respected if no borrower fraud can be proved. We recommend honoring all loan transactions unless and until it becomes clear that there was fraud on the part of the subject borrower. At any rate, we recommend that the Bank resolve to bring an action to recover loan proceeds, if supported by law, and to permit this firm to further research the relevant issues.

      v.  **Withdrawal Freeze Not Advisable at this Time.**

As of this writing, it appears that the adept handling of this matter by Speaker Fitial and the Board has avoided what we have feared the most, a run on the bank. Accordingly, we do not recommend exhorting the Director of Banking to exercise his authority to freeze withdrawals pursuant to 4 CMC section 6106 (f). However, this remedy is available as a last resort in the event that the situation should dramatically change for the worse.

### SUMMARY OF OPINION AND RECOMMENDATIONS

We summarize our opinion and recommendations as follows:

1. **Opinion:**

    a. The four main suspect loans were each, for different reasons, improper, and in some cases illegal.

    b. We defer to the Acting President/Chairman's findings and the pending independent audit concerning the source of funds for the share purchase and whether Mr. Montgomery has engaged in other unauthorized transactions.

    c. It was improper for Montgomery to change investment managers; and the Board can and should take steps to divest from the new account.

    d. The transactions of Montgomery, Berkich; Aldan and others expose directors, the bank and certain shareholders to civil and criminal liability based upon CNMI statutory and general common law.

12

RECEIVER'S - 000506

      RECEIVER'S - 000765

Ex. G - 13

**EXHIBIT C-13**

2. **Recommendations:** The directors and shareholders should take steps to minimize their exposure to liability, as follows:

    a. Fully cooperate with law enforcement agencies as well as the Banking Director.

    b. Expressly denounce or otherwise dissent in writing from the unauthorized acts of the Bank/Aldan/Montgomery in order to avoid civil liability. In order to avoid criminal liability imposed under Section 6813 of the Code, however, the directors must also notify the Banking Director and Labor of their dissent.

    c. Bring an action against Douglas Montgomery, and others, seeking a declaratory judgment that the stock transfer agreement is null and void as well as damages for fraud.

    d. Shareholders who were paid for their sold shares should open escrow accounts into which they will place the proceeds from the sale so that these amounts are be preserved for the benefit of the Bank, in the event that it is determined that these amounts or portions thereof were paid from the Bank treasury, and/or for the individual shareholders as damages against Montgomery.

    e. Refrain from taking hasty action to cancel or call-in loans absent clear proof that the borrowers themselves engaged in fraud.

    f. A freeze on withdrawals from the Bank is not advisable at this time; but such a measure could become necessary, as a last resort, in the event of a run on the Bank.

//
//
//
//
//
//

13

RECEIVER'S - 000507

RECEIVER'S - 000766

Ex. G - 14

**EXHIBIT C-14**

Should you wish to discuss the opinion contained herein, please do not hesitate to contact me.

Respectfully submitted, this 12th day of March, 2002.

MAIR, MAIR, SPADE & THOMPSON, P.C.
A Professional Corporation
Independent Counsel, Bank of Saipan, Inc.

By: _____
RANDALL TODD THOMPSON

14

RECEIVER'S - 000508

RECEIVER'S - 000767

Ex. G - 15

**EXHIBIT C-15**