# Exhibit D



**FDIC**
Federal Deposit Insurance Corporation
Division of Supervision
25 Ecker Street, Suite 2300
San Francisco, California 94105

BOS- FDIC Report 19

San Francisco Regional Office
(415) 546-0160

AUG 1 3 1997

Received of
Admin Department
AUG 19 1997
BANK OF SAIPAN
...... Office

RECEIVED MAY 0 7 2002
000126

The Board of Directors
Bank of Saipan
P.O. Box 690
Saipan, MP 96950

Subject:     Application for Federal Deposit Insurance

Dear Members of the Board:

As you know, we have completed an on-site examination of your institution pursuant to the subject application. This letter summarizes our examination findings and conclusions and the current view of this office with respect to the merit of the application.

We have conducted examinations covering the areas of safety and soundness, trust operations, compliance with consumer laws and regulations, community reinvestment, and information systems. In addition, we performed an assessment of all the statutory factors required under Section 6 of the Federal Deposit Insurance Act (FDIA). Our analysis is largely based on financial information of the bank as of March 31, 1997.

According to our established regulatory standards and examination findings, your bank is in poor overall financial condition. Asset quality is unsatisfactory, the bank is structurally unprofitable, risk management and forward planning are nonexistent, and capital is insufficient given the significant weaknesses with which the bank is confronted. Our examiners have found unfavorably on six of the seven statutory factors under Section 6 of the FDIA. As such, we are prepared to forward a denial recommendation for your application to our Washington D.C. office. Before the official recommendation is made, we hereby offer you our pre-decisional assessment of the application and an opportunity for your group to withdraw the application rather than face potential formal denial. FDIC final actions are publicly available and include the basis for decisions.

While our examiners have discussed their findings in detail with your group and management staff during their visit, significant regulatory concerns are highlighted in the following sections.

**Asset Quality**

Asset quality is unsatisfactory. Almost half of the bank's loan portfolio is past due or on nonaccrual status, and, likewise, approximately 50% of the portfolio is subject to criticism. Assets subject to adverse classification, that is substandard quality or worse, are almost 220% of capital and reserves or 29% of the bank's assets. Losses in the loan portfolio and other assets identified during the examination total almost $2 million.

EXHIBIT D-1

The overwhelming cause of the unsatisfactory asset quality is an absence of prudent lending policies, procedures, and underwriting standards that leaves management without any control over the credit administration function. Loan documentation is poor making it impossible to accurately assess collateral protection or repayment capacity. Collection efforts have been nonexistent or ineffective; improper capitalization of accrued interest is routine regarding problem credit. The lack of the most basic controls has led to disastrous consequences in the bank's credit card lending program. There is virtually no problem loan identification process for management to properly evaluate the portfolio risk or determine adequacy of the loan loss reserve. Significant concentrations of credit by four large borrowing relationships further elevate the risk profile. These four relationships account for 44% of total loans, and three of them are subject to adverse classification. Several questionable loan transactions involving ▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓ were uncovered during the examination. Management has no strategies to dispose of foreclosed properties which has resulted in prolonged holding periods. All these factors point to the likelihood of continued deterioration in asset quality unless dramatic changes in the bank's fundamental policies and practices are made.

## Earnings

The bank is structurally unprofitable. Earnings have been overstated due to an under-funded loan loss reserve and the failure to recognize operational losses in a timely manner. Actual net loss for the six months ending March 31, 1997, is estimated by the examiners to be $3 million, primarily as a result of the need to replenish the loan loss reserve to an adequate level and to recognize losses in other assets identified at this examination.

Earnings are hampered by high overhead expense, which increasingly exceeds net interest income. Salary and personnel expenses are exorbitant for the size of an institution such as Bank of Saipan. The bank has no formal planning process or approved budget to guide and monitor operating performance. Earnings projections submitted with the FDIC application are optimistic and not achievable. Although income from the trust operation represents a potential significant source of revenue, management's ability to successfully manage the Hillblom Estate and obtain necessary court approval for fee increases remains uncertain. Prospects for significant improvement in the foreseeable future are remote particularly given the high volume of nonearning assets and cost of administrating the Hillblom Estate.

