# EXHIBIT 4

1  CALVO & CLARK, LLP
2  1st Floor, Macaranas Building
   PMB 951 Box 10001
3  Saipan, MP 96950
   Telephone:    (670) 233-2045
4  Fax:          (670) 233-2776

5  LAW OFFICE OF WILLIAM M. FITZGERALD
6  2nd Floor, Macaranas Building
   Post Office Box 500909
7  Saipan, MP 96950
   Telephone:    (670) 234-7241
8  Fax:          (670) 234-7530

9  *Attorneys for Plaintiff The Bank of Saipan, Inc.*

10

11              IN THE SUPERIOR COURT
                     FOR THE
12  COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

13  THE BANK OF SAIPAN, INC.,                    Civil Action No. 04-0449A

14                Plaintiff,

15        v.                              **THE BANK OF SAIPAN'S RESPONSE
                                           TO RANDALL FENNELL'S PETITION**
16                                         **UNDER P.L. 15-22 AND RENEWED**
                                           **REQUEST FOR A THRESHOLD**
17  RANDALL T. FENNELL; RICHARD            **HEARING**
    PIERCE; WHITE, PIERCE, MAILMAN &
18  NUTTING; DAVID W. AXELROD;
    SCHWABE, WILLIAMSON & WYATT;
19  AND DOES 1-20,                         **Date: _____**
                                           **Time: _____**
20                Defendants.              **Judge: Hon. Arthur R. Barcinas**

21

22

23

24

25

26

27

28

## **INTRODUCTION**

In November 2008, after this Court's appointment to hear this long-delayed matter that has languished since 2005, the plaintiff Bank of Saipan (the "Bank") filed a scheduling conference request seeking to have the Court establish a hearing schedule and pre-trial and discovery deadlines.  In that request, the Bank sought a hearing date on the threshold issue of Fennell's claim that he is immune from lawsuit as a former receiver of the Bank and/or entitled to indemnity from the Bank.  Under the Supreme Court's prior decision in In re Bank of Saipan, 2005 MP 3, at ¶ 10, such immunity was not automatic, but rather had to be "'resolved at a plenary hearing with sworn witnesses and documentary proof, so that the question of law as to whether the Receiver breached any duty owing a fiduciary may be fairly resolved.'"

The Defendants in this action did not oppose the scheduling conference request, but they did oppose having a threshold fact-finding hearing, in direct contravention of the Supreme Court's prior mandate.  Further, defendant Fennell stated that he was (inconsistent with his claim that he was a Bank employee who had to be indemnified by the Bank) also maintaining his claim that he was a government employee entitled to be defended by the CNMI Government under P.L. 15-22.  In response, the government declined to grant Fennell's claim in a "Declination to Act" filed with this Court.

On January 9, 2009, Fennell, filed a petition with the Court for certification pursuant to P.L. 15-22 seeking to have the Court certify that the CNMI government has to defend him (and take his place) in this lawsuit as an alleged "employee" of the government.  In that "petition," however, Fennell failed to include any facts or legal basis supporting his claim, instead asking the Court to delay acting while instead hearing Fennell's motion to dismiss.   As explained below, these inconsistent positions by Fennell are untenable and prejudicial to the fair prosecution of this case, and a threshold hearing should be set in accordance with the Supreme Court's decision.

## ARGUMENT

**I.    Fairness and the Law Dictate that the Claim of Immunity (or Indemnity) Should Be Heard at the Start of the Suit, Not Be Used as an Indeterminate Threat to Moot Plaintiffs' Success in this Action at Some Time in the Future**

What Fennell is proposing is that he is somehow immune from suit or that -- even if Plaintiffs succeed in their claims against him -- the Bank or the government will nonetheless have to indemnify him for the very judgments they obtain against him.  No plaintiff will want to pursue an action where the defendant is immune, or where the plaintiff has to indemnify the defendant for the very judgment obtained; that would simply add injury to injury, literally causing a plaintiff to spend money to obtain a judgment for its injuries that it had to pay itself.  That is why, as previously briefed, courts have long held that immunity and related claims have to be heard at the very threshold of the case.  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (collecting authorities).  In comparison, what Fennell is proposing would unfairly and prejudicially expose the Bank and the government to unnecessary risk by allowing him to first have his motion to dismiss heard, and only then have a decision be reached on immunity or indemnification.  Fennell has cited no case law supporting such an unfair approach, and indeed that is not the law.

The fact is that Fennell is being sued for acts for which neither the government nor the Bank bear responsibility, and they should have an immediate opportunity to present such evidence to the Court at a fact-finding hearing as instructed by the Supreme Court.  In fact, the government itself was a depositor in the Bank of Saipan injured by Fennell's misconduct, and it has now sued Fennell in this case.  Specifically, the Marianas Public Land Authority (MPLA)[1] was permitted to intervene in this action as a plaintiff and has filed a complaint.  That complaint, which is supported by extensive documentation and is attached hereto as Attachment A, identifies

---

[1] The successor-in-interest to MPLA, the Department of Public Lands, is now prosecuting MPLA's claims under the Court's August 31, 2006 Order.

numerous acts of misconduct by Fennell for which he bears the responsibility. Although this should be the subject of the Court's threshold fact-finding hearing, it is important that the Court understand what the misconduct at issue includes. For example, Exhibit 1 on page 26 to MPLA's complaint records that Fennell and his codefendants made a secret payment of over $12,000 for information from a former law clerk to CNMI Supreme Court Justice Castro – an illicit payment that was hidden from the receivership court. Exhibit 5 to MPLA's complaint shows that Fennell offered assistance against the Bank's interest to the criminal defense counsel for one of the people who had defrauded the Bank and its depositors. Exhibit 6 to MPLA's complaint shows that Fennell and his co-defendants spent thousands of dollars of the Bank's and depositors' dollars on a media campaign aimed at savaging the reputation of the Bank and certain Commonwealth Judges, despite his duties as receiver to protect the Bank and its assets. Finally, Exhibit 3 to MPLA's complaint shows Fennell and his co-defendants hid from this Court their past conflicts and vendetta based on their belief that they (in their words) "got screwed" in prior litigation involving the multi-million dollar Hillblom estate that the Bank had administered and that Fennell had represented a claimant against.

Thus, the Bank and the government have every reason to believe they should prevail at the threshold hearing on immunity and indemnification, but that is no reason to permit Fennell to indefinitely delay that hearing. To the contrary, it is completely unfair that Fennell has been permitted to indefinitely extend this litigation for over four years (at great cost to plaintiffs) while keeping his unsupportable immunity and indemnification claim (which he still has yet to demonstrate has any validity at all) hanging over the plaintiffs' heads.

## II. Fennell's Claims to Immunity or Indemnity against the Government or Bank Raise Similar Identical Issues and Should Be Heard at the Same Initial Plenary Hearing

Fennell also is incorrect in trying to separate out his claims to immunity or indemnity against the Bank or government – the fact is that the issues substantially overlap and need to be

4

heard together.  Specifically, as to his claim of indemnity or immunity from the Bank, Fennell will not be entitled to indemnity, and he is not immune from suit, for acts taken in his personal capacity. *Bank of Saipan*, 2005 MP 3, at ¶ 14; *INF Enters. v. Donnellon*, 729 N.E. 2d 1221, 1222 (Ohio App. 1999) ("If the receiver exceeds the authority granted by the court or fails to use ordinary care, the general rule is that he or she may be sued in a personal capacity.").  Fennell also is not entitled to immunity or indemnity for acts performed in bad faith, or for acts in excess of court orders as to his powers as receiver. *Id.*

This is very similar to the issues raised by Fennell's claim against the government. Fennell is seeking to have the government defend him under P.L. 15-22, which is the Commonwealth Employees' Liability Reform and Tort Compensation Act of 2006 ("CELRTCA" or the "Act"), codified at 7 C.M.C. §§ 2201-2210.  Under 7 CMC § 2209, a claim is submitted to the Attorney General, who must determine whether to certify "that the employee was acting within the scope of his/her office or employment at the time of the incident out of which the claim arose."   7 CMC § 2210(a).  If the Attorney General refuses to "certify scope of office or employment, the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his/her office or employment." Id. § 2210(b).

