# RANDALL T. FENNELL

2nd Floor Flame Tree Terrace Bldg.
Post Office Box 500049CK
Saipan, MP 96950
Telephone (670) 323-6633
Facsimile (670 325-7433
E-mail: randy.fennell@saipan.com

Bank of Saipan, CK
  Post Office Box 500690 CK
Saipan, MP 96950
  Telephone (670) 235-6290
  Facsimile (670) 235-6294

Dear Dave,

Need the following:

1. How much money did Mendiola and Atalig get?
   a. Dates of orders
   b. Copies of orders if possible

2. Copy of Ataligs SM report allocating tax refund monies, and final order implementing it.

3. We need Diannes' affidavit, as strong as she can make it, ASAP. If she won't what can we do with pictures? When, where and for what occasion was it taken?

4. Alexis Fallons brother, Ed, will call you with info on the search engine application for existing discs, or you can call him at 978-681-9641.

5. Are there transcripts on the discs? If so, can we search for library reference?

6. How much did Walsworth get? Can we show any relation to his "gift" of money?

7. What proof do we have about ex-parte meetings of Castro & Lujan?

What we are obviously trying to do is to tie Lujan and Juniors donations, both to the Rota Collegio fund and to the library, to favorable treatment. Any helpful thoughts on that line are needed. For example, did most Lujan favorable treatment occur after the donations? Can you recall exactly how and when we got screwed? We are up against a wall, time wise. And the local court is not having any luck finding any of the audio transcripts we have requested. Missing log book!

Can you or Bill Ohle (preferably you as you know more history) give me a draft of my affidavit showing violation of the local cannons (copy being faxed) by Castro, and Lujan favoritism. Also, the April 9, 2000 transcript you faxed me has a good line where Walsworth gives the money and then goes on to say "thank you, thank you, thank you!" (Pg. 29) Also, Castro demanding desks and chairs be given to library (pg. 20-21) Call and wake me - 670-287-6633 if you need to.

cc:  Cindy Adams
     Richard Pierce

**FAX OUT**

# Exhibit 4

Confidential and Privileged

From: "Axelrod, David" <DAxelrod@SCHWABE.com>
    "Cindy Adams" <cindy.adams@saipan.com>
:   "Randy Fennell" <RTFennell@cs.com>
~e: Wed, Jun 19, 2002, 04:30 AM
  .ect: Confidential and Privileged

RECEIVED  JUN 2 0 2002

000999

Cindy,

Per fax from Randy, I am setting out my comments on the draft memorandum and affidavits. Generally it looks good and I think it is compelling. comments are:

Memorandum

p. 2: I think it may be a mistake to bring Lifoifoi in to the disqualifying contacts. Lujan can be isolated, but once you start picking up Saipan Chamorro's, I fear you may broaden support for Castro.

p. 3 You bring it up later in detail, but I would point out in this intro part that being involved in charities with persons who have matters pending before him is a clear violation.

pp. 5-6: Probate case is 95-626. The estate was "closed" for tax purposes by a "final" distribution and the creation of a liquidating trust on or before May 8, 2000. That is why they had their luncheon immediately after that. However, the probate case remained open until March 8, 2002 and important matters remained and were determined by Castro. by this ~e the $20 million issues were settled by agreement entered into under the threat of Castro being the person who would ~ide the issue and we all knew about that bias (see e.g., Atolig appointment and his refusal to DQ himself). Because of ~his nuance, it is particularly important to point out the ex parte contacts with Lujan through Bergeron (and directly per the cc's on letters) prior to the final distribution.

~ergeron was an employee of the Hillblom Estate made available to provide assistance to the Court on probate matters. Bergeron draws a clear line between her probate work and this work for the Trust that was basically pro bono and at Castro's suggestion/direction. Bergeron was not an employee of the CNMI judicial system.

p. 7: top—may want to point out that this time frame is basically late-99 and into 2000. What are you citing to for showing esteem? His remarks at the hearing on final distribution in 2000?

p. 8: I believe Lujan is a trustee of Junior's trust and its lawyer. "General counsel" may not be quite the characterization.

p.9: same comments on bringing in Lifoifoi

p. 10: On the disclosure, surely Randy was aware of many of these relationships. It seems to be the promises made to Castro by Lujan and the ex parte contacts that were the secret component.

p.14: I think the salient facts regarding Lamorena should come up earlier in the memo; perhaps where you describe Castro's other rulings on this specific petition. This whole thing is so corrupt.

Fennell Declaration

~ra. 10 I think your best evidence is the series of ex parte communications in early 2000 with letters cc'd to Castro and ~drafts promising him benefits. I thin it might be worthwhile walking the Court through those documents in a bit more ~etail, either in the memo or the declaration.

Page 1 of 2

11. "Most" of the ex parte communications? I don't think we were aware of any, except for our strong suspicions.

13 I don't think the Walsworth firm became participants in the HMF. Note the nuances of the final distribution (May 9, 2000) and closing of the probate case (March 8, 2002).

para 25:  It's all true so I am not sure what my hesitation is, but the local influence that Lifoifoi and Atalig carry with this judicial system seems grossly disproportionate to anything that we can understand.

That's it. Randy, in a casual conversation (if there is such a thing in this series of cases) Julian dropped the comment that Setbuisan (or whatever the name of the corporation is that Walsworth sent $$ to) is actually "Atalig's company."

good luck. David

# Exhibit 5

# RANDALL T. FENNELL
### Receiver for Bank of Saipan

*2nd Floor Flame Tree Terrace Bldg.*
*Post Office Box 500049CK*
*Saipan, MP 96950*
*Telephone (670) 323-6653*
*Facsimile (670) 323-7435*
*E-mail: randy.fennell@saipan.com*

*Bank of Saipan, CK*
*Post Office Box 500690  CK*
*Saipan, MP 96950*
*Telephone (670) 235-6290*
*Facsimile (670) 235-6294*

## TELEFACSIMILE COVER LETTER

DATE:  6/7/02

To:   Rex Kossack

From:   Bank of Saipan, Receivership Files  ✓
        Attn.: Randall T. Fennell, Receiver
                    AND
        Bank of Saipan, Receivership Files
        Attn.: Cindy Adams, Esq.