## Management

Supervision by the board of directors is inadequate, and the senior management team needs to be strengthened. There are virtually no formal policies and procedures in all major functional areas, including, but not limited to, lending, asset liability management, liquidity, interest rate risk, investment, information systems, Bank Secrecy Act, risk management, trust operations, security, and internal audit. Forward planning has generally been nonexistent, and management's ability to respond to changing circumstances is limited. Collectively, significant regulatory concerns regarding demonstrated management weaknesses are a major threshold concern and an impediment to insurability.

Compliance with existing banking laws and regulations is unsatisfactory. Our examiners found

EXHIBIT D-2

or will become applicable if the bank is granted Federal Deposit Insurance. Liabilities resulting from reimbursable violations of the Truth in Lending Act are estimated at $47,000 for consumer loans made only within the last two years. Other violations, including violations of the Bank Secrecy Act, could also subject the bank to further monetary and/or other punitive penalties. The board and management clearly do not have the needed knowledge of rules and regulations that are applicable to an insured institution.

The in-house data processing system was found to be inadequate, mismanaged, and unsuitable for current bank needs, and the control environment and security of the data operation is deficient with no written policies and procedures or contingency planning. Risk to financial data integrity is high. Responsiveness to recommendations by external auditors has been poor, and consequently many of the deficiencies remain uncorrected. Internal controls in all aspects of the banking operations are inadequate, and significant losses resulting from cash shortages, defalcation and theft by employees, and improper accounting control were identified at the examination.

There are no established guidelines governing self-dealing and insider transactions. The examiners found that several extensions of credit to insiders and related parties do not conform with generally acceptable banking standards, and that early actions by the bank as executor of the Hillblom Estate continue to have a serious impact on the bank. A $10,000 loan to Director _____ is classified loss at this examination primarily because of its seriously delinquent status, the insolvent financial condition of _____, and the questionable nature of the arrangement when the loan was originated. In addition, this loan was not reported in Mr. _____'s financial statement submitted with the FDIC application. All of these issues raise serious concerns as to the appropriateness of Mr. _____ continued service as a member of the board of directors and must be resolved as soon as possible.

While Chairman and CEO Tomas Aldan has taken some much needed actions since his arrival in March, 1997, there are many more needed to restore the bank to a safe and sound condition. Due to Mr. Aldan's lack of banking experience, it is vitally important that qualified individuals with the requisite banking expertise and experience be hired, at a minimum, for the positions of president, senior lending officer, and cashier.

The board must adopt and properly implement an adequate strategic business plan and a set of clear operating policies and procedures that govern all aspects of the bank's operations. These policies and procedures must, among other things, recognize the unique relationship between the Hillblom Estate and the bank and provide prudent guidance to minimize potential conflicts of interest and liabilities arising from transactions involving the two parties. While the Hillblom Estate is the only fiduciary account managed by the bank, the board needs to establish policies and procedures designed specifically for trust activities and provide for proper record keeping. The trust department also needs to be properly staffed to handle this sizable and complex account.

Records and minutes of board and committee meetings need to be improved. Our examiners found that these meeting minutes are either nonexistent or contained numerous discrepancies, contradictions, and incomplete records. The liability for the board members associated with insufficient and inadequate minutes and meeting records could be significant, and the deficiency must be corrected.

EXHIBIT D-3

## Capital

The bank's current level of capital is inadequate given the overall condition of the institution and the significant weaknesses presented above. Losses will continue to erode capital in view of the poor earnings performance and deteriorating asset quality. Instead of preserving needed capital, large cash dividends equaling 42 times net income were paid during the last fiscal year without due consideration to the bank's condition or projected need. Capital planning is again nonexistent. Compounding the concerns with capital adequacy is that the Hillblom Estate possesses the prerogative to request a possible return of the $3.5 million capital infusion made in July, 1995. If this occurs, the bank will become undercapitalized, and its immediate viability will be threatened.

Substantial capital augmentation is needed to resolve current problems and ensure future viability. Sources for additional capital will likely have to come from individuals other than The Hillblom Estate in light of the present condition of the bank and the prudence standards to which the trustee is bound.

## Liquidity and Sensitivity to Market Risk

While liquidity appears to be marginally acceptable, alternative sources of liquidity are limited. There are no established secondary back-up facilities, and the poor quality of the loan portfolio does not allow reasonable flexibility for secured borrowings or loan sales at the time of a crisis situation. Large deposit relationships, which are primarily public funds, represent approximately 27% of total deposits, and the securities pledging arrangement with respect to the CNMI government deposits has been costly. Due to the deficiencies in the bank's computer system, unfunded loan commitments cannot be accurately determined. Interest rate risk management is unsatisfactory as there are no policies and procedures or measurement and control systems in this area. No formal review of interest rate risk has been performed by the board or management.