Here, there are at least two independent grounds for refusing to certify:  (1) Fennell was not an "employee" of the NMI government within the meaning of the Act while he was receiver of the Bank; and (2) the suit against Fennell concerns conduct outside of the scope of Fennell's duties as receiver, even had he been employee.[2]

First, 7 CMC § 2202 states that the Commonwealth will only be liable for acts by "employees."  7 CMC § 2201(4) defines "employee" as follows: "an officer, elected or appointed

---

[2] As Fennell has not yet filed a brief in support of his petition, and no fact-finding hearing has yet been held, the Bank cannot yet seek to set forth a comprehensive response to Fennell's petition, and it reserves the right to further brief the issue.

official, exempted service, excepted service, classified or unclassified employee, or servant of a public entity, whether or not compensated, but does not include an independent contractor of the Commonwealth.   Employee includes former employees of the Commonwealth."   However, Fennell was never employed by any public entity; he was appointed to be the receiver for the Bank of Saipan – a private entity.   Fennell also asserts that the Bank must indemnify him as its former receiver, which is inconsistent with his claim to have been a government employee.

As suggested in the government's Declination to Act, at best, Fennell's relationship to the Commonwealth was as a temporary independent contractor of the courts – which does not qualify under the Act.   This is shown by the fact that he received payment from the Bank (not the government), was ineligible for worker's compensation from the government or similar benefits, was not on the government's payroll, and was not treated as an employee for taxes purposes.[3]   *Cf. State ex rel. Schaengold v. Ohio Pub. Employees Retirement Sys.*, 870 N.E.2d 719, 722-23 (Ohio 2007) ("Schaengold was an independent contractor rather than a public employee when he served as a temporary magistrate for the Dayton Municipal Court.   Schaengold was paid a flat fee by bilateral contract for services performed, was not eligible for workers' compensation, unemployment compensation, or employee fringe benefits, did not appear on either the city's or municipal court's payroll, was not controlled or supervised in conducting hearings or in issuing decisions, and received IRS form 1099 for tax purposes.").

Second, certification of claims under CELRTCA requires a fact-finding determination that the employee was acting "within the scope of his/her office or employment."   7 CMC § 2210(a); *accord* § 2202(a).   As recited above, the allegations in the lawsuit are that Fennell exceeded his powers as receiver and acted outside the scope of any employment he had.   Furthermore, the

---

[3] Fennell also made a claim against the Bank's insurance policy.   It is plainly inconsistent for Fennell to claim he was a government employee, and yet make a claim under a private corporation's insurance policy.

Commonwealth Supreme Court has held that whether a receiver acted within his authority requires a plenary factual hearing, which has yet to occur. *Bank of Saipan*, 2005 MP 3, ¶ 10. For all of these reasons, Fennell is not being sued for conduct within the scope of his employment.

In sum, Fennell's claims as to the government and the Bank will turn on questions of whether he was an employee of the Bank or government, and whether he was acting within the scope of his employment or powers in taking the tortious actions he took to destroy the Bank and harm its depositors, including the government. These issues thus should be heard together at an initial, plenary fact-finding hearing to be scheduled as soon as the Court's calendar permits.

**CONCLUSION**

As has been set out in the Bank's scheduling conference request, the threshold immunity and indemnification issues need to be heard now. It is not fair to the government or to the Bank for Fennell to be able to file a claim to have the government or Bank defend him in this action, yet to have Fennell try to have his cake and eat it too by indefinitely delaying the fact-finding hearing on his claims while he proceeds with an expensive, vigorous defense. Both the Bank and government are entitled to an initial, fact-finding plenary hearing at the threshold of this case to determine, once and for all, the merits (or lack thereof) of Fennell's immunity and related indemnification claims.

Respectfully submitted this 21st day of January, 2009.

CALVO & CLARK, LLP

By:  _____/s/_____
DANIEL M. BENJAMIN (F0309)
Counsel for Plaintiff
The Bank of Saipan, Inc.

# ATTACHMENT A

RAMON K. QUICHOCHO, ESQ.
2nd Floor, V.S. Sablan Building, Chalan Piao
P.O. Box 505621
Saipan, MP  96950
Tel. No.:  670.234.8946
Fax:  670.234.8920
Email:  rayq@vzpacifica.net

*Attorney for Intervenor Board of MPLA*

MATTHEW T. GREGORY, ESQ.
2nd Floor, V.S. Sablan Building, Chalan Piao
PMB 419 Box 10000
Saipan, MP  96950
Tel. No.:  670.234.3972
Fax:  670.234.3973

*Attorney for Intervenor MPLA*

## IN THE SUPERIOR COURT
## OF THE
## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| THE BANK OF SAIPAN, INC., ) | **CIVIL ACTION NO. 04-449A** |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| RANDALL T. FENNELL; RICHARD PIERCE; ) | |
| WHITE, PIERCE, MAILMAN, & NUTTING; ) | |
| DAVID W. AXELROD; SCHWABE, ) | |
| WILLIAMSON, & WYATT; AND DOES 1-20, ) | |
| ) | |
| Defendants. ) | |
| ——————————————————— ) | **COMPLAINT AND** |
| BOARD OF THE MARIANAS PUBLIC ) | **DEMAND FOR JURY TRIAL** |
| LANDS AUTHORITY AND MARIANAS ) | |
| PUBLIC LANDS AUTHORITY, for themselves ) | |
| and on behalf of the Northern Marianas Descent, ) | |
| ) | |
| Intervenor-Plaintiffs ) | |
| ) | |
| v. ) | |
| ) | |
| RANDALL T. FENNELL; RICHARD PIERCE; ) | |
| WHITE, PIERCE, MAILMAN, & NUTTING; ) | |
| DAVID W. AXELROD; SCHWABE, ) | |
| WILLIAMSON, & WYATT; AND DOES 1-20, ) | |
| ) | |
| Intervenor-Defendants. ) | |

*1*

COME NOW, the Board of the Marianas Public Lands Authority (the "Board"), by and through counsel, Ramon K. Quichocho, Esq., and the Marianas Public Lands Authority (the "MPLA"), by and through counsel, Matthew T. Gregory, Esq., and allege as follows:

## I.
## INTRODUCTION

1. As trustees for the Northern Marianas Descent, the Board and MPLA receive monies derived from the leasing of Northern Marianas Descent public lands to develop homesteads, among other things. As a result, MPLA has deposited project funds with the Bank of Saipan.

2. Unfortunately, the Bank of Saipan was placed in receivership, and Randall T. Fennell was appointed receiver. Due to the subsequent wrong acts of Defendants complained of herein, homestead development has been seriously impaired.

3. Looking back, it was a sad and dark period during April 30, 2002, to September 27, 2002, for the Bank of Saipan, the depositors (including MPLA), and the people of the Commonwealth due to the reprehensible conduct of the Defendants when they were put in a position of trust.

4. Unlike his successor, Mr. Antonio Muna and his counsel, who successfully opened the Bank of Saipan with a Rehabilitation Plan, Mr. Randall T. Fennell and his counsel sought to permanently close the Bank of Saipan with a Liquidation Plan with a vengeance.