### MAKE ALL FAXED CORRESPONDANCE TO BOTH ADDRESSES

TELEFACSIMILE Nos.:   234-9316 Office of Cindy Adams
                      323-7435 Office of Randall T. Fennell

Total number of pages including this cover sheet:   8

## COMMENTS

9 pg. letter of David Lujan - re: 8.75

Thought you might find it interesting to find out what mr. Lujan says about your client, Tom Alder

---

*If you do not receive all pages clearly, PLEASE CALL (670)323-6633*

---

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

# Exhibit 6

JUL-19-02  14:43  FROM:RANDALL FENNELL

# RANDALL T. FENNELL
### Receiver for Bank of Saipan

2nd Floor Flame Tree Terrace Bldg.
Post Office Box 500049CK
Saipan, MP 96950
Telephone (670) 323-6633
Facsimile (670 323-7433
E-mail: randy.fennell@saipan.com

Bank of Saipan, CK
Post Office Box 500690  CK
Saipan, MP 96950
Telephone (670) 235-6290
Facsimile (670) 235-6294

## TELEFACSIMILE COVER LETTER

DATE: 7/18/02

To: Cindy Adams

RECEIVED              8 2002

                      001494

From:    Bank of Saipan, Receivership Files  ✓
         Attn: Randall T. Fennell, Receiver
                 AND
         Bank of Saipan, Receivership Files
         Attn: Cindy Adams, Esq.

## MAKE ALL FAXED CORRESPONDANCE TO BOTH ADDRESSES

TELEFACSIMILE Nos.:    234-9316 Office of Cindy Adams
                       323-7435 Office of Randall T. Fennell

Total number of pages including this cover sheet:

## COMMENTS

6 pg. Invoice for BYT

If you do not receive all pages clearly, PLEASE CALL (670)323-6633

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

# B.Y.T. Consulting Services

P.O. Box 85
Saipan, MP. 96950
Tel: (670) 235-9875/72
Fax: (670) 235-9874

July 18, 2002

Mr. Randall T. Fennell
P. O. Box 500049
Saipan, MP  96950

Re:  Statement for Consulting Services

Dear Randy:

Please find enclosed my statement for consulting services provided in connection with your dismissal and reappointment as receiver for the Bank of Saipan.

Aside from organizing materials and providing annotations or explanations of the documents for general consumption, a fair portion of this statement went to reproduction of materials for distribution to the media and others. Given the gravity of the issues raised in this case, it is essential that original documents be provided for direct scrutiny by media representatives and others including key minority shareholders and legislators.

Please make the check payable to BYT Consulting Services.

Let me know if you have any questions.

Sincerely,

Brenda Y. Tenorio
Enclosure:

JUL-16-02  14:44  FROM:RANDALL FENNELL

A Statement for Providing Media Services in Connection with
Reappointment as Receiver for BoS
From June 1 to July 3, 2002

**June 3, 2002**

BYT, Telcom from Client requesting extension of arrangement-explained agenda.

**June 6, 2002**

BYT, Telcom and fax from Client, draft R. Pierce letter to R. Torres. Review printed media materials. Fax from Client, Letter from Calvo & Clark to AGO and Pierce. Fax from Client, Lujan letter to Turner. Fax from Client, final Pierce letter to Lujan. Telcom to Client seeking direction and making recommendation on how to get information to media before briefs are due. Reviewed materials provided previously along with current exchange of correspondence and telephoned media outlets to ascertain reaction. 2.50hrs.

**June 7, 2002**

BYT, responding to the Variety article, telcom with Client to obtain copy of Manibusan's reinstatement. Telcom to McMahon office, received copy of signed Order reinstating Receiver. Reviewed and faxed information to all media outlets including station on Guam. Telcom from Ruth Tighe, re, PDN. Fax and Telcom from Client transmitting Order Approving Termination of Trust. Telcom to discuss the significance of changes to "Order". Fax of letter from Lujan to Pierce, dated June 10, 2002. 2.0hrs.

**June 8, 2002**

BYT, drafted media notes to accompany latest Calvo & Clark, Pierce, and Lujan correspondence. Draft separate media notes to accompany Court Order Terminating the Liquidating Trust, highlighting Castro, Lamorena and Lujan conflicts. Meeting with Representative Torres counselor and provided correspondence along with separate explanatory notes. 5.0hrs.

**June 10, 2002**

BYT, Fax to Client, draft media notes. Telcom to Client, to discuss drafts. Client made recommendation with respect to one draft and approved for release to media. Reordered one draft to emphasize point he wanted to make and prepared for release. Other item is not to be released pending access to additional information. Still researching Lamorena conflict issue. 1.50hrs.

STA, Reproduced media packet for distribution. 1.50hrs.

JUL-19-02  14:44  FROM·RANDALL  FENNELL                    TO·678 303 7436                    PAGE  4/7

**June 11, 2002**

BYT, Telcom with Client, status of his review of media notes. Awaiting confirmation of information from another source. Discussion about AGO, Pierce and Lujan meeting. Outcome and press coverage. 0.50hrs.

ASSC, Contact with KCNM and MCV to discuss materials more thoroughly and urge more detailed coverage. 1.0hrs.

STA, Distribution to outlets, hand-delivered and by fax to Guam. 1.0hrs.

**June 12, 2002**

BYT, Appointment with Client, received copies of documents and photo. Brief discussion. Fax from Client, Executed letter of Agreement Creating Foundation. Modified media notes to Lamorena conflict. Reviewed all document. Annotated materials extensively. Sent two drafts to Client. Client has own draft and documents for distribution to Representative. 4.0hrs.

**June 13, 2002**

BYT, reviewed news coverage. 0.25hrs.

**June 21, 2002**

BYT, Telcom from Fennell. Fax from CNMI. ADJP Corporation materials. Receiver filing to disqualify Castro dated 6/19/02. Government filing to disqualify Lamorena. Declaration of Randall T. Fennell. Reviewed documents. Annotated materials for media representatives. Telcom with media representatives. Telcom and meeting to discuss documents with legislative members. 3.0hrs.

ASSC, Meeting and discussion of documents with MCV and KCNM. 1.50hrs.

STA, reproduction of documents for distribution to media and legislative members. 1.50hrs.

**June 24, 2002**

BYT, Telcom to R. Fennell, approval to release ADJP corporation documents to media. Need government action to counter conciliatory gestures. Other documents to come. Telcom to legislative staff. 2.0hrs.

ASSC, meeting to review Declaration of Receiver with KCNM Radio. 0.50hrs.

**June 25, 2002**

BYT, Telcom to Receiver. Status. Other documents forthcoming. Telcom to legislative staff. 1.0hrs.

ASSC, MCV Transcription of 6/25/02 newscast. 0.75hrs.

**June 26, 2002**

BYT, Met with Client, explained materials: Cristobal Investment Corp. Kim Lee Corporation; Carlsmith filing for temporary restraining order, 6/20/02 and District Court decision dated 6/21/02. Reviewed materials. Telephoned contacts and asked for confirmation on court action. Ordered and annotated documents for distribution. Requests coverage of Carlsmith development. 3.0hrs.

ASSC, MCV Transcription 6/26/02 newscast. 2nd and 3rd stories. 1.50hrs.

STA, reproduction and distribution of documents. 2.0hrs.