## Other Matters

We are disappointed that, despite several requests since the application was received, we have yet to receive all the information on the directors as part of the basic requirements of the application. Our examiners have left with CEO Akana a list of missing information, which include fingerprint cards and financial information on a number of directors.

Our review of the bank's articles of incorporation found that Articles IV and V are extremely broad, and that there is no language in either Article restricting the purposes or powers of the bank to those consistent with Federal law. The two Articles, as written, are in conflict with Federal laws and regulations, including Section 24 of the FDIA and potentially Regulation O of the Federal Reserve Board Regulations. As such, the Articles should be amended and simplified to conform to Federal laws and regulations.

At the request of Bank Counsel Rodney Jacob, our legal staff has reviewed the bank's draft amended Bylaws, in particular, the article dealing with the indemnification of bank employees. It

EXHIBIT D-4

Page 5

and limitations set forth in Part 359 of the FDIC Rules and Regulations, which implement the provisions of Section 18(k) of the FDIA. As a result, we suggest that you revise the Bylaws with language which subjects the Bylaws to the requirements and limitations set forth in all applicable Commonwealth and Federal laws and regulations, including Section 18(k) and Part 359. In addition, the Bylaws should contain language that to the extent there is any conflict between Commonwealth and Federal law, Federal law shall supersede and control.

The bank's current insurance coverage needs to be augmented as necessary. Given the bank's responsibility as executor of the Hilbian Estate and the increased asset size of the institution, it is prudent to increase the current coverage of the blanket bond insurance.

## Summary

While the examination findings summarized above are not all inclusive, they are major serious concerns that adversely impact the safety and soundness of the bank and pose significant impediments to a favorable conclusion of your application for Federal Deposit Insurance. We believe resolution of many of the noted deficiencies, particularly with respect to policies and procedures, loan underwriting standards and administration practices, management structure, and, the most critical of all, the bank's unsatisfactory condition, will require an extended period of time. The exact time frame is highly dependent upon the board's ability to adequately recapitalize the bank and reduce problem assets to a reasonable level. We urge you to withdraw your application and focus your efforts to address the deficiencies and restore the bank to a satisfactory condition.

Before you re-file the application with our office, it is essential that you accomplish, at a minimum, the following:

1.    The risk profile of the bank must be substantially reduced.   In addition to correcting all the noted deficiencies, asset classifications must be reduced to an acceptable level, capital must be substantially augmented, and the bank must be restored to a satisfactory condition.

2.    Management must be strengthened through the hiring of a qualified chief executive officer, a senior lending officer, and a cashier. An adequate and sustained level of directorate oversight should be evidenced.

3.    Acceptable policies and procedures for all functional areas of the bank must be developed and implemented, with a system established to monitor their adherence.

4.    Earnings must improve. A realistic budget, as well as short and long range strategic business plans, must be developed to provide for a clear set of goals and objectives for a profitable and viable operation.

5.    All violations of laws and regulations, both applicable currently and if the bank is under FDIC insurance, must be corrected. Bank officials must become sufficiently knowledgeable of governing laws and regulations applicable to insured institutions to ensure future compliance.

EXHIBIT D-5

6.   Conflicts of interest involving the Hillblom Estate must be resolved and future transactions must be guided by adequate policies and procedures. This includes a clear course of action by the board with respect to the possible reversal of the $3.5 million capital injection made by the Estate in 1995.

Many of the tasks noted above will require substantial expertise which the bank does not possess. We believe it is only beneficial to the bank to obtain qualified assistance and resources necessary to handle regulatory matters in particular. To the extent possible, this office is willing to assist you in working toward a mutually achievable solution.

Please respond to us in writing by August 29, 1997 with any comment you may have regarding the issues discussed in this letter and whether you are willing to withdraw the application.

Please do not hesitate to contact myself, Deputy Regional Director Sue P. Carroll or Case Manager Louis C. Cheng at 415-546-0160 if you have any questions.