5. The Board and MPLA bring this complaint, for themselves and on behalf of the Northern Marianas Descent, against Defendants Randall T. Fennell, Richard Pierce, Esq., and his firm White, Pierce, Mailman & Nutting ("White-Pierce"), off-island attorney David W. Axelrod, and his firm Schwabe, Williamson & Wyatt P.C. ("Schwabe"), who defrauded the Board,

MPLA, the Bank of Saipan, Inc. ("Bank"), and its depositors, deceived the Court, and breached their fiduciary duties to the Board, MPLA, the Bank, and its depositors and shareholders.

6. Fennell was the former temporary receiver for the Bank. Instead of trying to protect the assets of the Bank, he and his attorneys abused their positions of trust by forming a secret and unlawful scheme to destroy the Bank to settle old scores with the Bank's directors and majority shareholders. Defendants publicly disparaged the Bank and tried to liquidate the Bank when it was solvent, to the detriment of the public, the Bank, its employees, shareholders, and depositors, including MPLA. As part of their scheme, they repeatedly defrauded the Court, the Bank, the Board, and MPLA.

7. Axelrod and Schwabe secretly made an unlawful cash payment of $11,977.40 to CNMI Supreme Court Associate Justice Alex Castro's former Special Research Attorney/law clerk "at Receiver's Request" as part of their campaign to smear CNMI judges and scheme to ruin the Bank. This illicit payment and other secret receivership work were concealed from the Court apparently through a separate Schwabe trust account related to the *Hillblom Estate* case. A true and correct copy of their secret bills reflecting this payment, which they concealed from the Court, is attached as Exhibit 1.[1]

8. In addition to repeated fraud on the Court, Defendants engaged in media campaigns specifically directed at influencing judicial proceedings and to deceive the Court, Bank customers and depositors, including MPLA, and the public at large. Defendants conspired with the Bank's litigation adversary to the detriment of the Bank and its depositors, such as MPLA.

9. Upon information and belief, Defendants conspired to cooperate with convicted criminals Bert Montgomery and others (the "Montgomery gang") to hurt the Bank and its

---

[1] The Exhibits attached hereto contain highlighting to emphasize relevant portions but are otherwise authentic.

*Complaint and Demand for Jury Trial*

depositors. They deliberately caused widespread economic hardship to many private depositors throughout the CNMI. Some, if not all, of these acts were crimes. All of them injured the Board and MPLA.

10. Defendants were entrusted by the CNMI Superior Court to safeguard, preserve and protect the Bank and its assets. In addition to owing a fiduciary duty to the Bank, they owed a fiduciary duty to all entities with an interest in the rehabilitation of the Bank, including the Board and MPLA. Instead of honoring their duties, they attempted to ruin and liquidate the Bank while it was solvent, refused to collect loans, and failed to pursue claims against those who defrauded the Bank. In doing so, they violated their fiduciary obligations to the Bank and its depositors, including the Board and MPLA and must pay for all of the damages that they caused.

## II.
## JURISDICTION AND VENUE

11. This Court has jurisdiction over this matter pursuant to N.M.I. Const. art. IV, § 2, and 1 CMC § 3202.

12. Venue is proper in the Superior Court of the Commonwealth of the Northern Marianas Islands in Saipan.

## III.
## PARTIES

13. Plaintiff Board is the successor to the Marianas Public Land Corporation and is responsible for the management, use, and disposition of public lands on behalf of all the Northern Marianas Descent.

14. Plaintiff MPLA is an independent public corporation of the CNMI, which is established by PL 12-33, as amended by PL 12-71, pursuant to N.M.I. Const. art. XI. It is established under the control and general supervision of the Board.

15. Plaintiff The Bank of Saipan, Inc., ("Bank"), is a CNMI corporation, currently in receivership, duly-licensed and authorized to engage in retail banking activities in the Commonwealth.

16. Upon information and belief, Defendant Randall T. Fennell ("Fennell") is a resident of the Commonwealth of the Northern Mariana Islands who served as the receiver of the Bank from April 30, 2002, to September 27, 2002.

17. Defendant Richard Pierce ("Pierce") is a resident of the Commonwealth of the Northern Mariana Islands.

18. At all relevant times herein, Defendant White-Pierce was a CNMI law firm.

19. Upon information and belief, Defendant David W. Axelrod ("Axelrod") is a resident of Portland, Oregon.

20. Upon information and belief, Defendant Schwabe is a Portland, Oregon law firm.

21. Except as described herein, the true names of the defendants sued as Does 1 through 20, inclusive, are unascertained to the Board and MPLA which therefore sues these defendants by such fictitious names. The Board and MPLA will amend this Complaint to allege their true names and capacities when ascertained. These fictitiously named defendants were involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions. These defendants aided or abetted, or participated with the other defendants and others in the wrongful acts and course of conduct, or otherwise caused the damages sought herein and are responsible for the acts, occurrences and events alleged in this Complaint.

22. The named and Doe defendants in this action are sometimes collectively referred to herein as "Defendants."

## IV.
## OPERATIVE FACTS

23. On or about April 2002, the Board and MPLA had seven Certificates of Deposit (CD) at the Bank with a total face value of $8,135,724.31 (excluding accrued interest). The Board and MPLA are informed and believe that their deposits were the largest government agency deposits at the Bank and that they are and were among the largest single depositors at the Bank.

24. On April 27, 2002, two of the CDs mentioned above, each with a face value of $1,319,428.18, excluding accrued interest, matured, and were subsequently redeemed, on April 29, 2002, but was not paid out by the Bank because the Bank was subsequently placed under receivership.

25. On or about April 30, 2002, the CNMI Government closed the Bank and filed an *ex parte* petition in the CNMI Superior Court for the appointment of a receiver for the Bank, pursuant to a Commonwealth statute, 4 CMC § 6105, in the case *Acting Secretary of Commerce Fermin M. Atalig v. Bank of Saipan*, Civil Action No. 02-0268B.

26. At the hearing on the petition, held that same date, April 30, 2002, the Bank was ordered into receivership and Fennell was appointed as temporary receiver for 30 days. The April 30, 2002 Order set forth Fennell's limited powers as temporary receiver. Fennell held the position of temporary bank receiver until September 27, 2002.

27. During the beginning of Fennell's temporary appointment as receiver, he and his counsel refused to cooperate and refused to inform the Board and MPLA of the status or security of the Board and MPLA's deposits, including the money held in trust by the Bank.

28. Fennell and his counsel even failed and refused to serve pleadings and papers on MPLA's counsel even after MPLA's counsel filed a notice of appearance and a motion to intervene in the receivership civil action.

29. The Board and MPLA's deposits, including the money held in trust, at the Bank remained frozen until an Order of the Commonwealth Superior Court of August 25, 2004, that has permitted the gradual withdrawing of MPLA's deposits, but has left substantial restrictions on MPLA's rights.

30. At the present time, the Board and MPLA continue to maintain deposits in the Bank, and has only been able to receive such amounts of principle and interest on their deposits as have been authorized for release to it by the Court's Order of August 25, 2004, in the receivership proceedings described herein.

31. On May 8, 2002, Fennell filed his report with the Court, which placed a total freeze on all government deposits only, including all of the Board and MPLA's deposits.

32. During this time, the Board (through its counsel) had attempted to contact the Commonwealth Attorney General's office to have the Board and MPLA's interests represented in the receivership proceedings. However, the Attorney General declined the Board and MPLA's request for legal services. Consequently, on or about May 17, 2002, MPLA filed a motion to intervene in the receivership, which was subsequently granted.

33. Based on court records, in obtaining his appointment as receiver, Fennell deliberately and repeatedly failed to disclose material information that he was bound to disclose to the appointing court, the Bank, and the Bank's depositors regarding his conflicts of interest and hostility against the Bank, its major shareholders, and certain of its directors. Such nondisclosures were intentional, deliberate, or reckless.