**June 27, 2002**

BYT, Fax to Client, 6/25/02 and 6/26/02 MCV Transcripts. Telcom from Client, reacting to press coverage and continued interference from government. Client recommends a letter from minority shareholders. Draft letter. Telcom to legislative staff explaining material and government's continued meeting with government undermines Superior Court and Receiver. Additional telecom to legislative staff. Telcom from Client, concerned that government representatives will sign a stipulated agreement to (1) appoint Oscar as a Temporary Receiver for 45 days and (2) thereafter, agreeing to form a board including members of the Bank of Saipan that appoints a permanent receiver and conducts the affairs of the bank. Trying to locate Turner and others. Telcom, Pierce, Lillian Tenorio and Torres spoke and agreed to meet in the AM. Client located governor's representative. 2.0hrs.

ASSC, MCV Transcription 6/27/02, 1st story. 0.75hrs.

**June 28, 2002**

BYT, Client believes Dist. Ct. story deserves better coverage. Client sums up substance of meeting and outcome. Fax from Client, additional articles of Incorporation for Kim Lee Corporation & Cristobal Investment Corp. Review materials. Organize documents and annotate for media representatives. Lujan Declaration with attachments. 3.50hrs.

STA, document reproduction and distribution. 1.50hrs.

**July 1, 2002**

BYT, Letter from F. Atalig to O'Connor. Telcom to obtain approval for distribution of letter and discussion regarding the hearing schedule and other details relevant to the process.  0.50hrs.

STA, reproduction of Atalig-O'Connor letter; distribution to media outlets.  1.0hrs.

**July 2, 2002**

BYT, media outlets.  Letters to the editor-insights.  Conveyed information.  Telcom from Client regarding the schedule.  Parameters for PDN, nature of documentation and discussion.  0.50hrs.

**July 3,2002**

STA, reproduction of Atalig-O'Connor letter; distribution to minority share holders.

## Consulting Fees and Reimbursable Costs

| | | | |
|---|---|---|---|
| Principal | 31.25 | hours @$120 | $ 3,750.00 |
| Associates | 6.00 | hours @ $90 | $   540.00 |
| Staff | 8.50 | hours @ $30 | $   255.00 |

Total Consulting Fees                                      $ 4,545.00

Total Reimbursable Cost                                   $   646.00
(See attached log)
Reproduction 1,820 x .35@  $  637.00
Fax : 235-9874                  $     9.00
Reproduction 0.35@page

Balance from Prior Statement                          $      -0-

Total Fee Due:                                                $ 5,191.00

# Exhibit 7

Law Offices of
**Brian W. McMahon**
Post Office Box 1267
Saipan, MP 96950
Telephones: (670) 234-9314/9315
Facsimile: (670) 234-9316

BY:
CEPUTY CLERK OF COURT

Attorney for:  **Randall T. Fennell**
**Receiver for the Bank of Saipan**

## IN THE SUPERIOR COURT
## OF THE
## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

|  |  |
|---|---|
| | )      CIVIL ACTION NO. 02-0268B |
| | ) |
| | ) |
| **In Re: THE MATTER OF** | )      **REPORT OF RANDALL T.** |
| **THE BANK OF SAIPAN** | )      **FENNELL, RECEIVER FOR THE** |
| | )      **BANK OF SAIPAN** |
| | ) |
| | )      **REPORT OF AUGUST 22, 2002** |
| | ) |
| | ) |
| | ) |

THIS IS THE **RECEIVER'S REPORT** filed in this matter, dated August 22, 2002.  This Receiver's Report is intended to apprise the Court of the current financial status of the Bank of Saipan as it appears through the Receiver's review of the books and documents of the Bank. Accompanying this Report, the Court will find a Motion seeking approval of this Report and the actions of the Receiver, setting a claims period and authorizing payment of, or in some instances approving payments already made, for Receivership expenses.  A comprehensive proposed order is included.

1

This Report focuses on the current state of the Receivership and the financial condition of the Bank. It also provides detail as to the Bank's and Receiver's expenses.

## BACKGROUND

The Secretary of Commerce determined that the existing directors and their management team caused the failure of the Bank of Saipan (the "Bank"), resulting in over 6000 depositors losing access to their funds. See Exhibit A. Reports previously supplied to the Court from the FDIC, the Bank's independent auditors and documents revealing the financial condition of the Bank led the Secretary of Commerce to place the bank into receivership.

The temporary Receiver is not a party to the lawsuit that will determine if the Bank continues in Receivership. The parties to that case are the Secretary of Commerce and the Bank of Saipan (the Bank). Once it was determined by the Secretary of Commerce, pursuant to CNMI law, that the Bank of Saipan depositors were "in danger of being defrauded" and that the bank was in "poor financial condition," the Secretary closed the Bank and petitioned the court to place the Bank into receivership. The Board of Directors for the Bank of Saipan agreed. The Secretary of Commerce, after further review of the Bank's records, concluded that the receivership should continue. The Bank's Board reconsidered its position and objected to the extension of the receivership. That issue is now the subject of a matter pending before Judge Wiseman. The Receiver is not a party to that proceeding.

At the time the Bank was closed and put in receivership, a full-blown bank run was in progress with long lines of depositors demanding their funds. Further, the Bank had been unable to allow withdrawals of some large CDs. Faced with this information, the Secretary of Commerce was mandated by law to take the action of closing the Bank and placing it into receivership.

The Secretary determined that receivership was necessary to protect the public, and asked Mr. Randall Fennell if he could act as Receiver on a temporary basis. With the support of the Attorney General, Judge Manibusan appointed Mr. Fennell to act in that capacity. Mr. Fennell

2

clearly stated he would serve for only a temporary term and it was anticipated that 30 days would be sufficient to find a replacement. The appointment commenced April 30, 2002, and the Receiver, despite his request to be replaced, is still in the position of temporary receiver due to courtroom jockeying by the Bank's board. Needless to say, taking over a closed bank that has been defrauded by insiders is a multi-faceted task.

During what was supposed to be a limited tenure, the Temporary Receiver's primary goal was to gather information to determine what went wrong, to determine the Bank's current financial viability, and to hire professionals to provide guidance to the court and assist in determining the best course of future action to protect depositor funds. It was also necessary for the Receiver to retain lawyers to determine the existence of, and viability of, claims both for and against the Bank.

The Temporary Receiver does not act as a lawyer. He does not represent one party or the other, nor does he have his own agenda - he is not a principal. In a receivership, the court takes control of the property (in this case the Bank) to protect the depositors. The court then appoints a receiver to act on its behalf and to report with recommendations. The court then accepts, rejects, or modifies the suggestions of the Receiver. The court acts, in effect, as the board of directors and the receiver as his CEO. The conduct of a receivership is not a lawsuit. It does not have a plaintiff or defendant and there is no winner or loser. Instead, a bank receivership is the remedy imposed by the court to protect the depositors when the Bank appears unable to do so.

## RECEIVERSHIP GOALS

Upon appointment, the Temporary Receiver had to act quickly in several general areas to accomplish the following goals.