Sincerely,

George J. Masa
Regional Director


cc:   Mr. Oscar C. Camacho
      Director of Banking


# EXHIBIT D-6

# Exhibit E



# Department of Commerce
## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS
Caller Box 10007 CK., Saipan, MP 96950
Tel. (670) 664-3000/t • Fax: (670) 664-3067

May 28, 2002

Board of Directors
Bank of Saipan
P.O. Box 500690
Saipan, MP 96950

RE: Continued Receivership Determination pursuant to 4 CMC § 6106(f)

To the Board of Directors:

On April 30, 2002, Acting Secretary of Commerce through his powers as the Director of Banking, issued a notice and a determination that Bank of Saipan was in violation of 4 CMC § 6106(f). See Exhibit "A" Letter to Benigno Fitial, CEO Bank of Saipan. Through your attorney Robert Goldberg, you stipulated to the appointment of the Receiver. The Commonwealth Trial Court ordered that a receiver be appointed for the Bank of Saipan. Acting Secretary comes now to issue his support for his determination regarding the financial condition of the Bank pursuant to 4 CMC § 6106(f). The Acting Secretary reserves the right to supplement these findings as new relevant facts come to light.

1.     The Acting Secretary's action of placing Bank of Saipan in receivership on April 30, 2002 was an agency determination pursuant to 4 CMC § 6106(f).

The continued receivership of BOS is proper where if any one of the following conditions exist at the Bank:

   a.   If the Director has reason to believe that the bank is not in sound enough financial condition to continue doing business.

   b.   Its affairs are being conducted in such a manner that the public and/or depositors are in danger of being defrauded. See 4 CMC § 6106(f)

On April 30, 2002, the Acting Secretary determined that these conditions were applicable and applied to the Commonwealth Trial Court for the appointment of a receiver. See Attached Declaration of Fermin Atalig. The Bank of Saipan stipulated on April 30, 2002 to the appointment of a receiver in open court.

1

RECEIVER'S - 000378

RECEIVER'S - 000637

EXHIBIT
A

Ex. A - 1

EXHIBIT E-1

2.    Continued Finding that Bank of Saipan is not in sound financial condition.

a.    Historically, the Bank has engaged in unsound business practices that have culminated in the unsound financial condition.

The Bank was not in sound financial condition as of August 1997.  The Bank has been on notice of this when the FDIC in 1997 made a finding that:

" According to our established regulatory standards and examination findings, your bank is in poor overall financial condition. [Emphasis added] Asset quality is unsatisfactory, the bank is structurally unprofitable, risk management and forward planning are nonexistent, and capital is insufficient given the significant weaknesses with which the bank is confronted. Our examiners have found unfavorably on six of the seven statutory factors under Section 6 of the FDIA. As such, we are prepared to forward a denial recommendation for your application to our Washington D.C. office. Before the official recommendation is made, we hereby offer you our pre-decisional assessment of the application and an opportunity for your group to withdraw the application rather than face a potential formal denial. FDIC final actions are publicly available and include the basis for decisions. Exhibit "B" FDIC Report on Bank of Saipan, dated, August 13, 1997.

Since this time, the Bank's Board of Directors [Directors] has not taken any substantive actions to remedy the Bank's condition. The Bank's Directors have never adequately dealt with any of these problems.

FDIC's assessment is corroborated by the 1997, 1998, 1999 and 2000 audit by Deloitte Touche Tohmatsu [hereafter "D & T"]. See Exhibit "C", Exhibit "D", Exhibit "E", Exhibit "F". According to D & T, over a long year period there were consistently overall poor risk management practices in the 5 critical areas of (i) Allowance for Loan Losses (basic asset management), (ii) Loan documentation; (iii) Concentrations of Credit Risk; (iv) weak Electronic Data Processing; (v) improper valuations of mortgaged property.

D & T's 1997 report basically affirmed the FDIC's report. The subsequent reports for years 1998 and 2000 demonstrate only modest attempts to address the problems highlighted in 1998, 1999, and 2000. D & T did not find any changes in the area of loan documentation and file maintenance.

"We have identified significant technical weaknesses in credit administration. These include, but are not limited to, lack of appraisals, aged financial information on commercial loans in which debt service is dependent on cash flows from operations, little or no documentation of inspections performed by the Bank, expired or no hazard or liability insurance in which the Bank is identified as the loss payee, loan approval not documented in the credit files, etc..., Exhibits "C", "D", and "E" D & T Reports 1998, 1999, 2000 at paragraphs (4)(2) (1) respectively.