34. In connection with his appointment, Fennell retained Pierce, White-Pierce, Axelrod, and Schwabe (collectively, the "Receivership Attorneys") to act as his counsel. The Receivership Attorneys also failed to disclose material information about their conflicts of

interest and how said conflicts would adversely affect their representation of the Bank's court-appointed receiver. These conflicts included that Pierce and White-Pierce had concurrently represented the Bank since 1997 and that Pierce never disclosed or obtained consent to his representation of Fennell. Other conflicts regarding Fennell and the Receivership Attorneys concerned past litigation involving the probate of the Estate of Larry Hillblom.

35. Once appointed and retained, Fennell owed fiduciary duties not only to the Bank, but also to all legitimate claimants of the Bank's assets, including the Board and MPLA. These duties included, without limitation, the duty to conduct the receivership in the best interests of the depositors, to avoid harming the depositors, to disclose all material information affecting the receivership, and to place the interests of the depositors above his own personal interests. At all relevant times, the Receivership Attorneys knew of Fennell's fiduciary duties to the depositors, including MPLA.

36. At all relevant times, Fennell and the Receivership Attorneys were motivated by, and conducted the receivership consistent with, a hidden agenda to destroy rather than rehabilitate the Bank, to the detriment of the Bank, its depositors, and shareholders. Fennell and the Receivership Attorneys thus exercised the receivership powers in a manner inconsistent with the best interests of the Bank and the depositors, including MPLA.

37. Fennell precipitated and engaged in *ex parte* communications with the Court off-the-record, with no recording. On or about May 8, 2002, Fennell filed an *ex parte* petition for "Clarification of Order Granting Petition for Appointment of Receiver." The Court granted Fennell's petition on May 10, 2002, and the Order greatly expanded Fennell's powers as receiver and extended his receivership indefinitely. Notwithstanding this expansion of powers, Fennell exceeded the scope of his powers before and after this Order.

38. During his tenure as receiver, Fennell deliberately and maliciously harmed the Bank, its depositors, employees, customers, directors and shareholders by, *inter alia*, attempting to destroy the Bank instead of working to rehabilitate it. Fennell ignored requests from the Board and MPLA for information concerning their deposits and the money held in trust by the Bank. Fennell actively endeavored to prevent the Bank from participating in discussions and proceedings directly related to the Bank's continued existence and rehabilitation. Fennell's practice of excluding the Bank and depositors from such *ex parte* proceedings that were conducted off-the-record and with no recording was unlawful and inappropriate; and said practice deprived the Bank and depositors of due process of law during the course of the receivership proceedings, in breach of Fennell's fiduciary duty to the Bank and depositors, including the Board and MPLA.

39. Although Fennell had fiduciary duties not to damage the Bank, or its depositors, and to act fairly towards its employees, shareholders, employees, and depositors, he publicly denigrated the Bank while serving as receiver, calling it, *inter alia*, a "failed institution." Such conduct undermined public confidence in the Bank at a critical point in its existence and endangered and retarded the Bank's subsequent rehabilitation efforts.

40. Fennell engaged in one or more "private briefings" with the Court which were normally "off-the-record" and with no recording, for the purpose of advancing his wrongful and damaging agenda, as he knew it would be difficult if not impossible for the Bank and depositors to obtain meaningful and timely judicial review of what Fennell and the Receivership Attorneys said or submitted to the court.

41. On information and belief, Fennell repeatedly refused to meet or cooperate with the Bank's Directors or counsel in furtherance of efforts to rehabilitate the Bank. Fennell's refusal

*Complaint and Demand for Jury Trial*

to work with the Directors at critical times was in breach of his duty to work with the Bank to avoid liquidation and achieve the best possible results for the Bank, its shareholders, depositors, employees, and customers.

42. Fennell reopened the Bank during his tenure, without any rehabilitation plan in place, allowing non-government depositors to withdraw a large percentage of the Bank's deposits and precipitating a "run" on the Bank, seriously eroding the Bank's financial status and endangering its ability to become rehabilitated. This was of particular harm to the Board and MPLA because, at that time, they remained unable to withdraw their funds.

43. Fennell acted as receiver for the Bank from April 30, 2002, until he was removed by order from the Supreme Court of the Commonwealth of the Northern Mariana Islands on May 29, 2002. The Supreme Court stayed the May 29, 2002 Order on May 31, 2002, and reinstated Fennell as temporary receiver but limited his powers to those provided by law and specifically ordered that Fennell could not liquidate the Bank's assets. On September 27, 2002, Fennell was permanently removed and replaced as receiver.

44. During this period, Fennell sought to be exonerated from "any and all claims" which might result from his acts or omissions as receiver. On September 27, 2002, and December 31, 2002, the Honorable Edward Manibusan issued Orders exonerating Fennell as a former Receiver.

45. However, the Bank, by and through its Board of Directors, took a timely appeal from these Orders. That appeal, Consolidated Appeal Nos. 02-0029GA and 03-0008GA, was decided in an Opinion of the Commonwealth Supreme Court, *Bank of Saipan v. Atalig*, 2005 MP 3.

46. In its Opinion, the Supreme Court reversed and vacated the exoneration Orders. It recognized that a "pre-suit grant of immunity is without statutory or caselaw support in the

Commonwealth or in any other jurisdiction." It held that "receivers may generally be entitled to qualified immunity but they may be held personally liable if they act in bad faith or outside the scope of authority granted by the court." It went on to state that "[i]t was impossible to determine if Fennell met these requirements, however, because there was no case or controversy against Fennell before the trial court." Accordingly, it held that "[w]hether or not a receiver is entitled to immunity is 'to be resolved at a plenary hearing with sworn witnesses and documentary proof, so that the question of law as to whether the Receiver breached any duty owing a fiduciary may be fairly resolved.'"

47. On January 29, 2003, the Bank filed a proposed Rehabilitation Plan with the Court. In this Rehabilitation Plan, the Bank specifically noted that the former Receiver's actions had been wrongful and had caused harm to the Bank:

> Original Receiver's actions adversely affected loan collections and generated negative images regarding the possibility of rehabilitation and reorganization of the Bank of Saipan.

48. The Rehabilitation Plan stated that one of the solutions to the Bank of Saipan's problems was to aggressively pursue claims against wrongdoers:

> Outlined below are a series of proposed solutions to the Bank's problems:
>
> *Aggressively* seek to recover fraudulent loans and pursue claims against wrongdoers.

49. On February 13, 2003, the Honorable Edward Manibusan "approved" the "Rehabilitation Plan presented to the Court."

50. At all relevant times herein, through the *ex parte* hearings conducted off-the-record and with no recording, the failure to produce requested information that they were bound to disclose, and other means, Defendants have sought to fraudulently conceal from the Bank and

depositors, including the Board and MPLA, the fact that they had causes of action against Defendants and have thereby deprived the Bank and depositors of a reasonable opportunity to discover such causes of action until some time after Fennell was permanently removed as the receiver and a full investigation could be undertaken. Even then, continuing non-cooperation has hindered that investigation and acted to further fraudulently conceal the causes of action.

51. At all relevant times herein, Defendants were aware of each other's conduct, assisted, participated in, furthered, aided, abetted, comforted, and encouraged each other in such conduct and acted in concert with one another.

52. The cumulative effect of the misconduct and malfeasance committed by the Defendants as described above has been to harm the depositors of the Bank, and most particularly the Board and MPLA and the other government depositors whose accounts were frozen at the onset of the receivership.

53. Defendants pursued liquidation of the Bank and other tactics described above designed to harm the Bank, its directors, shareholders, and depositors. They did this notwithstanding their conflicts of interest, and knowing that such actions were contrary to the interests of the depositors including MPLA. On information and belief, Defendants knew that, but for their conflicted and bad faith motives to harm the Bank, its shareholders, its directors, and depositors, they could and should have instead have been pursuing a plan of rehabilitation from the onset of the receivership. They failed to significantly pursue this option because it was inconsistent with their improper and self-interested motives.