- securing bank property, its funds, records and books.
- reviewing financial data to see what was wrong with the bank.
- undertaking a study to determine if the bank could or should be sold, merged, liquidated or rehabilitated.

3

- assembling a legal team to review the affairs of the bank and determine if there was any

  basis to bring civil actions to recover money to which depositors or the bank were entitled.

- commencing or continue defenses against claims being brought against the bank.

- taking the steps necessary to protect the Court's exercise of jurisdiction over the bank.

- taking action to collect outstanding loans and marshal other bank assets.

## RECEIVER'S ACTIVITIES

In the three months the Temporary Receiver has been in place, substantial progress has been made toward the aforementioned goals. An overview of the receiver's specific activities to date are as follows:

Secure the Bank, its books and records

The Receiver has physical control of the cash, the loan and deposit records, and other assets of the bank. The computerized records are in generally good working order, and up to date.

Financial Condition

Reviewing the financial situation of the bank has proved time consuming and complicated. The financial records in place on the date the Receivership was established have proven to overstate the solvency of the bank. The loan loss reserve was inadequate, and the loan portfolio was in bad shape. Burger and Comer, CPAs, employed first by the Bank and then by the Temporary Receiver are expected to shortly complete the 2001 Audit and review of loan files.

Initial indications were that, for a variety of reasons related in part to the fraud perpetrated on the Bank, but in large part due to the historically poor management of the bank, the financial statements offered to the Receiver by Bank management on the date it was placed in receivership did not present a true picture of the Bank's condition. The Receiver therefore retained well

4

respected bank consultants to review the options for the future of the Bank. These reports by Griffin and Company and Columbia Financial Advisors have been filed separately with the Court.

<u>Liquidating, Merger, Sale, Rehabilitation.</u>

Again, the detailed analysis of complicated choices was referred to Griffin+Co and Columbia Financial, whose reports have been filed with the Court. The Receiver has conferred extensively with these consultants. Based on the findings in these reports, the Receiver has written the Governor and major government agency depositors requesting their position on forbearance of certain rights they may have to assist private sector depositors. See Receiver's PlanDevelopment, Infra, for further details and exhibits.

<u>Legal Team</u>

The Receiver retained Richard Pierce to analyze what causes of action the Bank may have. Work product privilege mandates the attorney report be filed under seal.

In addition, the bank has had to defend against a focused and well-financed series of legal attacks by the Board of Directors who assert that the Receiver is at fault for the Bank's demise. This has distracted the Receiver's counsel from more legitimate matters and has cost the bank needed money. The Receiver has instituted an action in Texas to recover money taken from the bank by Mr. Wilson (who has plead guilty to wire fraud) and used to purchase membership units in credit card processing companies. The Bank seeks a return of the funds taken from the Bank. The Bank's collection attorneys continue their efforts on defaulted loan recovery.

Attorney Cindy Adams of Brian W. McMahon's law Office was retained to handle administrative matters. She has worked closely with bank staff since the inception of the receivership and is filing a separate report on the administrative matters for which she was consulted.

After devoting the majority of his firm's resources to the receivership for the last 4 months, McMahon has indicated to the Receiver that the work load is in excess of what his firm can handle.

He has asked the Receiver to explore the possibility of transferring some of the work currently being done by his firm to another law firm. As the Court is well aware, the number of unconflicted law firms available to handle this task on Saipan is limited. The only non-conflicted law firm that has indicated an interest is the S. Joshua Berger Law Firm. The Receiver is in negotiations with Mr. Berger at this time and if the negotiations are successful will seek to have the Court approve hiring this firm to take over a large portion of the work currently being handled by the McMahon Law Firm. Mr. Berger's proposal is attached as Exhibit B. The Receiver seeks approval of the terms set forth in that proposal.

A large Portland firm, Schwabe, Williamson and Wyatt provides back up and research as needed for receivership law and provided fact research related to proceedings in the Supreme Court, and on other issues.

Protect Court's Jurisdiction

The Receiver has been forced to spend an inordinate amount of time and money responding to self-serving legal maneuvering by the Directors, and the two major shareholder groups consisting of the Calvo brothers and the JLH Pacific Trust, who assert that they should have a role in plotting the course of the receivership. Motions and appeals are pending, which have greatly limited the Superior Court's ability to act quickly in ruling on motions and instructing the Receiver as to how to proceed. The CNMI Supreme Court has enjoined the Receiver from selling assets.

Collections

When the receivership was instituted, many debtors, perhaps testing the waters, stopped paying on their loans. The Receiver sent out a letter to local collection attorneys seeking reduced rates for handling a step-by-step collection process for the Bank as it cannot afford usual contingency rates on these delinquent loans. Receiver's letter is attached as Exhibit C, the responses thereto are attached as Exhibit D. After negotiations and discussions with the responding attorneys, Mr. Mike White agreed to work with the Bank's staff on setting up an in-house collection department that would prepare legal documents for an attorney's review and

signature. This will save the Bank considerable money over hiring a collection attorney to prepare all documents. Approximately 250 demand letters have been prepared by the Bank's staff to be reviewed and signed by the White Law Firm. The cost of this to the Receiver is $15.00 per letter. It is hoped that this will get a response from the majority of the delinquent borrowers. If not, the Receiver will negotiate further for rates on reviewing and executing complaints that the Bank staff will prepare on behalf of and with supervision from a collection attorney. The possibility of hiring in-house counsel is being considered. Attorney Michael White's contract, attached as Exhibit E, is submitted for approval.

Loans/Deposits/Off-Set

Many borrowers from the Bank of Saipan also have deposits and the Receiver has been inundated with calls from people desiring to offset. The Receiver has advised that, pursuant to Court Order, deposits may not be used to off-set loan obligations. The reasoning for this is that it is not yet certain whether all depositors will be made whole. If a depositor was able to off-set his loan obligations by utilizing deposits now frozen at the bank, he would in effect be getting 100% of his deposit back. As it is not yet certain that the Bank will be able to repay all depositors a 100% of their funds, it is not appropriate to allow an off-set at this point. However, the Receiver has asked the bank staff to prepare a list of the loans and deposits that could possibly be off-set to see what effect this would have on the bank.

Insurance and Bonding of the Receiver.

The Receiver, immediately after appointment, contacted local insurance agents concerning procurement of a fidelity bond and errors and omissions insurance. No local insurance agent was able to readily procure policies. The Receiver further contacted mainland insurers, with the same result. The difficulty in procuring policies stemmed from numerous problems, including the unfamiliarity of insurers with the CNMI, the variety of Bank Receiverships in the United States, and the actions of the Bank's Board in threatening personal litigation against the Receiver.

7

The Receiver has assigned Mr. Pierce's firm to continue the effort of finding a willing insurer. A summary of the efforts made by Laurie Peterka, a paralegal assigned the task by Mr. Pierce, is attached hereto as Exhibit F. Some progress has been made in what has turned out to be a difficult endeavor.