RECEIVER'S 000379

RECEIVER'S 000638

Ex. A - 2

EXHIBIT E-2

As noted this is the exact same language used for the last four years to describe the critical area of loan file maintenance. This evidence demonstrates an utter disregard for normal banking practices and puts the depositors' funds at substantial risk. Lastly, the report by Columbia Financial Services concurs with the assessments made by D & T. Exhibit "S", Columbia Financial Services Report.

In 2000, D & T noted that Bank's (new) policy to review loans with current balances of $100,000 or greater. The "Allowance for Loan Losses Report for Quarter Ended September 30, 2000" (generated by the Directors' review) did not contain details necessary to support the evaluation of the loan portfolio and the adequacy of the allowance for loan losses." Exhibit "P", D &T Report 2000. The most modest attempts to rectify this situation have been substantially deficient. The Acting Secretary can only conclude that the present Board of Directors is either generally incapable or suitably unwilling to perform their statutory and fiduciary duties towards the depositors.

   b. Current Financial Condition is not sound.

The current financial condition as of the date of the closing of the Bank by the Acting Secretary is miserable. The Bank had $41,000,000 in deposits. As of May 24, 2002, the Bank has $5,040,833 in demand deposits. Also as of May 24, 2002, the Bank has only $4,020,877 in cash that was not pledged as security for government deposits. The cash account includes the cash in the Federal Reserve Bank of approximately $1,200,000. This Federal Reserve account will need continued funding if the Bank is going to resume normal operations. This cash was reduced by the limited withdrawals on demand deposit accounts allowed by this Court. See Exhibit "G" Court Order.

   i. Bank's assets will need to be written down.

At present there is little or no market for the loan portfolio of the Bank. The Bank is unable to raise cash by selling loans because the loans are not salable. This is made apparent by the attached letters from Bank of Hawaii (See Exhibit "H"), First Hawaiian Bank (See Exhibit "I"), Bank Pacific (See Exhibit "J") and Citizens Security Bank (See Exhibit "K"). The Bank's Directors have been on notice since 1997 that it was in no condition to withstand any crisis or run on the Bank."

While the Bank's financial statements indicate a solvent bank, the Acting Secretary believes that he may be required to write down the Bank's loan portfolio pursuant to 6 CMC § 6107(d). This will further demonstrate the unsound financial condition of the Bank. The letters from local banks expressing disinterest in purchasing loans leads the Acting Secretary to believe further action by the receiver will be necessary to determine the true market value of the loan portfolio. This write down may well result in a determination that the Bank is not in sound financial condition.

There appears to be an extreme discrepancy between the value of the loans as represented by the Bank's books and what other banks are willing to pay for these assets.

RECEIVER'S - 000380

RECEIVER'S - 000639

Ex. A - 3

EXHIBIT E-3

In order to independently determine the value of the loan portfolio, since it appears to differ from the value shown on the books of the Bank, the receivership of the Bank has grounds to continue.

3.    Acting Secretary of Commerce believes that the present Bank Directors are inadequate.

The FDIC noted that the current Directors are not sufficient. In light of the present debacle, the Acting Secretary needs to aggressively re-affirm the FDIC conclusion that:

> " Supervision by the board of directors is inadequate, and the senior management team needs to be strengthened. There are virtually no formal policies and procedures in all major functional areas, including, but not limited to: lending, asset liability management, liquidity, interest rate risk, investment, information systems, Bank Secrecy Act, risk management, trust operation, security, and internal audit. Forward planning has generally been nonexistent, and management's ability to respond to changing circumstances is limited. Collectively, significant regulatory concerns regarding demonstrated management weaknesses are a major threshold concern and impediment to insurability." see Exhibit "B" FDIC Report on Bank of Saipan, at 2.

The conclusion that the Directors were unwilling, or unable, to take the steps necessary to protect its depositors, is blatant. The Acting Secretary currently believes that it is too late for the Bank's Directors to now promise to look forward; they were unable to do so in the past. Accordingly, the Bank's fiscal situation being so dire, limited withdrawals with no prospect for an immediate repayment. A permanent receiver must be appointed to do what the Board did not do.