54. Thus, but for the conduct of the Defendants, the Bank's rehabilitation could have occurred sooner, and at a reduced cost. Had this occurred, the depositors, and especially the Board and MPLA and the other government depositors, would have been able to withdraw or

otherwise utilize the funds they had deposited at the Bank at a much earlier date, as the Board and MPLA desired to be able to do. Instead, the Board and MPLA's ability to withdraw or otherwise utilize its funds continues to be restricted by the Court's Order of August 25, 2004, having already been frozen prior to this.

## V.
## FIRST CAUSE OF ACTION
### FRAUD
### (FENNELL AND THE RECEIVERSHIP ATTORNEYS)

55. The Board and MPLA hereby re-allege and incorporate by this reference as if fully set forth herein all of the allegations contained in each of the paragraphs of the Complaint.

56. Once appointed and retained, and throughout the course of the receivership, Fennell and the Receivership Attorneys owed fiduciary duties not only to the Bank, but also to all legitimate claimants on the Bank's assets, including depositors, such as the Board and MPLA. These duties included, without limitation, the duty to conduct the receivership in the best interests of the depositors, to avoid harming the depositors, to disclose all material information affecting the receivership, and to place the interests of the depositors above their own personal interests. These fiduciary duties included the duties of loyalty, due care, confidentiality and full disclosure. At all relevant times, the culpable Receivership Attorneys knew of Fennell's fiduciary duties to the depositors, including the Board and MPLA.

57. Defendants intentionally, knowingly, or otherwise culpably concealed or suppressed by means of written and oral communications, and by conduct, from the Bank and its depositors, including MPLA and the Board, that their true intent was to destroy the Bank so as to be able to retaliate against the Bank's shareholders, directors and attorneys, and to the detriment of the Bank's depositors, especially government depositors such as the Board and MPLA.

58. Defendants fraudulently concealed or suppressed material facts that they were bound to disclose.

59. Defendants told the Bank, its depositors (including the Board and MPLA), and the Court facts to mislead the Bank, its depositors (including the Board and MPLA), and the Court from discovering the concealed or suppressed facts.

60. Defendants fraudulently and actively concealed material facts with the intent to deceive and defraud the Bank, its depositors (including the Board and MPLA), and the Court.

61. Specific fraudulent acts include, without limitation:

62. **The Concealment of Conflicts**:  On or around April 30, 2002, when Fennell was appointed receiver, he did not disclose to the Court, the Board, MPLA, or the Bank that he intended to destroy the Bank.  Nor did he disclose that he, Axelrod and Schwabe had conflicts of interest and bore grudges against some of the Bank's directors resulting from the *Estate of Hillblom* litigation, where they believed they had gotten "screwed" by members of the CNMI judiciary, including the late Justice Pedro Atalig, who they claimed had issued a "bullshit report" that was a "joke."  Attached as Exhibits 2 and 3 are true and correct copies of correspondence between defendants where they confess to these conflicts and make these disparaging statements about members of the CNMI judiciary, all of which they concealed from the Court, from the Board, from MPLA, and from the Bank.  Such nondisclosures were false, intentional, and deliberate.

63. **Affirmative Misrepresentations Regarding Conflicts**:  On or around May 2, 2002, Fennell affirmatively represented to the Bank that he bore no animosity arising from *Hillblom* and that he would carry out his duties as temporary receiver in an unbiased and professional manner.  These representations were false, intentional, and deliberate.

64. **Receivership Attorneys' Misleading Conduct Regarding Conflicts**: Like Fennell, the Receivership Attorneys failed to disclose material information about their conflicts of interest and how said conflicts would adversely affect their representation of Fennell. These conflicts included Axelrod's hatred of and racism toward members of the CNMI judiciary. Attached as Exhibit 4 is a true and correct copy of an email from Axelrod advising Fennell's attorneys about how to "isolate" certain members of the CNMI judiciary, while also explaining that attacking too many "Chamorros" would be detrimental to the Receivership Attorneys' and Fennell's secret plans.

65. These conflicts also included that the White-Pierce law firm had concurrently represented the Bank since 1997 and that Pierce never had disclosed or obtained the Bank's consent to his representation of Fennell. In obtaining his appointment, Pierce affirmatively misrepresented the nature of his prior representation of the Bank during the *Estate of Hillblom* litigation and affirmatively misrepresented to the Court that his prior representation of the Bank was unimportant because the receivership was a "non-adversarial" proceeding, when prior to that time he already had been scheming with Fennell, Axelrod and Schwabe about how to destroy the Bank and falsely attack the directors and shareholders against whom they bore grudges.

66. **Fraudulently Increasing Fennell's Powers**: On or around May 8, 2002, after almost no documented investigation, Fennell filed a false and misleading "report" with the Court.

67. On or around May 8, 2002, Defendants purported to "answer" the complaint in the Receivership Case, on "behalf" of the Bank, without Court authorization. On or around the same date, Fennell, acting through Defendant Pierce, filed an *ex parte* petition for "Clarification of Order Granting Petition for Appointment of Receiver." This falsely titled motion actually sought

to greatly increase Fennell's powers and to strip the Bank of its ability to defend adversarial proceedings, a key component of Defendants' scheme to destroy the Bank.

68. The *ex parte* motion for "clarification" presented a knowingly false, biased and incomplete statement to the Court. However, because Fennell had moved for "clarification" on an *ex parte* basis, neither the Bank, nor the Board or MPLA (which had not yet been allowed to participate) were able to expose the fraud.

69. Based upon Defendants' fraud, the Court granted Fennell's petition on May 10, 2002. The Order greatly expanded Fennell's powers as receiver and extended his receivership indefinitely.

70. **Defendants' Fraudulent Efforts to Destroy the Bank**: The Court never authorized Fennell to destroy the Bank. Fennell falsely promised the Court that he was investigating all the possible options of how to proceed in the receivership, when in fact, he and the Receivership Attorneys never intended to consider rehabilitation or do anything besides liquidate the Bank. Their efforts at liquidation began prior to the time when they were authorized to even consider such an option and continued after the Supreme Court had forbidden them from liquidating any Bank assets. Liquidation was the worst option for the Bank, its shareholders, and depositors, such as the Board and MPLA, who would have received pennies on the dollar had the Bank been liquidated.

71. **Doctored Consultant Reports**: Even though liquidation was in the worst interests of the Bank, its shareholders and its depositors, such as the Board and MPLA, Fennell and the Receivership Attorneys falsely located and instructed "consultants" to present liquidation as warranted, when, in fact, it was not. They then submitted the false consultant reports — which, in part, had been designed and modified by Fennell and his lawyers — to the Court as an

"objective" assessment of the viability of the Bank.  To buttress their claims that the Bank has

"failed," had made "bad loans" and was incapable of salvation, defendants failed to collect loans,

publicly disparaged the Bank individually, and through the media consultant they secretly hired

without Court authorization, and refused to timely and aggressively pursue claims against the

criminals who were responsible for the Bank being in receivership.  Instead, Defendants were

cooperating with the criminals in the hopes that they would help Defendants concoct a story

about how the Bank's directors, and not the convicted offenders, were responsible for the fraud

on the Bank.  In fact, Fennell and the Receivership Attorneys were sharing information with

attorney Rexford Kosack, who was representing a member of the Montgomery gang in a

criminal proceeding.  Attached as Exhibit 5 is a true and correct copy of a facsimile from Fennell

to Kosack.