Minority Shareholders.

The Receiver has received numerous inquiries from minority shareholders and their legal counsel concerning their rights to institute legal action against the majority shareholders and their representative Board members. The Receiver has maintained, on advice of counsel, no position on this matter. The Receiver has also maintained no position on reported offers made by the Calvo's and JLH Trust to purchase the shares of minority shareholders. The Receiver has requested that the court authorize him to decline the shareholders' offers to sell to their shares to the Bank (in Richard Pierce's Attorney's Report dated August 7, 2002) and allow minority shareholders' to sell their interests as they please. Shareholders notices advising the Receiver of their intent to sell their shares to the Calvos and JLH Trust are attached as Exhibit G.

Bank Management.

The Receiver has held informal discussions with local CPA firms, local bankers, his consultants, and others to gather suggestions for CEO candidates in the event that the Bank is able to reopen. Some potential candidates have been contacted, but few have expressed interest. Further efforts in this matter await the decision of the CNMI government on its ability or willingness to fund a reopening of the Bank.

Sale of Intertex Building

Prior to the receivership, the Bank had foreclosed the mortgage on the Intertex building. (The debtor has left the island in substantial debt to CNMI creditors) The Intertex building is located on Middle Road and houses the World Tour & Travel Agency. It is a three story building

8

containing apartments as well as commercial space. The Receiver first scheduled an execution sale in the month of June. At that sale, the top bid was $125,000.00, which the Receiver rejected. The Receiver then held another execution sale in July of which the top bid was $170,000.00. The Receiver then bid in $180,000.00 of the judgment held by the Bank. That sale remains to be approved by the Court. Mr. John Joyner acted as the Auctioneer and is seeking court approval of the sale. The Receiver then entered into negotiations with private parties and advised real estate brokers on Saipan that the building was for sale. The Receiver is currently negotiating for the sale of the building in the $350,000.00 range, which appears ready to close. The Receiver proposes to take some in cash and a mortgage on the remainder. Once the transaction is finalized, the Receiver will apply to the Court for approval, as well as request the Supreme Court to lift the stay with respect to the sale.

2001 Audit Report

The Court has authorized the payment of Burger & Comer, P.C., to finish the 2001 audit of the Bank. Mr. David Burger has been working at the Bank in reviewing the loan files and other records to enable him to complete the audit. He has prepared a draft management letter which the Receiver is reviewing. It is expected that the full audit report will be done within two to three weeks.

Media Relations

The Court is aware of the media interest in the Bank of Saipan which has been extensively covered by the local newspapers, radio and television. Representatives of the Board of Directors and some major Shareholders have made a concentrated media attack on the receivership and continue to make false and misleading representations to the press. This unnecessarily alarms the general public, undermines the public's confidence in the Receiver's and Court's actions and, ultimately has a significant negative impact upon ability of the Receiver to efficiently manage the affairs of the Bank. The Receiver believes it is advisable to present the facts regarding the progress of the Bank

receivership in the local media for the benefit of depositors. Therefore, the Receiver has asked the local media consulting firm of B.Y.T. Consulting Services to make a proposal to the receivership for media services.  A copy thereof is attached here to as Exhibit H.  The Receiver recommends the hiring of a professional to handle media relations, both to make sure that they are properly handled and to enable the Receiver to focus on other issues.

Security for Government Agency Deposits

Current government deposits are:

| | |
|---|---|
| CNMI Treasurer | $ 286,537.46 |
| Marianas Public Lands Authority | $ 8,152,533.45 |
| NMIRF Retirement | $ 5,570,396.76 |
| CDA | $1,251,562.64 |
| Marianas Visitors Authority | $ 490,245.39 |

Both NMIRF and CDA claim a perfected security interest in 5.9 Million Dollars of U.S. Treasury notes held by the Bank of Saipan.  Initial review by the Receiver of these agreements raised questions as to the validity of any security interest by these agencies.  The Receiver has asked the Schwabe Law Firm to have its securities department review these agreements and give an opinion on their validity.  The documents related to these claimed security interests are attached as Exhibits I and J.

Further, the Receiver requests permission to publish in the two local newspapers a notice that all those claiming a priority or security interest in the Bank filed their claims with the Receiver no later than October 1, 200, or the claims will be barred.  The notice should also require  that all general creditors, other than demand depositors and savings account holders, file their claims by the same date or be barred.

10

On-going Audit and Review of Secretary of Commerce

The Secretary of Commerce has ordered an audit and review of the Bank's records. The Receiver and the Bank's staff have been assisting in providing documents and work space to representatives of the Secretary of Commerce's office while they are reviewing the different books and records of the Bank.

Request for Preferential Payment of Returning Aliens

The Receiver has received a request from Tan Holdings Company, attached hereto as Exhibit K, that workers whose jobs are ending and are returning to their country of origin be allowed to withdraw their total deposits. The Receiver responded that this would be contrary to the Court's orders and asked that Tan Holdings consider starting a loan fund for its employees by which the company would pay off the employee's deposit and take an assignment of rights from the employee to the deposit. *See* letter attached as Exhibit L. The Receiver has also met with Richard A. Pierce of the Saipan Garment Manufacturers' Association ("SGMA") to explore the possibilities of assisting alien laborers and the bank in setting up a loan fund, as well as becoming a central clearing house for payments to workers who have returned to their country of origin as SGMA is the logical clearing house for such an operation. Negotiations are ongoing.

Miscellaneous

The Bank has experienced two insider thefts, one discovered this July with a loss of somewhat less than $12,000. Prior to institution of the Receivership, there was a $25,000 theft in April 2002. The insurance carried by the Bank has a deductible above either of these two losses. Tom Schoen and Cindy Adams conducted an extensive investigation into the July theft resulting in the termination of the employee who stole the money and disciplinary action against those employees whose failure to follow bank procedure allowed the theft to take place.

11

Also the Receiver has received many complaints regarding the monthly service fee charged to Checking Accounts. This fee seems unfair as the accounts are frozen and the Receiver seeks approval to suspend these charges.

## RECEIVER'S PLAN DEVELOPMENT

After no interest was shown by Guam or Saipan banks in a sale, merger or purchase of Bank of Saipan assets, the Receiver sought to retain experts to assist. Permission was granted by the Court to retain bank experts to analyze the condition of the bank and make recommendations for its future. The Receiver sought input from the banking department at the Schwabe law firm, several CPA firms, CEO's from local and Guam banks, the Banking Commissioner from the Federated States of Micronesia(FSM) and the CEO of the First national Bank of the FSM[1].

After considering the advice from these sources, and phone interview with various candidates, Columbia Financial Advisors out of Seattle, Washington and Griffin and Company out of Hawaii were selected to assist.