Most disturbing of all to the Acting Secretary is the total lack of concern the Directors have shown for the depositors. There is little or no concern reflected in these transcripts for the safety of the depositors. Directors' meetings from May 26, 2001 to February, 2002. See Exhibit "L" at 7-129. There is little or no serious discussion of improving the Bank, or implementing the reforms that were urged four years before by FDIC. It appears to be more concern for selling their shares at above market price than the concern with respect to the overall running of the Bank. The transcripts reflect no attempt at performing due diligence, by either the Board or its counsel, to make sure the Bank was not being sold to con artists, despite a fiduciary duty to do so. Mr. Schoen, Chief Operating Officer of the Bank, was so concerned about this lack of due diligence that he warned the Board:

> "... we need to address the FDIC project and I want to find out from the Board whether in fact the Board is seriously in considering selling the Bank to any new perspective buyer, if there's any. Because what I am getting information form perspective buyer is that they don't want to see the bank become FDIC." See Exhibit "L" at 248.

4

RECEIVER'S - 000381

RECEIVER'S - 000640

Ex. A - 4

EXHIBIT E-4

Acting Secretary finds the utter disregard by the Directors to inquire into why would be purchasers would not want an FDIC bank. Even after this, the Directors and their legal counsel took no action to perform a simple background check of the prospective purchasers. By simply entering the name Dusean Berkich in an internet search engine reveals that this individual had been involved in bank fraud in the Caribbean. See Exhibit "M", "In the Matter of the Order for the Winding up of First International Bank of Grenada Limited: First Report of the Liquidator"

Further, the transcripts reflect bonuses and dividends approximately $1,000,000 being awarded when the Bank was in no financial condition to pay them.

4.      Acting Secretary of Commerce has found sufficient evidence to demonstrate that depositors have been defrauded within the meaning of 4 CMC § 6106(f).

There can be no dispute that the affairs of the Bank are being " conducted in such a manner that the public or the persons having securities or funds under its custody are in danger of being defrauded." 4 CMC § 6106(f). The former Chief Executive Officer of the Bank and the Directors allowed the purchasing group of Berkich, Wilson, and Montgomery to take de facto control of the Bank. Subsequently the Federal Court of the Northern Mariana Islands issued an indictment for the purchasing group members and the former CEO. See Exhibit "N", Federal Indictment. The actions by these gentlemen have defrauded the bank and its customers of their funds. Wilson entered a guilty plea in the Federal District Court of the Northern Mariana Islands.

a.      The Bank provided false or misleading statements to Commonwealth Government and its agencies.

The Bank provided false or misleading information when the CNMI Government depositors made inquiry to the Board of Directors. See Exhibit "O", BOS Letter to NMI Retirement Fund;  Exhibit "P" BOS Letter to Marianas Public Land Authority. CNMI law requires certain government deposits to be 100% collateralized. Government Deposit Security Act 1 CMC § 7723 et seq.

The Bank has $6,390,480 in U.S. Government securities and $6,638,881 Commonwealth Development Authority guaranty of certain loans securing $15,832,009 of government deposits. Exhibit "Q", Current Financial Statement of the Bank. The Bank pledged the same securities to two different Commonwealth agencies. The letters to the NMI Retirement Fund from the Bank demonstrate that the Bank was offering the same funds, $5,390,480 of U.S. Government Securities and CDA guaranteed loans of $6,638,881 to secure NMI Retirement deposits totaling $5,570,366.79. In the subsequent letter to MPLA, the Bank offered the same funds as collateralizing MPLA deposits in excess of $8 Million. Lastly, there are CNMI Treasury deposits of approximately $300,000. The grand total of all government deposits is $15,832,009, the total amount that is available for collateralization is $12,029,361. This leaves approximately $3.5 million in government deposits unsecured. This heightens the Acting Secretary of Commerce belief that there is a serious danger of fraud being perpetrated on investors

RECEIVER'S - 000382

RECEIVER'S - 000641

Ex. A - 5

EXHIBIT E-5

caused by the way the Bank has conducted its business. A continued receivership is the only remedy, the Acting Secretary of Commerce's opinion, to protect the public and the depositors of the Bank.

b.    Misappropriation of Bank funds by certain Directors.

Acting Secretary concludes that the Bank remain in receivership where the current Directors who were not federally indicted are in possession of Bank assets. During the continued receivership, a plan will be fully developed to address the issues outlined in the Berger & Comer report. See Exhibit "Q" Berger & Comer report details the misappropriation of bank funds in the amount of $3,587,886 by the Calvos and JLH Pacific Trust. The cancelled checks indicate that these checks were drawn on the Bank of Saipan. See Exhibit "R". There is no Board action authorizing the use of Bank funds nor was this "financing" of the sale disclosed to the Banking Division. The transcripts of the Board Minutes of December 12, 2001, show the fact that the selling Shareholder/Directors attempted to conceal this transaction from the other non-participating Directors. Again, given the actions and inactions by the current Directors, the Acting Secretary finds a need for a continuing receivership.

c.    Acting Secretary finds that the present Board of Directors is inadequate to govern the affairs of the Bank.