72. **False "Reports" under Seal and Illegal _Ex Parte_ Contacts**:  In order to carry out

their wrongful scheme of trying to liquidate the Bank, Defendants repeatedly engaged in

improper and illegal _ex parte_ proceedings that were conducted off-the-record and with no

recording or transcript, and they repeatedly filed documents under seal for no reason other than

making sure that nobody could challenge the misstatements they secretly were using to mislead

the Court.

73. On or around May 20, 2002, Pierce filed a fraudulent and misleading "report" under

seal for the wrongful purpose of deceiving the Court into being prejudiced against the Bank,

while preventing any challenge to the misrepresentations therein.

74. Defendants defrauded the Court, the Board, MPLA, and the Bank by filing secret

"reports" under seal that contained false statements about the Bank that the Board, MPLA and

the Bank had no way to contest.  Fennell and the Receivership Attorneys attempted to justify

these sealed filings on the grounds that they contained sensitive depositor information. This was also a fraud on the Court because Defendants were making secret and wrongful accusations against the Bank in order to convince the Court that liquidation was necessary, while preventing the Board and MPLA and the Bank from informing the Court of the truth. It had nothing to do with "depositor information." In fact, defendants disclosed at least some of the sealed filings to the Bank's litigation adversary without regard for the supposedly sensitive depositor information therein.

75. This conduct was not authorized by any Court Order. The Court did not authorize any of the Receivership Attorneys to make *ex parte* arguments. While the Court did permit Fennell to have *ex parte* contacts regarding necessary receivership business, the Court did not authorize Fennell himself to engage in such contacts regarding contested matters, so as to deprive the Board, MPLA and the Bank of the opportunity to be heard, which is precisely what Defendants did.

76. **Deceitful Smear Campaign against Members of the CNMI Judiciary**: On May 29, 2002, the CNMI Supreme Court, through Justice Castro, removed Fennell as temporary receiver. Following the May 29 Order removing Fennell, defendants launched an all-out assault against Justice Castro and other members of the CNMI judiciary. They conducted "investigations" against Justice Castro and other members of the CNMI judiciary, including the late Justice Pedro Atalig and Justice *pro tem* Alberto C. Lamorena III. This conduct was not, and never could be, authorized by any Court.

77. Part of Defendants' attacks on Justice Castro was a deceitful media smear campaign that was conducted both before and after Fennell filed a declaration and Defendants filed a

motion in the Supreme Court to disqualify Justice Castro on June 20, 2002. This conduct was not, and never could be, authorized by any Court.

78. No later than June 1, 2002, Fennell retained a media consultant to assist him with the receivership. He did not disclose that he had done so to the Court.

79. Attached as Exhibit 6 is a true and correct copy of the billing records submitted by the media consultant to Fennell for June. The June bills, which were sent to Defendant Fennell on July 18, 2002, contain the following entries:

- "Telecom to Client seeking direction and making recommendation on how to get information to media before briefs are due" (June 6);

- "Draft separate media notes to accompany Court Order Terminating the Liquidating Trust, highlighting Castro, Lamorena and Lujan conflicts" (June 8);

- "Appointment with Client, received copies of documents and photo. ... Fax from Client, Executed letter of Agreement Creating Foundation. Modified media notes to Lamorena conflict. Reviewed all document. Annotated materials extensively. Sent two drafts to Client. Client has own draft and documents for distribution to Representative" (June 12);

- "Receiver filing to disqualify Castro dated 6/19/02. Government filing to disqualify Lamorena. Declaration of Randall T. Fennell. Reviewed documents. Annotated materials for media representatives. Telcom with media representatives. Telcom and meeting to discuss documents with legislative members." (June 21);

- "ASSC, meeting to review Declaration of Receiver with KCNM Radio." (June 24);

- "BYT, media outlets. Letters to editor-insights. Conveyed information. Telcom from Client regarding the schedule. Parameters for PDN, nature of documentation and discussion." (July 2).

80. As seen above, before and after Fennell filed his public declaration against Justice Castro, he was spreading slander to the press, the government, and even the press in Guam, where the Justice who ultimately decided the motion to disqualify Justice Castro resides.

81. Knowing that no Court would authorize such misconduct, Fennell then committed fraud on the Court, the Board, MPLA, and the Bank by submitting incomplete and false records to the receivership Court. On August 22, 2002, after he had employed the "media consultant" for almost at least three months, he finally sought permission from the Court to employ a media consultant, stating that he had asked a media consultant "to make a proposal to the receivership for media services," and attaching an "engagement letter" from the media consultant, dated August 1, 2002. His false explanation to the Court was that he needed a media consultant to combat negative publicity supposedly generated by the Bank. Attached as Exhibit 7 is a true and correct copy of his petition to the Court seeking authorization to employ a media consultant.

82. On October 4, 2002, Fennell submitted "bills" from the consultant to the receivership Court, asking the Court to approve the payment of the "bills" with the Bank's money. Attached as Exhibit 8 is a true and correct copy of this billing request. In this submission, he attached an August 7, 2002, letter from the consultant "Re: Statement for Consulting Services, June and July Statements." But he did not submit the July 18 letter enclosing the detailed June bills explaining how he had used the consultant to smear members of the CNMI judiciary and denigrate the Bank and its directors and shareholders. Nor did he attach any of the time entries for June. In reliance on these misrepresentations, the Court approved the retention on September 27, 2002.

83. **Concealment of $11,977.40 Payment to Former Employee of Judiciary**: Prior to the receivership, Fennell, Axelrod and Schwabe were co-counsel in representing minor heir claimant Jellian Cuartero in the *Estate of Hillblom* litigation. Attached as Exhibit 1 is a true and correct copy of some of Schwabe's billing records for Ms. Cuartero ("Paternity Bills").

84. The Paternity Bills contain entries indicating work Axelrod and Schwabe did regarding the Fennell receivership. For example, the Paternity Bills show that on June 12, Schwabe paid:

> Fees (professional) – Check Diane K. Bergeron; Third-Party
> Payments for Research and Investigative Services at Receiver's
> Request for Supreme Court Proceedings – $11,977.40.

It appears that the $11,977.40 payment was made from a trust account belonging to minor heir claimant Cuartero, who had nothing to do with the Fennell receivership.

85. Diane Bergeron was the former SRA (law clerk) to Justice Castro during the *Hillblom* proceedings.

86. As shown by the fax header on Exhibit 9, the same day that Ms. Bergeron received the payment from Schwabe, Ms. Bergeron faxed a number of documents, apparently to Schwabe (many of which were the same ones that eventually were attached to the declaration Fennell submitted in conjunction with his disqualification motion).

87. Fennell, Axelrod and Schwabe concealed these bills, which contain receivership work, from the receivership Court. When they initially submitted their bills, the Court rejected them as insufficiently specific. When they resubmitted their bills to the receivership Court for approval, the bills they submitted did not include this payment.

88. **Misrepresentations on June 19, 2002**: On June 19, 2002, Assistant Attorney General Allan Dollison told the Court that the Government had not received any of the sealed

reports made by Defendants. The Attorney General further represented to Judge Lizama that the sealed filings were non-adversarial and had been filed under seal because they contained sensitive depositor information.

89. Both these statements were false. Attached as Exhibit 10 is a true and correct copy of a facsimile from one of Fennell's attorneys to the government enclosing two documents that Fennell had filed under seal. Furthermore, the sealed filings were not non-adversarial; they contained false attacks on the Bank to which it could not respond. Nor did they contain "sensitive depositor information." That falsehood was taken directly from the sealed filings themselves.

90. Defendant Pierce, who had reviewed, written, and assisted with the sealed filings that were submitted to the Court, was present in the courtroom while the Attorney General was deliberately misleading Judge Lizama. Pierce made absolutely no effort to correct the record then. Nor did Fennell or any of the Receivership Attorneys make any such effort at any time thereafter.