Both companies initially sent representatives to gather data and meet with Bank employees. Columbia then issued an initial report, outlining the basic condition of the Bank. This report was previously filed with the Court. The Receiver requested both firms to analyze options for the future of the Bank, from reopening as a full service bank to liquidation.

Draft reports were provided to the Receiver in late July. The Receiver requested the consultants to come to Saipan with a stop in Hawaii to enable the consultants to compare their findings and prepare a joint power point presentation for meetings with government officials and the public.

On July 28, Bob Rogowski, a principal in Columbia Financial Advisors and Nick Griffin from Griffin and Company arrived on Saipan.

---

[1] The FSM Bank had experienced trouble retaining their FDIC status, and had used Nick Griffin's services with good results, according to FSM officials.

A meeting was held with the Secretary of Commerce and his staff members. Another meeting was held at the Governor's conference room with the Governor, Lt. Governor, representatives of Commonwealth Development Authority, Marianas Visitors Authority, Northern Mariana Islands Retirement Fund, Marianas Public Lands Authority, Public Auditors Office, and the Receiver, at which a power point presentation was made reviewing the final reports of the consultants. The Court has previously been provided with these reports.

The next day a "town meeting" was held for the public at the Courthouse. The meeting was well attended and included depositors, shareholders and attorneys for various parties with an interest in the Bank. Mr. Fennell received questions after the presentation. Later that day, the Receiver, Mr. Rogowski and Mr. Griffin met with Lt. Governor Benavente to further review the experts' reports.

The Receiver than sent a letter to the Governor and CNMI agencies with deposits at the Bank. Letter attached as Exhibit M. This letter summarized and outlined the findings of the experts. In a nutshell, this letter presented the following options based on the reports:

<u>Keeping the Bank Open as a Full Service Bank</u>. To keep the bank open, Griffin and Company indicated all of the following work have to be done:

> 1) Existing government deposits would need to be converted to equity (shares of stock) or some form of a debenture (a bond representing subordinated debt). This would mean, in effect, that government agencies would be owners of the Bank. The best case scenario for this plan would envision the agencies recovering their investment in 5-10 years, if the Bank was successful in mounting a turn-around. This would then enable the new government shareholders to sell or redeem their interests. If the Bank failed again or did not perform as anticipated, the government would loose [sic] or not recover its investment.

> 2) New cash of $15-20 million would also have to be made available, either by the government, private parties or through establishing a line of credit with existing financial institutions. This would be necessary to meet the withdrawal demands of private depositors, have capital for loans and to cover operating expenses. Allowing full access to deposits is necessary, according to my advisors, to have any hope of restoring public confidence in the Bank. This cash infusion could be in the form of an equity investment (investment in stock), a loan from the government or private parties, or a line of credit from existing financial institutions. However, practically speaking, it is the CNMI government, its agencies and affiliated entities that would have to provide these funds or guarantee a line of credit as it is unlikely that private sector investors would be willing to take this risk. Certainly, existing shareholders could be approached about contributing cash; but

these shareholders have previously stated that $10 million would be out of the question, and $10 million is below the minimum required for total Bank recovery.

3) New management would have to be installed at the bank. The inability of the prior Board of Directors and top management namely the former C.E.O., to manage a sound Bank has been well documented. Competent, experienced bankers would have to be recruited to fill management needs. This management would require competitive salaries.

4) Under this reopening scenario, the government agencies and related entities converting deposits to equity would become the major shareholders in the bank. As such they would control the Board of Directors, and the selection of top management.

5) The "new" Bank of Saipan would retain all rights to proceed against those who caused the failure of the "old" Bank, and be entitled to any recovery. In the event all depositors and other creditors are made whole, this recovery would run to the government investors who are shareholders in the bank.

6) As Mr. Griffin noted in his presentation, there are 'many moving parts" if option of re-opening the Bank as a full service institution is to be implemented. There is a large amount of risk and no guarantee of success. This new Bank would not be FDIC insured and there would be a large risk that it could not retain old depositors and draw new deposits. A CNMI government or CDA guarantee for depositors would assist in public confidence.

Letter to the Governor dated 08/02/02, Exhibit M.

Liquidation with Private Depositors Taking Preference. Both companies believed that the best option for the future is recovery of assets through a slow liquidation, with small private depositors taking preference over large public depositors. This would require:

A. A downsizing of the Bank to a collection agency.

B. Release of $5.4 million of U.S. securities owned by the Bank but claimed by MPLA and the Retirement Fund as guarantees of their deposits.

C. A willingness of government depositors to wait until last to receive access to their deposits.

In his letter to the Governor, Receiver presented reasons for government forbearance, noting that governments historically have, throughout the world, assisted the private sector in times of crisis. The receiver noted:

1) No CNMI government agency or related entity has all, or even a major portion, of its assets on deposit with the Bank of Saipan. There are approximately

14

6,000 private accounts at Bank. Many of these individuals have all their savings or business capital in the Bank of Saipan. Temporary lack of access to deposits will be an inconvenience to government agencies. To private depositors, it can mean total devastation. The receiver is aware of people who have had lack of access to health care due to the freezing of their deposits and of numerous businesses that have been unable to meet employee payroll or pay suppliers. Many teeter on the brink of bankruptcy. Private depositors have been unable to make car loan payments, house payments, credit card payments, etc. All of these individual's credit ratings have been harmed. If the situation continues, the harm may be irreparable, forcing individuals into bankruptcy.

2) Many of the depositors are guest workers. As a result of the Bank's failure, many of these people are being forced to deal with loan sharks who prey on the alien worker community. Whether true or not, opponents of the CNMI having control of its own immigration will use a delay in repayment of a guest worker's deposits as an example of the Commonwealth's mistreatment of its alien labor force. The CNMI cannot afford this adverse publicity.

3) By moving quickly to protect and assist the private sector, the government demonstrates its capability to assist businesses and individuals in times of crisis. This sends a positive message to potential investors indicating competency and commitment in the CNMI Government. Failure of the government to act quickly and decisively sends out a negative image to potential investors.

4) Businesses with funds on deposit cannot make a profit without access to their working capital. No profits means no taxes for the government. Further, if these businesses fail due to lack of access to their capital, more people lose their hard to come by jobs. The ripple effect on the economy will be far greater than the loss of funds on deposit.

5) Failure of Bank of Saipan has led to uncertainty with regard to the entire CNMI banking community. The private business sector depends on the reliability and reputation of the local banking community to prosper. The CNMI government, business sector and banking community thus each have a vested interest in a quick resolution of this problem.

If the government agrees to forbearance, private depositors could have immediate access to $8-9 million, or approximately 42.5% of their deposits. If there is no government forbearance agreement, private depositors would be limited to an immediate withdrawal of 15% of their funds on deposit while government agencies will receive immediate access to 43.7% of their deposits, assuming they can prove the validity of security agreements. In any of these examples, all depositors would get further distributions as funds became available.

Letter to governor dated August 02, 2002, Exhibit M.