The Directors have failed to take the steps to ensure independent legal representation of the Bank. This is untenable from the Acting Secretary's viewpoint. These views are expressed in the Acting Secretary's Motion to Disqualify the Law Firm of Calvo & Clark filed on May 25, 2002.

4. Possible Criminal Violations

Once all facts are known, the Acting Secretary intends to request the Attorney General to make a determination on whether or not the director/shareholders receiving or authorizing the disbursement of $3,587,886 in payments from the Bank violated 4 CMC § 6805.

4 CMC §6805 Unlawful Concealment of Transactions

It is unlawful for an officer, director, employee, attorney or agent of a bank to conceal any transaction of the bank to conceal or endeavor to conceal any transaction of the bank from any officer, director, or employee of the bank or any official or employee of the department to whom it should be properly be disclosed.

Until a determination is made on this issue it is necessary for an independent receiver to remain in control of the Bank.

6

EXHIBIT E-6

5. Violation of Commonwealth Law of Corporations regarding minority shareholders.

The Acting Secretary is also concerned of the possible violation of 4 CMC § 4106.

> **4 CMC § 4106(c)**
> If any officer, director, or controlling shareholder, in violation of his fiduciary duties, unlawfully takes funds or assets belonging to the corporation, this taking shall in addition to any other remedies provided by law or regulation be deemed to be a repurchase by the corporation of capital stock of such officer, director, or controlling shareholder. The value of the stock repurchase shall be based on the fair market value of the corporation's stock on the date of the unlawful taking.

The Acting Secretary will also direct the receiver to examine the applicability of this provision of the statute to the events culminating in the use of the Bank's money to allegedly purchase treasury stock from the Calvo's and the JLH Pacific Trust. The Directors who participated in the "sale" of the shares of the bank may have violated this provision. The violation of this provision would make these Board members/shareholders no longer eligible to participate in the corporation as shareholders. Furthermore, the Acting Secretary believes that the receivership must continue until this issue is resolved around ownership of the Bank's stock as based upon the application of this law 4 CMC § 4106(c).

Pursuant to 4 CMC § 6106, the Board of Directors has thirty (30) days from the date of determination to appeal to the Commonwealth Trial Court. Please contact us if you need any further assistance.

Sincerely,

Fermin M. Atalig
Acting Secretary of Commerce

7

RECEIVER'S - 000384

RECEIVER'S - 000643

Ex. A - 7

EXHIBIT E-7

# Exhibit F

Gregory Baka (F0199)
Acting Attorney General

Tom Schweiger (F0196)
Assistant Attorney General
Office of the Attorney General
Juan A. Sablan Memorial Building
Capitol Hill, 2nd Floor
Caller Box 10007
Saipan, MP 96950

(670) 664-2341
(670) 664-2349 Fax

**E-FILED**
CNMI SUPERIOR COURT
E-filed: Dec 12 2008 5:06PM
Clerk Review: Dec 18 2008 1:26PM
Filing ID: 22882153
Case Number: 04-0449-CV
Elsa Duenas



## IN THE SUPERIOR COURT

## FOR THE

## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| BANK OF SAIPAN, INC.,<br>　　　　Plaintiff<br><br>v.<br><br>RANDALL T. FENNELL et. al,<br>　　　　Defendants | ) C.A. No. 04-0449<br>)<br>)<br>) **NOTICE OF DECLINATION**<br>) **TO ACT ON DEFENDANT**<br>) **FENNELL'S REQUEST**<br>) **FOR CERTIFICATION**<br>) |

The Office of the Attorney General of the CNMI declines to issue an opinion on whether the CNMI Government had the power "to control the detailed physical performance" of the "day-to-day operations" of the Court Appointed Receiver Mr. Randall T. Fennell, so as to make him a government employee rather than an independent contractor. See U.S. v. Orleans, 425 U.S. 807 (1976), Logue v. U.S., 412 U.S. 521 (1973).

Date: Dec. 12, 2008　　　　　Tom Schweiger

Tom Schweiger – Assistant Attorney General

# EXHIBIT F