91. The Bank, the Board and MPLA were unaware of the concealed or suppressed facts and would have taken action had they known the true facts.

92. The omissions and representations of Fennell and the Receivership Attorneys were material, false and misleading, and Fennell and the Receivership Attorneys knew they were false and misleading at the time they were made, and they were made for the purpose of inducing the Bank, its depositors (including the Board and MPLA), and the Court to rely upon them and to act or to refrain from acting in reliance thereon.

93. The Board, MPLA, the Bank, and the Court reasonably and justifiably relied upon untruthful representations, statements and omissions and acted in accordance thereof.

**94.** As a direct and proximate result of Fennell and the Receivership Attorneys' conduct detailed above and in other respects, the Board and MPLA have been damaged in an amount to be proven at trial.

## VI.
### SECOND CAUSE OF ACTION
**CONDUCT BEFORE APPOINTMENT AS RECEIVER;**
**CONDUCT IN EXCESS OF APRIL 30, 2002 ORDER;**
**CONDUCT IN EXCESS OF MAY 10, 2002 ORDER;**
**CONDUCT IN EXCESS OF MAY 29, 2002 ORDER;**
**CONDUCT IN EXCESS OF MAY 31, 2002 ORDER;**
**CONDUCT IN EXCESS OF SEPTEMBER 27, 2002 ORDER**
**(FENNELL)**

95. The Board and MPLA hereby re-allege and incorporate by this reference as if fully set forth herein all of the allegations contained in each of the paragraphs of the Complaint.

96. Fennell's powers as receiver are clearly set forth in the Court's orders of April 30, 2002, May 10, 2002, and September 27, 2002 and the Supreme Court's Orders of May 29, 2002 and May 31, 2002.

97. Before his appointment and during his tenure as receiver, Fennell intentionally, willfully and maliciously acted in excess of these powers to the detriment of the Bank and its depositors, including the Board and MPLA.

98. As a direct and proximate result of Fennell's conduct detailed above and in other respects, the Board and MPLA have been damaged in an amount to be proven at trial.

## VII.
### THIRD CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY
**(FENNELL)**

99. The Board and MPLA hereby re-allege and incorporate by this reference as if fully set forth herein all of the allegations contained in each of the paragraphs of the Complaint.

100.    Fennell owed strict fiduciary duties to the Bank's depositors, including the Board and MPLA. Fennell was required at all times to honestly and in good faith with a view to the best interests of the Bank's depositors, including the Board and MPLA, and to exercise care, skill, and diligence that a reasonably prudent person would exercise in comparable circumstances.

101.    Fennell failed to fulfill his obligations to the Bank's depositors, including the Board and MPLA; he failed to faithfully execute service and breached his duties to the Bank's depositors, including the Board and MPLA, in various ways, including, without limitation, the acts and omissions alleged herein.

102.    As a direct and proximate result of Fennell's breach of fiduciary duty detailed above and in other respects, the Board and MPLA have been damaged in an amount to be proven at trial.

## VIII.
## FOURTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY
## (RECEIVERSHIP ATTORNEYS)

103.    The Board and MPLA hereby re-allege and incorporate by this reference as if fully set forth herein all of the allegations contained in each of the paragraphs of the Complaint.

104.    The Receivership Attorneys owed strict fiduciary duties to the Bank's depositors, including the Board and MPLA. The Receivership Attorneys were required at all times honestly and in good faith with a view to the best interests of the Bank's depositors (including the Board and MPLA), and to exercise care, skill, and diligence that a reasonably prudent person would exercise in comparable circumstances.

105.    The Receivership Attorneys failed to fulfill their obligations to the Bank's depositors (including the Board and MPLA), failed to faithfully execute service, and breached

his duties to the Bank's depositors (including the Board and MPLA) in various ways, including, without limitation, the acts and omissions alleged herein.

106.    As a direct and proximate result of Fennell's breach of fiduciary duty detailed above and in other respects, the Board and MPLA have been damaged in an amount to be proven at trial.

**IX.**
**FIFTH CAUSE OF ACTION**
**PARTICIPATION IN BREACH OF FIDUCIARY DUTY**
**(RECEIVERSHIP ATTORNEYS AND DOES)**

107.    The Board and MPLA hereby re-allege and incorporate by this reference as if fully set forth herein all of the allegations contained in each of the paragraphs of the Complaint.

108.    The Receivership Attorneys and Does knew or should have known of Fennell's breaches of fiduciary duties and actively participated in the breaches by implementing, directing, assisting, approving and otherwise furthering their scheme through the unlawful, improper, fraudulent and self-dealing actions alleged herein.

109.    As a direct and proximate result of the Receivership Attorneys' and Does' participation in breaches of fiduciary duty detailed herein and in other respects, the Board and MPLA has been damaged in an amount to be proven at trial.

**X.**
**SIXTH CAUSE OF ACTION**
**LIABILITY FOR THE ACTS OF OTHERS,**
**RESTATEMENT (SECOND) TORTS § 876**
**(ALL DEFENDANTS)**

110.    The Board and MPLA hereby re-allege and incorporate by this reference as if fully set forth herein all of the allegations contained in each of the paragraphs of the Complaint.

111.    Defendants formed an unlawful agreement to engage in the conduct set forth herein, including but not limited to, breaching their fiduciary duties to the Bank, the Board and

*25*

*Complaint and Demand for Jury Trial*

MPLA, breaching Fennell's fiduciary duties to the Bank, the Board and MPLA, and interfering with the Bank's business relations.

112. Defendants each agreed to participate and did participate in the conspiracy, in furtherance of their own financial gain.

113. As a direct and proximate result of their conspiracy and acts taken in furtherance of the conspiracy, the Board and MPLA have been damaged in an amount to be proven at trial.

114. Furthermore, Defendants committed tortious acts in concert with the other, knew that each other's conduct constituted a breach of duty, and gave substantial assistance or encouragement to one another.

115. As a direct and proximate result of Defendants' conduct detailed above and in other respects, the Board and MPLA have been damaged in an amount to be proven at trial.

## XI.
## PUNITIVE DAMAGES

116. The Board and MPLA hereby re-allege and incorporate by this reference as if fully set forth herein all of the allegations contained in each of the paragraphs of the Complaint.

117. Because of the willful, wanton, vile, outrageous, and intentional nature of Defendants' conduct as alleged herein, and their conscious disregard and abuse of a position of trust, Defendants are liable for punitive damages, in an amount to be determined at trial.

## XII.
## PRAYER FOR RELIEF

WHEREFORE, the Board and MPLA pray for judgment against Defendants as follows:

a. General damages against all Defendants, jointly and severally, in an amount to be proven at trial;

b.   Punitive damages in an amount appropriate to punish Defendants and set an example to others;

c.   An award of attorney's fees and costs incurred in this action; and

d.   For other such relief as the Court may deem proper.

Dated this 12th day of October, 2005.

Respectfully submitted,

RAMON K. QUICHOCHO
CNMI Bar No. F0243
Attorney for Intervenor Board of MPLA


MATTHEW T. GREGORY
CNMI Bar No. F0205
Attorney for Intervenor MPLA


## DEMAND FOR JURY TRIAL

The Board and MPLA hereby demand a trial by jury of all issues triable of right by jury.

Dated this 12th day of October, 2005.