The Receiver received replies from the Governor indicating that liquidation of the Bank should proceed. Letter attached as Exhibit N. The Marianas Public Lands Authority (MPLA) has initially demanded its alleged security interest be honored, and declined to agree any form of

15

forbearance. Letter attached as Exhibit O. The Receiver hopes to continue a dialogue to work with MPLA on a solution to their concerns.

The Receiver further met with CDA representatives to explore the status of $6.5 million in loan guarantees of loans made by the Bank, and to examine the feasibility of CDA taking over government deposits and loans of equal value. These discussions continue. Discussions have also been in progress with some of the Directors and major depositors concerning settlement of potential claims. These negotiations are aimed at raising as much cash as possible to make private depositors whole as quickly as possible.

If negotiations are successful, private depositors may be able to recover a substantial portion of their deposits in the near future. The most important key to success of these negotiations is the willingness of CDA to take over CNMI agency deposits totaling $16.5 million, and the willingness of the agencies, notably MPLA and NMI Retirement Fund, to assist by agreeing to this scenario, which would have them receive their deposits back over a period of approximately five years.

## BANK OF SAIPAN'S FINANCIAL CONDITION

### Balance Sheet Trends

Attached as Exhibits P and Q are the Bank's Statement of Condition and Statement of Income, respectively. Although the Bank's balance sheet continues the downward trend evident since the beginning of 2002, which basically means that the Bank's business is shrinking, there has been no significant negative shift in equity, assets, liabilities or income since the implementation of the Receivership.

16

## Figure 1: Balance Sheet Trends[2]



It is notable that the sharp decline in the balance sheet occurred immediately prior to the Receivership, that is February through April of this year. Since the Receivership has been put in place, the balance sheet has stabilized.[3]

Cash Flow

Cash flow during the 15 month period ending December 31, 2001, showed an alarming trend from fiscal year end on September 30, 2000. In short, while the Bank showed a positive cash

_____

[2] These revised asset figures are the results of lately delivered figures by David Burger (August 14) which adjusted loan loss reserves against retained earnings.

[3] Where appropriate, the data from which all figures and summary tables are derived is annexed as an appendix to this Report.

flow of $1.7 million during fiscal year 2000, the following year ending December 31, 2001 saw cash flow shrink, ultimately showing a negative cash flow of over half a million dollars.  See Figure 2, Cash Flow

### Figure 2:  Cash Flow



| | 9/30/00 | 12/31/01 |
|---|---|---|
| Cash Flow | $1,715,663.00 | $(639,627.00) |

While cash flow from operations increased in fiscal year 2001, this cash flow was drained by a $970,000 dividend declared in that year, along with an unusual transaction involving shares. In an uncharacterized transaction, the Bank transferred approximately $3.5 million to the Calvos and the JLH Trust for their shares. Montgomery then, in a series of transactions, caused approximately $3.1 million to be deposited into the Bank.  Under Aldan's direction, the Bank booked $487,890 as a purchase of treasury stock.  This created a cash flow problem which was exacerbated by a decrease in the amount on deposit from a positive gain of $3,550,772 in 2000 to a negative cash flow of $2,124,224 in 2001. See Figure 3, 2001 Cash Flow.

### Figure 3:  2001 Cash Flow

| | | |
|---|---|---|
| Operating Cash Flow | $ | 2,604,374 |
| Investment Cash Flow | $ | 338,113 |
| Net Decrease in Deposits | $ | (2,124,224) |
| Payment of Dividends | $ | (970,000) |
| Purchase of Treasury Stock [4] | $ | (487,890) |

---

[4] As characterized by Aldan which may or may not be accurate.

18

| Net Decrease in Cash Flow | $ | (639,627) |
|---|---|---|

As Figure 3 shows, negative cash flow was due, in part, to the declaration of a dividend by the Board of Directors in 2001. As discussed below, this dividend was apparently calculated in order to take as much of the retained earnings out of the corporation as possible before the sale of the shares of the majority shareholders to Montgomery. This was also calculated to drain as much of the one-time "other income" from the Bank as possible prior to its transfer to Montgomery. The result of the dividend was, however, negative cash flow, and as discussed in the following section, impaired liquidity. It significantly contributed to the Bank's ultimate failure and insolvency.

<u>Bank Liquidity</u>

While increasing the liquidity of the Bank has been a stated goal of the Receivership, the Receiver's first priorities were to stabilize the Bank's operations and get much needed funds into the hands of the Bank's depositors in order to help tide them over while a long term plan for the Bank could be developed. These two priorities have been realized by the Receiver without impairing the Bank's fragile liquidity ratio. In fact, liquid assets (cash and cash equivalents) prior to the Receivership have halted their downward trend and stabilized since the Receivership was put into place. See Figure 4, Liquid Assets vs. Liabilities Since April 2002.

**Figure 4:  Liquid Assets vs. Liabilities Since April 2002**

| April 30: | Liquid Assets | | | Liabilities | | |
|---|---|---|---|---|---|---|
| | Cash & Clearings | $ | 3,059,598 | DDA | $ | 5,836,458 |
| | Due From Banks | $ | 2,276,572 | Savings | $ | 9,544,262 |
| | Investments | $ | 6,144,505 | TCD | $ | 25,590,131 |
| | Total | $ | 11,480,675 | Total | $ | 40,970,851 |

**% Liquid Assets to Liabilities:**    **28.02%**

19

**May 31:**

| Liquid Assets | | | Liabilities | | |
|---|---|---|---|---|---|
| Cash & Clearings | $ | 2,123,248 | DDA | $ | 4,735,980 |
| Due From Banks | $ | 1,345,490 | Savings | $ | 7,920,773 |
| Investments | $ | 5,413,461 | TCD | $ | 25,347,855 |
| Total | $ | 8,882,199 | Total | $ | 38,004,608 |

**% Liquid Assets to Liabilities:**   **23.37%**

**June 30:**

| Liquid Assets | | | Liabilities | | |
|---|---|---|---|---|---|
| Cash & Clearings | $ | 1,801,397 | DDA | $ | 4,497,230 |
| Due From Banks | $ | 1,713,061 | Savings | $ | 7,784,149 |
| Investments | $ | 5,417,712 | TCD | $ | 25,298,769 |
| Total | $ | 8,932,170 | Total | $ | 37,580,149 |

**% Liquid Assets to Liabilities:**   **23.77%**

As the following Figure 5 shows, the ratio of the Bank's liquid assets at various times from September of 1999 to June of 2002 demonstrates a long history of decline.

**Figure 5:  Liquidity Trend**



This trend, from a ratio of liquid assets to liabilities of over 60% to less than 30%, has been ongoing over a period of over two years prior to the appointment of a Receiver.  Therefore, although

20

the Bank's liquidity problems may have been exacerbated by the fraud perpetrated upon the Bank last winter, it is clear that the fraud was not the only source of the Bank's current liquidity problems.