Respectfully submitted,

RAMON K. QUICHOCHO
CNMI Bar No. F0243
Attorney for Intervenor Board of MPLA


MATTHEW T. GREGORY
CNMI Bar No. F0205
Attorney for Intervenor MPLA

27

*Complaint and Demand for Jury Trial*

# Exhibit 1



# SCHWABE, WILLIAMSON & WYATT, P.C.
## ATTORNEYS AT LAW

PACWEST CENTER, SUITES 1800-1900 • 1211 SOUTHWEST FIFTH AVENUE • PORTLAND, OREGON 97204-3795
TELEPHONE: 503.222.9981 • FAX: 503.796.2900 • www.schwabe.com

## FACSIMILE TRANSMISSION
### Please notify the recipient immediately.

DATE: September 26, 2002

| TO: | FAX NO. | PHONE NO. |
|---|---|---|
| Mr. Randall T. Fennell Esq. Law Offices of Randall T. Fennell | (670) 323-7435 | (670) 323-6633 |
| Richard W. Pierce White Pierce Mailman & Nutting | (670) 234-9537 | (670) 234-6547 |

| FROM: | PHONE NO.: | E-MAIL ADDRESS: |
|---|---|---|
| David W. Axelrod | (503) 796-2066 | daxelrod@schwabe.com |

**MESSAGE:**

Attached are the exhibits that go with our response on the fee petition. I don't know how you are handling the attorney/client aspect of the bills, but leave that to you to assure appropriate confidentiality. The narrative portion of our response will be sent by e-mail very shortly. Let us know if you need anything on our end.

David

| FILE NUMBER: | 109374-127867 | TRANSMITTAL TIME: | 2:14 a.m. / p.m. |
|---|---|---|---|
| NO. OF PAGES, INCLUDING COVER: | X | ALSO VIA: | |
| VIA FAX ONLY: | | | |

## CAUTION - CONFIDENTIAL

THE INFORMATION CONTAINED IN THIS FACSIMILE IS CONFIDENTIAL AND MAY ALSO CONTAIN PRIVILEGED ATTORNEY-CLIENT INFORMATION OR WORK PRODUCT. THE INFORMATION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED. IF YOU ARE NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THE FACSIMILE IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ADDRESS ABOVE VIA THE U.S. POSTAL SERVICE AT OUR COST. THANK YOU.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE CALL (503) 796-2410 AS SOON AS POSSIBLE.

| FAX OPERATOR: | | DIRECT DIAL PHONE: | (503) 796-2410 |
|---|---|---|---|



Portland, Oregon 503.222.9981 • Bend, Oregon 541.330.2804 • Salem, Oregon 503.585.7712 • Seattle, Washington 206.622.1711 • Vancouver, Washington 360.584.7551 • Washington D.C. 202.828.6870

**SCHWABE**
**WILLIAMSON**
**& WYATT** P.C.

In account with

1211 S.W. FIFTH AVENUE
SUITE 1600
PORTLAND, OREGON 97204-3795
PHONE: (503) 222-9981
FAX: (503) 796-2900

OTHER OFFICES:
BEND, OR
SEATTLE, WA
VANCOUVER, WA
WASHINGTON, D.C.

TAX ID # IRS-93-1130272

September 26, 2002

Client/Matter #: 109374-127867
Invoice #:  834265

RANDALL T FENNELL
PO BOX 49
SAIPAN, MP  96950

Re: BANK OF SAIPAN Receivership

## REMITTANCE ADVICE

PREVIOUS OUTSTANDING INVOICES

| DATE | INVOICE # | AMOUNT | CREDITS | BALANCE |
|------|-----------|--------|---------|---------|
| 05/24/02 | 825342 | 11848.10 | $.00 | 11848.10 |
| 06/28/02 | 828101 | 14008.27 | $.00 | 14008.27 |
| 07/30/02 | 830297 | 6070.38 | $.00 | 6070.38 |
| 08/29/02 | 832550 | 10702.66 | $.00 | 10702.66 |

PREVIOUS BALANCE                           $    42,629.41

FINAL SUMMARY

| | |
|---|---|
| SUBTOTAL CURRENT COSTS | $      956.92 |
| SUBTOTAL CURRENT FEES | $    6,904.25 |
| TOTAL CURRENT INVOICE | $    7,861.17 |
| PREVIOUS OUTSTANDING INVOICES | $   42,629.41 |
| TOTAL AMOUNT DUE (CURRENT & PREVIOUS) | $   50,490.58 |

DWA

TERMS: DUE AND PAYABLE UPON RECEIPT
MOUNTS UNPAID MORE THAN 30 DAYS AFTER INVOICING ARE SUBJECT TO A LATE PAYMENT CHARGE OF 9% PER ANNUM.
IOLTA PARTICIPANTS - PROCEEDS SUPPORT PUBLIC INTEREST OBJECTIVES OF THE LAW
COSTS POSTED AFTER THIS INVOICE WILL APPEAR ON SUBSEQUENT INVOICE

EXHIBIT A-1
Page 1 of 37

In account with
**SCHWABE**
**WILLIAMSON**
**& WYATT**
P.C.
ATTORNEYS AT LAW

1211 S.W. FIFTH AVENUE
SUITE 1600
PORTLAND, OREGON 97204-3795
PHONE: (503) 222-9981
FAX: (503) 796-2900

OTHER OFFICES:
BEND, OR
SEATTLE, WA
VANCOUVER, WA
WASHINGTON, D.C.        TAX ID # IRS-93-1130272

September 26, 2002

Client/Matter #: 109374-127867
Invoice #:  834265

RANDALL T FENNELL
PO BOX 49
SAIPAN, MP  96950

Re: BANK OF SAIPAN Receivership

FOR LEGAL SERVICES RENDERED

| DATE | INDV | HOURS | DESCRIPTION OF SERVICES |
|------|------|-------|--------------------------|
| 08/20/02 | WJO | 1.00 | Conferences with Carmen Calzacorta and Andy Gerlicher re: document preparation for transfer of loan portfolio to CDA (.7); phone messages w/client re: same (.3) |
| 08/21/02 | WJO | 2.00 | Email to Andy Gerlicher w/proposed Bank of Saipan transaction with CDA (.50); phone conversation re: same (.50); received and began review of Bank of Saipan Directors and Officers' Liability Policy (1.0) |
| 08/22/02 | WJO | 1.00 | Researched issues regarding transfer of bank loan portfolio to CDA (.8); emails with Andy Gerlicher and Mark Manulik re: same (.2) |
| 08/26/02 | WJO | 1.00 | Received and began reviewing Bank of Saipan's opposition to exoneration of Temporary Receiver |
| 08/27/02 | MAM | .20 | Telephone conferences with Messrs. Ohle and Gerlicher |
| 08/27/02 | WJO | 3.00 | Worked on draft Reply memorandum in support of exoneration motion for Temporary receiver (2.0); researched standards for expert testimony in preparation of motion to strike Tarter affidavit (1.0) |
| 08/27/02 | AJG | .10 | Telephone call from Bill Ohle to discuss status and next steps |
| 08/28/02 | ATG | 1.50 | Research regarding federal law standards for qualification as expert witness |
| 08/28/02 | DWA | .85 | Telephone call from Fennell (.4); memo from Ohle (.15); review draft Ohle pages re exoneration, discharge (.3) |
| 08/28/02 | WJO | 5.50 | Drafted reply memorandum in support of exoneration motion for temporary receiver (3.5); researched cases cited by bank directors (2.0) |
| 08/29/02 | WJO | 8.40 | Worked on draft reply in support of exoneration motion and emailed same to client (5.0); drafted motion to strike Tarter expert affidavit and emailed same to client (3.4) |

TERMS: DUE AND PAYABLE UPON RECEIPT

AMOUNTS UNPAID MORE THAN 30 DAYS AFTER INVOICING ARE SUBJECT TO A LATE PAYMENT CHARGE OF 9% PER ANNUM.
IOLTA PARTICIPANTS - PROCEEDS SUPPORT PUBLIC INTEREST OBJECTIVES OF THE LAW FOUND
COSTS POSTED AFTER THIS INVOICE WILL APPEAR ON SUBSEQUENT INVOICES.

EXHIBIT A-1