The Receiver has examined sources for new capital in order to improve the Bank's liquidity. As part of this effort, the Receiver has successfully negotiated for the return of $210,000 to the Bank by the Calvo Group. See Receiver's Report of May 20, 2002. The Receiver is also pursuing recovery of assets from those involved in the fraudulent transfer of $5 million in funds from the Bank to entities controlled by Mr. Michael T. Wilson . See Receiver's 2nd Special Report on Litigation. However, to return the Bank to its previous levels of liquidity would take between $10 and $15 million. See Figure 6.

### Figure 6:  Additional Capital Requirements

| | Ratio of Liquid Assets to Liabilities | | | |
| --- | --- | --- | --- | --- |
| | @ Cur Levels | @ 12/01 Levels | @ 09/00 Levels | @ 09/99 Levels |
| | 23.77% | 50.48% | 60.33% | 62.77% |
| Cur. Liabilities: | $37,580,148 | $37,580,148 | $37,580,148 | $37,580,148 |
| Liq Assets Benchmark: | $8,932,170 | $18,969,323 | $22,673,883 | $23,587,537 |
| Add'l Capital Rqd: | -0- | $10,037,153 | $13,741,663 | $14,655,367 |

Bank Solvency

As can be seen from Figure 6:  Additional Capital Requirements, at least 10 to 15 million dollars will be necessary to return the Bank to historical liquidity standards. Yet, liquidity aside, this money is also needed to return the Bank to solvency.

In determining the Bank's liquidity and solvency at the beginning of the Receivership, the Receiver had no option but to rely on the information presented to him in the Bank's financial statements to make this determination. These financial statements ultimately proved unreliable. Of greatest concern to the Receiver is the overstatement of the value of the Bank's loans.  As of December 31, 2001, over 30% of the Bank's loans were in delinquent status, while the percent of

loans which have been historically classified as "non-performing" (that is, interest from these loans is no longer accrued as income to the Bank) has ranged between 6% and 20%. See Figure 7: Aged Loan Summary

**Figure 7: Aged Loan Summary**



The average percent of delinquent loans since January 2001 is over 26%. This leads to the conclusion that as of April 30, 2002, the value of the loan portfolio is overstated by at least $9,329,698.18 (i.e. the loan balance at that date ($35,514,260.15) multiplied by the 26.27% delinquency rate). For purposes of illustration, Figure 8 contains a breakdown of the value of loans as booked versus the value of loans less delinquent loans.

### Figure 8:  Adjusted Loan Balances



Prudent accounting would discount loans payable by enough to reflect the Bank's ability to collect the loans. This would result in a write down of the Bank's loans of about $10,000,000.  For a more detailed analysis, please see both the Griffin+Co Report to the Receiver, "The Bank of Saipan Strategic Alternatives" and the Columbia Financial Advisors Report, "A  Review of the Restructuring and Sale Alternatives for the Bank of Saipan" filed on July 30, 2002.

In sum, the Bank's financial data reveals a bank which is shrinking as a viable business entity, which has continually impaired cash flow and liquidity, and whose assets have been overstated by failure to write off uncollectible loans.

FDIC Issues

The Bank of Saipan is one of only two banks in the Commonwealth which has not gained FDIC insurance. The reason it has not become an FDIC member is because it could not meet the management and business requirements necessary of an FDIC Bank.  This shortfall was known by

23

the Bank's Board of Directors, and the steps necessary to correct the deficiencies were outlined and scheduled for remedial action. Yet the Board never followed through. Among some of the shortcomings of the Bank listed are the following:

> Reduce the number of delinquent loans

> Implement prudent lending policies

> Establish guidelines for self-dealing and insider transactions

> Implement procedure for identifying problem loans

> Reduce overhead expenses – particularly salary and "exorbitant" personnel expenses

> Strengthen supervision by the Board of directors

> Increase responsiveness to recommendations by external auditors

> Overhaul in-house data processing

Of these recommendations for improvement, virtually none were completed by the Bank. The experts told the Receiver that given the 1997 report and the receivership, it is highly unlikely that the Bank would ever become insurable by the FDIC. The Bank simply did not take appropriate remedial steps.

While procedures for identifying problem loans were adopted and a compliance officer appointed, no in house compliance review was ever completed, and it is unclear whether one was ever attempted. Reduction in overhead expenses, particularly in salaries and benefits, was never addressed by the bank and does not appear on the Bank's FDIC compliance schedule. Up until Receivership, the Bank was paying Board Members $500 per board meeting attended, and the Bank's C.E.O. was being paid a salary of $100,000 per year, even though the 1997 FDIC report recommended replacing him. Mr. Aldan was also given a $50,000 bonus in the months preceding his indictment.

As to strengthened supervision by the Board of Directors, a review of the board meeting transcripts of 2001 show that the Board expended little energy at the Board meetings discussing the

24

actual operations of the Bank.  Board members have since claimed that they were unaware of the activities of the C.E.O. and the Bank's new owner, who also worked in the Bank's International Loan Department, which led to their indictment in Federal Court for wire fraud, among other crimes.  The Board also claims to be unaware of the flow of money that resulted in cash payments by the Bank to a group of the Bank's major shareholders in an amount over $3 million.

The Bank was also admonished to become more responsive to the recommendations of outside auditors.  However, since the date of the FDIC report, not only did the Board fail to act to implement the FDIC recommendations, it also failed to implement in any significant way the recommendations of two independent outside auditing firms, and their own attorney.  See Ferguson Proposal of 1999, Deloitte & Touche Proposal of 2000, Burger and Comer Report of 2001-2002, and Mair Mair Opinion of 2002 attached as Exhibits R to U.

Finally the Bank was told to revamp its in-house data processing systems.  As with many of the other FDIC projects started by the Bank, this plan, too, failed to be implemented.  Deloitte & Touche was hired to begin an FDIC audit of these systems in early 2001, but as described below, as soon as the Board of Directors was aware that the majority shareholders had the opportunity to sell the Bank as a non-FDIC institution, the data processing project was abandoned.  See Exhibit V. Deloitte & Touche engagement letter and correspondence re: FDIC data processing audit.

To become an FDIC member is not an easy task and requires a strong commitment on the part of a bank's management team and unswerving leadership by the Board of Directors over what may be a several year process before membership is approved.  In fact, although a schedule for reaching FDIC compliance was in fact implemented at the Bank  as soon as it was learned that the majority shareholders could sell their shares at a premium if the bank was *not* FDIC insured, they quickly scuttled all attempts to gain FDIC approval.

Not only did the Bank's Board fail to heed the advise of the FDIC, independent auditors, lawyers and consultants in order to lead the Bank to sound financial practices and much needed deposit insurance, it actually took affirmative action to cancel any effort at qualifying for FDIC insurance.  This occurred during fiscal year 2001, when it became apparent to the major

25