shareholders of the Bank, that they could sell their shares for a premium to B. Douglas Montgomery.

In the transcripts of the Board meeting of April 27, 2001 (attached as Exhibit W) the Board first showed signs of interest in a proposed stock transaction in which the majority shareholders would be bought out of the Bank at a premium of $18 per share – *provided the Bank did not become FDIC*. April 27, 2001 Meeting Transcript:

> Tom [Aldan]: "…we need to address the FDIC project and I want to find out from the Board whether in fact the Board is serious to consider selling the Bank to any new perspective [sic] buyer, if there's any. Because what I am getting information from perspective [sic] buyer is that they don't want to see the bank become FDIC."

To this remark, Director David Lujan responded:

> [David] Lujan: "Let me suggest that we table or defer the proposal from Deloitte and Touche until the next board meeting and let's hear out how serious this [sic]  potential buyers are. Because you know the JHL Pacific Trust point of view if an offer makes sense we will be willing to sell. And so if these guys are, if one of their requirements is that it is not FDIC bank that they want then why should we spend this $92,000 I believe that Deloitte has submitted. In the meantime, we would have no problem on our side for Tom entertainment and holding confidential discussion with these potential buyers to figure out their seriousness."

Id.

No Board member ever addressed, at least on the record, why a legitimate purchaser would not want FDIC insurance for a small-town Bank. The Receiver's experts opined there would be no legitimate business purpose.

Then after a discussion of share price for the transaction, in which the major shareholders hope to maximize their profit per share, Director Lujan follows up with another suggestion:

> [David] Lujan:  "My suggestion, Tom, we need to draft a confidentiality agreement that with whoever you speak to they got to sign it.  The worst thing we can do honestly is for people to know that we are considering this because it may cause a run on the bank.  So we got to be super sensitive about this topic and whoever it is we speak to has got to sign a confidentiality agreement and as would include all of us in that…"

Id at *6.

Based on available records it appears that at this point the interests of the directors and majority shareholders, and the bank's depositors and minority shareholders diverged.  The Board began acting on its own agenda, and in secret – to avoid a run on the Bank.  Plans which were proposed earlier in that meeting to reduce the loan to deposit ratio (which was then at 72.72%) by having the major shareholders agree to make substantial deposits in the Bank never reached fruition.  Any fair reading on Board meeting transcripts indicates primary attention turned to the stock purchase.

A little over two weeks later the Board of Directors met again, on May 15, 2001.  This time Bank operations were not discussed at all.  Instead in just over 4 pages of transcripts, 3 pages were devoted entirely to the stock purchase, a transaction which would benefit the majority shareholders but the Bank not at all, and the final page covers confidential Hillblom probate matters.  The non-confidential portion of these meeting transcripts should be read in their entirety.  They are instructive both in what was discussed and what was not discussed.  The effect on the Bank and its depositors was not considered, except to the extent that there was an undercurrent in the discussion of a fear that "[t]he depositors who lose their money, they have a right to come after the directors for making a decision to sell to a company that drove the bank into the ground or whatever," (George Chui, May 15, 2001 Board Meeting Transcripts at *1) and Bank counsel Michael Pangelinan was asked to research the subject of "As a Board, does a member owes [sic] and obligation to act in the best interest of the company?" May 15, 2001 Board Meeting Transcripts at *3.  In fact the entire meeting was focused on limiting the Board of Directors' and majority shareholders' liability for selling to the wrong party at the wrong price.  That is, according to Director Lujan, "So we protect our assets [sic]."

On May 23, 2001, less than one week later, another meeting was held to discuss the "legal aspects of the requirement of the Board in selling *its,* selling the Bank's share."  May 23, 2001 Meeting Transcript at *1 (emphasis added).  At that meeting not only was there some confusion as to who actually owned the Bank (the Board or the Shareholders) but also as to the prevalence of non-FDIC banks in general.  Tom Schoen, the Bank's Chief Operating Officer, notified the Board

that the Bank of Saipan was the *only non-FDIC bank* in attendance at the Independent Banker's Association Conference in Hawaii, a conference which at least one director thought was solely for non-FDIC banks. Id. Still, the Board decided to table any issue of the Bank's auditor and FDIC. May 23, 2001 Meeting Transcript at *2:

> Tom [Aldan]: "So I would try and get more specific information in terms of resume and banking references and the guy, Douglas Montgomery, stated what company he works for or own shares of. Shall we leave the subject of the bank. With regards to, until we satisfy this issue of the bank shares, I still want to defer the issue of the Bank's auditor and FDIC. Is that the understanding of everybody?"

> Board members: "Yes, to be deferred."

> Tom: "Yes, because we [sic] are interested in purchasing a non-FDIC bank."

[David] Lujan: "Not only that, but why spend the money, you know?"


Dividend and Stock Purchase-Impact on the Bank


An objective review of the Bank's financial condition... both current and historical can not be complete without reviewing significant past practices of the Bank's Board of Directors which contributed to the failure of the Bank.

The Receiver would like to draw the Court's attention to the fact that the Board has, through counsel, and through the press, complained that it is totally faultless with regard to the misappropriation of at least $5 million by Dusean Berkich, Bert Douglas Montgomery, Michael T. Wilson and Tomas "Tommy" Aldan (a/k/a the "BMW Gang"). It has also claimed that the BMW Gang is the only source of the Bank's current strife.

The facts do not support these contentions.

Bank records show that once presented with the offer to sell to Montgomery, the majority shareholders put on blinders and refused to see who and what Montgomery was, even though there are multiple expressions in the various board meetings that the Board was uncomfortable with Montgomery as a purchaser and feared liability for selling out to a man who may lead to the destruction of the Bank. As Mr. Lujan put it, ".... Run on the bank."

It is clear that in the context of the sale of the majority's shares to Montgomery, the Board was serving the majority shareholders' interests, not the Bank. The Board, as well as Tommy Aldan, facilitated negotiations with the new buyer, solely to the benefit of the majority shareholders, the Tans, the Calvo Group and the JLH Trust. Corporate money was expended in the legal representation of these major shareholders in the negotiation and drafting of a purchase agreement and in traveling to Las Vegas in order to meet the buyers. The Board decided, solely to the benefit of the majority shareholders, that the Bank would no longer pursue FDIC compliance, and abandoned all efforts to do so without any consideration of the benefits FDIC would inure to the depositors and non-selling minority shareholders. Finally the Board declared a $1 million dividend prior to the sale of stock by the majority shareholders, solely for the purpose of bleeding out the proceeds of various Hillblom probate settlements from the Bank and into the pockets primarily of the majority shareholders immediately prior to the sale of their stock.

All these actions, not just the actions of the BMW indicatees, contributed to the Bank's decline. The Bank was denied the advantages of FDIC approval by the Board and majority shareholders. The Bank's liquidity was impaired by the stripping of capital from the Bank in the form of a dividend equal to one fifth the value of the money embezzled by the Bank's new owner. The Bank picked up all the expenses of the majority shareholder's transaction with Montgomery, even though such a transaction could not have benefited the corporation. Finally, the Board and majority shareholders, together, and solely for the interest of the majority shareholders, agreed to sell the Bank to a person whom they had every reason to distrust – and they did so without the slightest investigation, exhibiting more interest in protecting themselves from liability through form (such as gaining the Banking Commissioner's approval of the sale) rather than through substance (neither the Board nor Mr. Montgomery conducted any reasonable due diligence prior to the sale).

Bank records also show that since 1999, the Bank's liquidity and balance sheet have been in a downward spiral. Yet despite this, the Board made an extraordinary effort to declare the biggest dividend possible (over 100% of "other income" derived from the settlement of various Hillblom Estate law suits) without even considering the Bank's depositors, the Bank's liquidity, or the

29

requirements necessary for Bank's plans to become FDIC insured. This dividend impaired the Bank's liquidity and benefited the majority shareholders, who thereby obtained a large cash pay-out before the sale of their stock to the BMW indictees.

Records also show that independent experts, and the Bank's Board of Directors itself, recognized that the most prudent and responsible course of action, both for the shareholders and the depositors, would be for the Bank to come into FDIC compliance. This would have the effect of insuring all deposits at the Bank and protecting the Bank's depositors from the Bank's insolvency. It would also have the added advantage of cleaning up Bank policies with regard to its loan portfolio and documentation, thus making the Bank and its loans more valuable, thus increasing value to the Shareholders. Yet when the majority shareholders were faced with an offer by a buyer desiring a non-FDIC bank, the Board of Directors, under the influence of the Bank's majority shareholders, stopped all efforts to become FDIC compliant, finding it to be, in the words of Mr. Lujan, "a waste of money."

## RECEIVERSHIP FINANCIAL STATUS

As per the Court's Order, the Receiver is reporting the following income and expenses of the Receivership. First, the Receiver has recovered $210,000 in funds paid out to the Calvo Group during the stock transactions, which occurred in December of 2001.

Expenses of the Receivership fall into three basic categories: Payroll Expenses, Operational Expenses, and Professional Fees and Expenses. These expenses, totaling $ 584,427.61for the period reported, are shown in the following Figure 9

**Figure 9: Receivership Expenses**



As can be seen from Figure 10, the largest expenses are related to employee payroll and benefits. This includes salaries and wages, retirement benefits and insurance.

**Figure 10: Employee Expenses**

| | | |
|---|---|---|
| Employee Benefits | $ | 11,734.52 |
| Medical and Dental Insurance | $ | 30,640.61 |
| Salaries and Wages | $ | 165,112.80 |

Employee expenses are expected to slowly decline as hours are reduced due to lack of activity and as employees successfully find other employment.

After Employee Expenses, the next largest category of expenses is Operational Expenses. The largest of these are Space Rental ($47,029), Power, Light and Water ($19,211) and Communication Expenses ($15,888). These expenses are unlikely to change in the future unless the Bank closes down the Tinian and Saipan Branches or undergoes a controlled liquidation.

### Figure 2:  Operational Expenses

| | | |
|---|---|---:|
| Check, Credit Card Supplies/Expenses | $ | 6,471.14 |
| Communication Expenses | $ | 15,887.83 |
| ATM/ Credit Check Expenses | $ | 4,106.04 |
| Courier Expenses | $ | 2,156.78 |
| Equipment Lease | $ | 4,734.00 |
| Gasoline Expense | $ | 284.25 |
| Miscellaneous Expenses | $ | 1,106.89 |
| Monitoring Systems | $ | 3,195.00 |
| Office Supplies | $ | 7,526.96 |
| Power, Light and Water | $ | 19,210.64 |
| Publication and Advertisement | $ | 2,072.70 |
| Repairs and Maintenance | $ | 1,455.93 |
| Repossession Expenses | $ | 750.00 |
| Space Rental | $ | 47,028.93 |
| Taxes and Licenses | $ | 249.29 |
| Transaction/Wire Expenses | $ | 1,586.60 |
| Travel Expenses:  Branch Operations | $ | 3,300.45 |

Professional Fees and Expenses consist of collection expenses in the amount of $978.55, while $10,000 was paid as retainer to the law firm of Loeffler, Jonas and Tugey for their work in recovering assets, defending suits and prosecuting counterclaims in the courts of Texas.  $20,000 was paid to Burger and Comer, P.C. to allow them to finalize their audit of the Bank's fiscal year ending December, 2001.  Finally fees totaling $83,956.85 were paid to two independent, outside banking consultants, who were hired in order to evaluate the Bank's fiscal status and to provide possible options for the Bank's future.  Their bills are attached as Exhibits X and Y.  These two firms recently gave a public presentation of their findings.

### Figure 3: Professional Fees & Expenses

| | |
|---|---|
| Smith & Williams (Collections) | $ 978.55 |
| Loeffler Jonas & Tuggey (Legal) | $ 10,000.00 |
| Burger & Comer (Auditor) | $ 20,000.00 |
| Griffin & Co. (Consultant) | $ 41,000.00 |
| Columbia Financial (Consultant) | $ 42,956.85 |

Customer Account Summary

As anticipated, the number of accounts as well as deposit balances declined after the Bank's limited re-opening on May 21. The purpose of the re-opening plan was to ensure that much needed cash was available to depositors who had had no access to their funds since the Bank's closure on April 30. A comparison of the Bank's deposit base as of the First Receiver's Report and as of June 21, one month after re-opening, appears in Figure 14, below.

### Figure 14: Customer Account Activity

| | DDA | | | Savings | | | TCD | | |
|---|---|---|---|---|---|---|---|---|---|
| | [$ | ] | [#] | [$ | ] | [#] | [$ | ] | [#] |
| April | $ | 5,807,845 | [1,655] | $ | 9,543,638 | [5,498] | $ | 25,593,917 | [454] |
| June | $ | 4,497,230 | [1,265] | $ | 7,784,149 | [3,465] | $ | 25,298,769 | [445] |
| Net Decline | $ | 1,310,615 | [ 390] | $ | 1,759,489 | [2,033] | $ | 295,148 | [ 9] |
| | | 22.57% | 23.56% | | 18.44% | 36.98% | | 1.15% | 1.98% |

| Total Account Activity | | |
|---|---|---|
| | [$ | ] | [#] |
| April | $ 40,955,400 | [7,607] |
| June | $ 37,580,148 | [5,175] |
| Net Decline | $ 3,365,252 | [2,432] |
| | 8.15% | 31.97% |

These figures show that while there has been a significant (over 30%) drop in the number of accounts at the Bank, the total dollar amount on deposit has decreased less than 9%. This is due to the large number of small (under $500) accounts which were previously with the Bank and which

33

were closed after the Bank's re-opening.  The closing out of these accounts has had the advantage of decreasing operational costs while having a limited impact upon the Bank's overall deposit base or liquidity.

As of June 30, seven days after the figures reported above, the total amount available for withdrawal from the Bank of Saipan was approximately $750,000.  This is money which has been left on deposit at the Bank even though these customers, representing a total of 3,286 accounts at the Bank, are entitled to take this money out under the re-opening plan.

### Figure 15:  Available Funds

Total Available for Withdrawal

|  | [ $ | ] | [ #] |
|---|---|---|---|
| DDA | $ | 304,870.83 | [ 929] |
| Savings | $ | 448,637.20 | [ 2,357] |
| Total Available | $ | 753,508.03 | [ 3286] |

% of Available Funds Still on Deposit 22.39%

In other words as of June 30 roughly 22% of the funds which have been made available to the public under the re-opening plan have been left on deposit at the Bank.   This amount is, however, anticipated to diminish over time as depositors gradually access their available funds.

Bank Administration/Operational Expenses

Bank expenditures covering May 16, 2002 to August 9, 2002 is attached as Exhibit Z.

The Bank's operations are covered in four reports from Operations Office Tom Schoen. These reports are attached as Exhibits AA.   Data sources for graphs contained in the report are attached as Exhibit BB.

Dated August 20, 2002.

RANDALL T. FENNELL
RECEIVER FOR THE BANK OF SAIPAN

34

## LIST OF EXHIBITS

| | |
|---|---|
| Exhibit A | Receivership Determination from Secretary of Commerce |
| Exhibit B | Mr. Joshua Berger's proposal |
| Exhibit C | Receiver's letter soliciting collection proposals |
| Exhibit D | Responses to solicitation re collection |
| Exhibit E | Atty. Michael White's contract |
| Exhibit F | Laurie Peterka's summary of insurers |
| Exhibit G | Various Notice of intent to sell shares |
| Exhibit H | Engagement Letter re BYT Consulting |
| Exhibit I | NMIRF Security Agreement re deposit |
| Exhibit J | CDA Security Agreement re deposit |
| Exhibit K | Tan Holdings' letter re returning contract workers |
| Exhibit L | Receiver's response to Tan Holdings' letter |
| Exhibit M | Receiver's letter to the Governor dated 8/2/02 |
| Exhibit N | Governor's letter dated 8/13/02 |
| Exhibit O | MPLA response dated 8/5/02 |
| Exhibit P | Statement of Condition |
| Exhibit Q | Statement of Income |
| Exhibit R | Ferguson proposal of 1999 |
| Exhibit S | Deloitte & Touche proposal of 2000 |
| Exhibit T | Burge and Comer report of 2001, 2002 |
| Exhibit U | Mair Mair opinion of 2002 |
| Exhibit V | Deloitte & Touche engagement letter and correspondence re data processing audit |
| Exhibit W | Transcript of Board Meeting dated 4/27/01 |
| Exhibit X | Griffin+Co Invoice |
| Exhibit Y | CFA invoice |
| Exhibit Z | Bank expenditures |
| Exhibit AA | Operations report dated 7/12/02, 8/14/02, 8/15/02 & 8/19/02 |
| Exhibit BB | Data sources for graphs |

# B.Y.T. Consulting Services
P.O. Box 85
Saipan. MP. 96950
Tel: (670) 235-9873/72
Fax: (670) 235-9874

August 1, 2002

Randall T. Fennell, Esq.
Receiver
Bank of Saipan
P. O. Box 500049
Saipan, MP · 96950

Re:    **Engagement Letter**
      **Contract to Provide Public Relations and Media Coverage**

Dear Mr. Fennell:

Judging by newspaper reports and the flurry of suits and counter-suits filed almost
weekly, it would be exceedingly difficult for the consumer to separate fact from fiction in
this technical and highly complex matter.  Based on our brief discussions you are
interested in making sure that all interested parties are correctly informed as to the facts
surrounding this matter.

Costs are dictated by the level of effort required to move complicated facts into the
mainstream in a very short period of time.

The scope of work includes document review, preparation of fact sheets and summaries,
that can be more easily digested by the media and other interested parties.  Press releases
and other conventional means of reaching the public will also be utilized.

The Receiver's input will be required to keep abreast of proposed government actions,
court schedules, and to obtain documents and other material for review and appropriate
action.

Please sign this engagement letter to allow us to begin this work in earnest.

Sincerely,

Brenda Y. Tenorio
Enclosure:

EXHIBIT
*H*

Receiver
Bank of Saipan
Engagement Letter
August 1, 2002

Contract Approved by:

_____          _____
                                          Randall T. Fennell
                                               Receiver

Date:

## About BYT Consulting Services

BYT Consulting Services has provided strategic planning, lobbying, permitting services to public and private clients since 1988 and is uniquely suited to perform the services required by the Chief Negotiator.

Principal Brenda Y. Tenorio has experience in government policy development in the Commonwealth of the Northern Mariana Islands, having served in a key position in the Office of the Lt. Governor for a period of six years in the early 1980's. During this period, Ms. Tenorio worked on 902 Covenant Consultations and 702 Covenant Financial Negotiations. This series of Covenant 902 Consultations covered issues of fundamental importance to the local government, from fisheries management and ownership of submerged lands, to tax exempt bonds and Headnote 3 (A) [duty free imports from the CNMI to the U.S. mainland] to labor and immigration matters. 702 Covenant Financial Negotiations resulted in a $228 million agreement.

In the 1990's, Ms. Tenorio provided consulting services focused on developing an appropriate government response to the federal takeover of CNMI labor and immigration controls. Ms. Tenorio developed the existing overall strategy to stave off a federal take-over that is still being used by the Office of the Governor. The second phase of this work required full implementation of the plan, including recruitment of lobbyists and other support organizations, policy development, design and implementation of a media/public information campaign in response to attacks in the Commonwealth and abroad.

Ms. Tenorio was also appointed the Governor's Special Representative to Section 902 Consultations with the United States President's Representative in 1994. This appointment was conferred for a limited duration and the exclusive purpose of addressing the citizenship of foreign nations born in the CNMI and a review of role of the Washington Resident Representative in Washington. Ownership of submerged lands was later added to the portfolio, resulting in a recommendation to file a suit against the United States.

Ms. Tenorio provides strategic planning and permitting services to private clients, ranging from resort developments to submerged land leases, gaming licenses and procurement matters.

BYT Consulting Services can also provide support services for large projects. BYT Consulting Services works with Associates who provide ancillary or support services as necessary. Our team has experience providing administrative support for special projects and events. Research is an important component of the work that we do. At present, we have the capability to execute effective media strategy, using all available tools from press releases to radio and television commercials to documentaries.

FROM RANDALL FENNELL                    ID,670 323 7435                    PAGE   4

## Fee Schedule

### Hourly Rate Schedule

| | |
|---|---|
| Principal | $120.00 |
| Associates | $ 90.00 |
| Technical/Administrative Staff | $ 65.00 |
| Support Staff | $ 30.00 |

### Estimation of Costs

Cost is based on the time commitment required to undertake the project as described in the scope of work.

Out-of-pocket expenses including telephone, fax, courier services, air travel, lodging and other costs specifically required for this project are billed separately and marked up 15%. Copying is charged at .35 per page.  If special presentations, events or printed materials are required, actual costs for collateral materials will be billed.  This cost may vary depending on size, special colors or paper stock, photographs, and graphics and the number of revisions may differ depending on need.

### Contract Term

The work commences upon execution of the engagement letter and continues for the duration of Receiver's duties.

### Billing and Payment

Billing statements are presented for payment monthly and a 12% is assessed for invoices 60 days past due.  Past due dates are fixed to the date of the statement.

A retainer is required to commence work on this project.  The retainer and monthly payments are made out to:

BYT Consulting Services
P. O. Box 500085
Saipan, MP  96950

# Exhibit 8

1  RICHARD W. PIERCE
2  WHITE, PIERCE, MAILMAN & NUTTING
   P.O. Box 5222
3  Saipan, MP  96950
   Telephone:     (670) 234-6547
4  Facsimile:      (670) 234-9537

5  Attorneys for Randall T. Fennell in his capacity as Receiver for Bank of Saipan, Randall T. Fennell

6

7                           IN THE SUPERIOR COURT
8                                  FOR THE
                COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS
9

10

11                                              CIVIL ACTION NO.
                                                    02-0268B
12

13    In Re: THE MATTER OF              RANDALL T.  FENNELL'S FINAL
                                        BILLINGS AND REQUEST FOR
14    THE BANK OF SAIPAN                CLARIFICATION ON ORDER OF
                                               EXONERATION
15

16

17

18

19

20

21       Now comes Randall T.  Fennell, in his capacity as former Receiver for the Bank of

22  Saipan, and files the financial statement for the Bank for the 15 months ending December

23
    31, 2002, prepared by Burger & Comer P.C., and its final bill (Tab 1), the final billings
24
    during Mr. Fennell's tenure for Loeffler Jonas & Tuggey LLP of San Antonio, Texas (Tab
25
26  2), Schwabe Williamson & Wyatt PC (Tab 3), White Pierce Mailman & Nutting and the

27  collection cases of Michael T. White of White Pierce Mailman & Nutting (Tab 4), the Law
28
    Office of Brian McMahon (Tab 5), the Law Office of Richard Pipes (Tab 6), and Mr.

                                           1

Fennell's statement and request for payments of expenses and request for fees (Tab 7).

This filing is made in accordance with the Court's order of September 27, 2002. The attorney billings are redacted to eliminate attorney-client communications and work product of a confidential nature. Unredacted billings are filed with the Court under seal and *in camera* and are not served upon those on the service list.

**Request for Clarification on Court's Order of Exoneration**

The Court September 27, 2002, order of exoneration for Mr. Fennell states at page 2, lines 16 to 17: "It is further ordered that the Bank and the Receiver shall indemnify Mr. Fennell for any and all claims arising from Mr. Fennell's actions as Receiver."

Normally, a direction to indemnify includes the duty to defend, which appears to be the intent of the Court's order. *See Hennessy v. Robinson*, 985 F. Supp. 283, 287 (N.D. N.Y. 1997) ("this Resolution provides for indemnification which, of course, includes the duty to defend because duty to indemnify includes the duty to defend as well") (citations omitted). However, in the context of insurance policies, courts sometimes have to deal with arguments that indemnification does not include defense costs. *See, e.g., Mt. Hawley Ins. Co. v. Federal Sav. & Loan Ins. Corp.*, 695 F. Supp. 469, 474-75 (C.D. Ca. 1987). Therefore, to eliminate any ambiguity and to avoid needless litigation in the future, it is respectfully requested that the Court's exoneration order of September 27, 2002, be amended to read as follows:

"It is further ordered that the Bank and the Receiver shall defend and indemnify Mr.

2

1 Fennell for any and all claims arising from Mr. Fennell's actions as Receiver."

2

3  The Receiver respectfully suggests that the Court intended for the defense to be

4 provided, and this change in the order will make that intent clear.

5

6

7 Respectfully submitted this October 4, 2002.

8 _____

9 Randall T. Fennell, in his capacity as former Receiver

10

11

12 WHITE, PIERCE, MAILMAN & NUTTING

13

14 Richard W. Pierce
  Attorney for Randall T. Fennell in his capacity as former Receiver for the Bank of Saipan

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Tab 7

RICHARD W. PIERCE
WHITE, PIERCE, MAILMAN & NUTTING
P.O. Box 5222
Saipan, MP 96950
Telephone:      (670) 234-6547
Facsimile:      (670) 234-9537

Attorneys for Randall T. Fennell

IN THE SUPERIOR COURT
FOR THE
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

|  |  |
|---|---|
| In Re: THE MATTER OF<br><br>THE BANK OF SAIPAN | CIVIL ACTION NO.<br>**02-0268B**<br><br>**DECLARATION OF**<br>**RANDALL T. FENNELL** |

I, Randall T. Fennell, declare as follows:

1.    I make this declaration of my own personal knowledge.  If called on to testify, I would testify in accord with this declaration.

2.    I was appointed to act as Receiver for the Bank of Saipan by Judge Manibusan on April 30, 2002.  I was discharged by the Court by order of September 27, 2002.

3.    This declaration is made in support of the request for payment of attorney fees, my expenses and the fees for my work.

1

Tab 7

4.   I have previously reviewed all attorney fees billings through the end of August 2002. The billings reflect work done for me as Receiver. Having been an attorney, I have knowledge of the market price of attorneys of the caliber that I hired, and I believe that the hourly fees are fair and reasonable. In so far as the hourly fees for the law firm of Loeffler Jones & Tuggey, I am relying upon its own statements of the their hourly rate, the fact that the Bank hired that firm in March at the same rate, the quality of its work performed for the Bank, and my general knowledge of fees for stateside city firms.

5.   I have also reviewed the post-September 1, 2002, billings. The fees after September 1, 2002, are less than prior to that date, primarily because litigation in the Supreme Court lessened and most of the motion work for the Superior Court had to be complete by the end of August. All fees requested to be paid are at Tabs 2 through 6 of the final report.

6.   I know that the Schwabe firm, WPMN, and Brian McMahon's office spent more time working for me on receivership matters than they billed.

7.   Richard Pipes obtained for me documents for the disqualfication proceedings in the Supreme Court.

8.   This attorney work required substantial commitment of time by attorneys drafted for this particularly job.   The legal issues have been a challenge with

2

Tab 7

some novel questions for this jurisdiction. The work required the synthesis of law and facts in a short period of time and a heavy time commitment particularly by WPMN and Brian McMahon's office. The fees were fixed at a reasonable rate, and the attorneys expect to be paid for their work. While the total amount of fees seems high, the fees are low considering the complexity of the matter, the amount of work and output and the litigious behavior of others who have greater resources and no scrutiny from third parties. From the receiver's view point, this has not been a desirable case for attorneys. While the Supreme Court has yet to rule on the mandamus proceeding, I believe that the attorneys for the receiver have generally obtained favorable results for the receivership. I urge the Court to approve their billings and order that they be paid.

9.  I personally seek fees of $100.00 per hour or $16,000 per month for four months. While I am not a practicing attorney, I have legal training and experience, experience in business, and experience in one bank receivership cases. Additionally, the receivership subjected me to personal attacks and kept me from my normal activities beyond the one month to which I had originally agreed. These factors warrant the payment of the $100.00 per hour.

10.  I did not keep contemporaneous time records. For that reason, I am only

Tab 7

requesting for 160 hours per month or $16,000.00 per month.  I generally worked more than eight hour days on this project, including Saturdays and sometimes Sunday work with the attorneys or experts.  In June, I took a short trip to Korea and in September, I had two short trips, for a total of six business days away from Saipan since my beginning the job as receiver.

11.  I am not seeking reimbursement for my staff time or office expenses or telephones charges.  However, I am seeking payment of the fees of BYT Consulting Services.  Ms. Brenda Tenorio's total fees are $9,974.00 as itemized in the attached letters to me dated August 7 and September 27, 2002.

12.  In May 2002, by certain parties' assistance to employees of the Bank of Saipan who would stop the Bank from re-opening and the well publicized nature of the alleged grievances, I and my attorneys had to spend time putting out the public fires that had been started.  Later, in early June, public stories emerged from David Lujan's purported statements about how so many lawsuits would flow and government officials sued if the receiver were not stopped.  I knew that if I did not have assistance in dealing with the media and educating the public and the depositors, either I and my attorneys would have to spend an inordinate amount of time doing so or the disinformation could infect the conduct of the receivership.  Rightfully or wrongfully, in a highly public case

4

Tab 7

like the closure of the Bank of Saipan and millions of dollars unpaid to depositors and unpaid to the Bank by borrowers, public perception of the stability of the receivership is important. So, I hired Brenda Tenorio to keep abreast of the receivership proceeding and to educate the media and other interested persons about the status of the receivership and progress on being able to pay depositors.

13.  Burger & Comer's financial report for the 15 months ending December 31, 2001, along with its final bill, is at Tab 1. It remains to be paid $5,800.00 of the agreed costs for its work. That amount should be paid to Burger & Comer as it has completed its assignment which was begun prior to the receivership at an agreed cost with the Bank.

I declare under penalty of perjury under the laws of the Commonwealth of the Northern Mariana Islands that the foregoing is true and correct.

Executed in Saipan, CNMI, this October 3, 2002.

Randall T. Fennell

5

# B.Y.T. Consulting Services
P.O. Box 85
Saipan, MP. 96950
Tel: (670) 235-9873/72
Fax: (670) 235-9874

September 27, 2002

Mr. Randall T. Fennell
Receiver
P. O. Box 500049
Saipan, MP   96950

**Re:     Statement for Consulting Services**
         **July, August and September 2002**

Dear Randy:

Please find enclosed my statement for consulting services provided in July, August and
September 2002.

| | |
|---|---|
| July 2002 | $2,840.35 |
| August 20002 | $2,551.65 |
| September 2002 | $4,482.00 |

A good portion of time was spent explaining the significance of court and government
actions to media outlets and encouraging more detailed review of documents.   During
this period, I met with and provided explanations and documents to media, executive and
legislative officials.

Please make the check payable in the amount of $9,974.00, to BYT Consulting Services.

Lastly, please also find enclosed a copy of a timeline that we developed last week in the
course of our expectation that media exchanges would escalate between the parties.   It
will be good background material for the new Receiver.

Let me know if you have any questions regarding these statements.

Sincerely,

Brenda Y. Tenorio
Enclosure:

## A Statement for Providing Media Services to BoS Receiver
### From September 1 to September 30, 2002

September 2   BYT, Telecom to the Receiver regarding recent media coverage of fees and Receiver's arrangements for collection and other responsibilities. Also discussed what approaches could be taken to clarify the subject for depositors and the general public. 0.50hrs.

September 3   BYT, Telcom from Receiver, response to Tribune article dated September 2, 2002. Telcom to Pierce for summary of views and request for additional information. Research files for reference materials and media file to draft response. Initiate timeline of press coverage and court filings based on media database and attorney records of pleadings. Press release with Tribune clip distributed to media outlets. Telecom to McMahon, copies of Montgomery Affidavit and BoS payments to majority shareholders 5.0hrs.

STA, Fax to Receiver, MCV Transcription for August 29 and August 30.
0.25hrs.

September 4   BYT, Research media files to respond to BC-MCV interview of 8/30/02. Telecom to Receiver and Pierce, regarding records of pleadings filed to date. Develop timeline of press coverage and court filings based on media database and attorney records. Reviewed Affidavit of Thomas A Tarter In support of Bank of Saipan's Opposition to Exoneration; The Bank of Saipan, Inc.'s Reply Memorandum in Support of Motion to Stay; Declaration of Randall T. Fennell; Joinder Re: Objection to the and Motion to Appoint Special Master. Drafted press release and handled distribution to media outlets. 7.0hrs.

September 5   BYT Reviewed Receiver's Objection to Lodgment By Calvo's and So-Called Motion to Appoint Special Master; The Bank of Saipan, Inc.'s Reply Memorandum In Support of Motion to Stay; Order Denying Motion to Stay; Appointment with KCNM; Fax to Coffman, release and Receiver Declaration. Additional work on timeline. 3.50hrs.

September 6   BYT, Telecom media sources re, court date. Attend Hearing; Reviewed Order Granting Motions to Intervene; Order Denying Motion for Review By Full Panel; Order to list all Ex Parte Motions.

ASSC, MCV Transcript, Supreme Court hearing; MCV Transcription, Superior Court hearing; KCNM Transcription of Receiver Interview. 2.0hrs.

September 9   BYT, Court hearings. Monitor media coverage. 3.50hrs.

ASSC, KCNM Transcription 9/9 Interview with O'Connor.  MCV Transcription 9/9 of Superior court hearing to appoint a new receiver. 1.75hrs.

STA, Fax to Fennell, 9/6 MCV Transcriptions and 9/6 KCNM Transcription of Receiver Interview.  0.25hrs.

September 10  BYT, Reviewed Order Denying Motion for Substitution of Receiver.

ASSC, 9/10 MCV Transcription of court arguments for appointment of new receiver.  KCNM Transcription, 9/10, O'Connor Interview, Pt. 2. 2.00hrs.

STA, Fax to Receiver, 9/9 MCV Transcription of court hearing.  0.25hrs.

September 11  STA, Fax to Receiver, 9/10 MCV Transcription of court arguments for appointment of new receiver.  0.25hrs.

September 12  ASSC, MCV Transcription 9/12/02, Suit filed by Sovereign Equity versus Calvos, JLH and Montgomery.  KCNM Transcription 9/12, Interview with Bellas, UFX suit against Calvos, JLH.  1.75hrs.

STA, Fax to Receiver, KCNM Transcription, 9/10, O'Connor Interview, Pt. 2.  Fax to Receiver, MCV, 9/12 Trasncription of Suit filed by Sovereign Equity versus Calvos, JLH and Montgomery. 0.50hrs.

September 13  BYT, Reviewed Ex Parte Receiver's Request for Approval of the Sale of Assets.

ASSC, MCV Transcription, 9/13, Interview with T. Bellas, regarding UFX suit against Calvos, JLH, Montgomery.  0.75hrs.

September 16  BYT, attendance at Superior Court hearing. 3.0hrs.

STA, Fax to Receiver, KCNM 9/12 Transcript of Bellas UFX interview and MCV 9/13 Bellas UFX Interview. 0.50hrs.

September 19  BYT, Attended court hearing.  1.50hrs.

September 20  BYT, Reviewed Superior Court Order denying appointment of a special master; Summary of Orders to be Considered by the Court.  Telecom to MCV and KCNM regarding interviews.  1.50hrs.

September 23  ASSC, KCNM Transcription, 9/23 Interview with R. Pierce.  1.75hrs.

September 24  BYT, Superior Court hearing.  Telecom to media.  1.75hrs.

STA, Fax to Receiver, KCNM Transcription, 9/23/02 Interview with Pierce. Copies of KCNM 9/23 Interview with Pierce distributed to all media outlets. Reproduced and faxed copies of Summary of Orders to be Considered by the Court. 2.0hrs.

September 25 BYT, Reviewed Receiver's Request for Approval of CDA MOU. 1.0hrs.

September 26 BYT, Provide Receiver with a copy of media and court timeline.

**Consulting Fees and Reimbursable Costs**

| | | | | |
|---|---|---|---|---|
| Principal | 27.75 | hours @$120 | $ | 3,330.00 |
| Associates | 10.00 | hours @ $90 | $ | 900.00 |
| Staff | 4.00 | hours @ $30 | $ | 120.00 |

Total Consulting Fees                                         $   4,350.00

Total Reimbursable Cost                                       $      132.00
(See attached log)

Fax :  234-9872              $     2.50

Reproduction  370 x .35@      $  129.50
Reproduction 0.35@page

Total Fees Due for September 2002                            $   4,482.00

Balance Due for August 2002                                 $   2,551.65

Total Fee Due:                                              **$   7,033.65**

| BYT CONSULTING SERVICES | | | | |
|---|---|---|---|---|
| INCOMING/OUTGOING DOCUMENT LOG | | | | |
| 9/2/2002 | McMahon | Pickup | 4 | Clean copy check |
| 9/3/2002 | Receiver | OF-323-7435 | 6 | MCV transcript 9/3/02 |
| 9/3/2002 | Media | OHD | 2 | Press release |
| 9/3/2002 | Media | OHD | 2 | Press release |
| 9/3/2002 | Media | OHD | 2 | Press release |
| 9/3/2002 | Media | OHD | 2 | Press release |
| 9/4/2002 | Pierce | IF-234-9537 | 5 | Declaration of Randall T. Fennell |
| 9/4/2002 | Pierce | IF-234-9537 | 5 | Joiner re; objection to file motion to appoint special master |
| 9/4/2002 | Pierce | IF-234-9537 | 11 | The bank of Saipan, Inc.,reply memo in support of motion to stay |
| 9/4/2002 | Pierce | IF-234-9537 | 2 | Order denying motion to stay |
| 9/4/2002 | Pierce | IF-234-9537 | 6 | BOS, Inc. response to receiver's government objections to request for panel review |
| 9/4/2002 | Pierce | IF-234-9537 | 11 | Affidavit of Thomas A. Tarter in support of BoS  opposition to exoneration |
| 9/4/2002 | Pierce | IF-234-9537 | 4 | Thomas Tarter resume |
| 9/4/2002 | Receiver | File | 28 | Receivers pleading list |
| 9/5/2002 | Receiver | OF-323-7435 | 2 | MCV transcript 9/5/02 |
| 9/5/2002 | Pierce | Pickup | | Disk |
| 9/5/2002 | Pierce | IF-234-9537 | 5 | Opposition to motion to strike affidavit of Thomas A. Tartar |
| 9/5/2002 | Media | OF-477-3982 | 6 | Press release 9/5/02 Declaration of Randall T. Fennell |
| 9/5/2002 | Media | OHD | 6 | Press release 9/5/02 Declaration of Randall T. Fennell |
| 9/5/2002 | Media | OHD | 6 | Press release 9/5/02 Declaration of Randall T. Fennell |
| 9/5/2002 | Media | OHD | 6 | Press release 9/5/02 Declaration of Randall T. Fennell |
| 9/5/2002 | Media | OHD | 6 | Press release 9/5/02 Declaration of Randall T. Fennell |
| 9/5/2002 | Pierce | IF-234-9537 | 10 | Receivers objection to lodgment by Calvo's and so called motion to appoint special maste |
| 9/5/2002 | Pierce | IF-234-9537 | 7 | Declaration of Richard W. Pierce |
| 9/5/2002 | Pierce | IF-234-9537 | 9 | Declaration of Randall T. Fennell w/ attachment |
| 9/5/2002 | Media | OF-477-3982 | 6 | MCV Transcription & Declaration of Randall T. Fennell |
| 9/6/2002 | Pierce | IF-234-9537 | 2 | Order |
| 9/6/2002 | Pierce | IF-234-9537 | 2 | Order denying motion for review for full panel |
| 9/6/2002 | Pierce | IF-234-9537 | 3 | Order granting motion to intervene |
| 9/9/2002 | Receiver | OF-323-7435 | 8 | MCV transcription & KCNM News 9/5-6/02 |
| 9/10/2002 | Pierce | IF-234-9537 | 3 | Order denying motion for substitution of receiver |
| 9/10/2002 | Receiver | OF-323-7435 | 2 | MCV transcript 9/9/02 |
| 9/13/2002 | Receiver | OF-323-7435 | 2 | MCV Transcript 9/12/02 |
| 9/16/2002 | Pierce | IF-234-9537 | 3 | Certificate of Service |

| 9/16/2002 | Pierce | IF-234-9537 | 2 | Proposed order approving the sale of certain assets of the bank |
|---|---|---|---|---|
| 9/16/2002 | Pierce | IF-234-9537 | 2 | Proposed order on receivers request for approval of sale of asset |
| 9/16/2002 | Pierce | IF-234-9537 | 6 | Estopple Certificate |
| 9/16/2002 | Pierce | IF-234-9537 | 5 | Assignment of sub-lease |
| 9/16/2002 | Pierce | IF-234-9537 | 9 | Declaration of Randall T. Fennell 9/13/02 |
| 9/16/2002 | Pierce | IF-234-9537 | 4 | Ex parte receiver's request for approval of the sale of asset 9/13/02 |
| 9/16/2002 | Receiver | OF-323-7435 | 7 | MCV transcript 9/13/02 & KCNM transcript 9/12/02 |
| 9/19/2002 | Pierce | IF-234-9537 | 4 | Randall T. Fennell Proposal (Draft) |
| 9/20/2002 | Pierce | IF-234-8637 | 2 | Order CA# 02-0268B |
| 9/24/2002 | Receiver | OF-323-7435 | 7 | KCNM transcript 6/24/02 |
| 9/24/2002 | Media | OF | 21 | KCNM transcript 6/24/02 |
| 9/24/2002 | Pierce | IF-234-9537 | 25 | Summary Order |
| 9/24/2002 | Media | OF | 78 | Summary Order |
| 9/25/2002 | McMahon | IF-234-9316 | 14 | Receiver's request for approval of CDA MOU |
| | | | | |
| Total | | | 370 | |

**A Statement for Providing Media Services to BoS Receiver**
**From August 1 to August 31, 2002**

August 1,      BYT, at request of legislative staff, provided another copy of District
Court filings, Griffin and Columbia financial rehabilitation plans.  Reviewed Dott's
stated objections to Griffin and Columbia financial plans for rehabilitation of BoS.  Fax
PDN article on Judge Unpingco's recusal to Variety, Tribune and KCNM, Fennell, and
appropriate government officials.  0.75hr.

August 5      BYT, Telcom from Receiver, September 9 hearing.  Fax from Receiver,
JNB letter dated August 2, regarding Griffin and Columbia Financial reports.  Follow up
required.  1.0hr.

August 7      BYT, Telcom from Receiver regarding the Receiver's request that all
government deposits remain with BoS or be converted into equity.  Fax from Receiver, a
copy of the Receiver's August 2 letter to the Governor and MPLA's letter to the
Receiver, dated August 5, 2002, requesting the withdrawal of deposit.  0.50hrs.

August 8      BYT, Telcom from Receiver regarding PDN inquiry and request for
materials.  Appointment with PDN reporter.  0.50hrs.

August 9      BYT, Telcom from Receiver, issues regarding government deposits and
government position of same.  Results of financial briefings.  0.50hrs.

August 10     BYT, meeting with government official to discuss protection of depositors
and role of independent agencies.

August 12     BYT, Telcom regarding letter to Governor Babauta.  Met with Governor's
advisor and indicates the governor will state his support for depositors soon.  0.50hrs.

August 13     BYT, Letter from Governor to Receiver, response to Receiver- Governor
letter.  Telcom with Receiver about what government actions are required to advance
bank and depositors interests.  Telcom from Receiver, relaying preliminary results of
government meeting to address issue of how best to handle government deposits and
concerns related thereto.  Fax from Adams, Letter from Governor to Receiver, regarding
the disposition of government deposits.  0.50hrs.

August 14     BYT, Fax from Receiver, JNB letter in response to Receiver letter to dated
August 2.  Telcom from Receiver, regarding Governor's response.  Telecom to
government staff.  Considering response.  1.0hrs.

August 15     BYT, discussion with government staff regarding government response.
0.50hrs.

August 16      BYT, Fax from Receiver, Reviewed Order Granting Motion to Disqualify Justice Alexandro C. Castro and Order Denying Motion to Disqualify Justice Lamorena, III.  Telcom to Receiver, re, Orders.  Fax from Pierce, Civil Action No. 02-0268B, District Court, Filing of Superceding Indictment.  Reviewed documents and provided copies to media outlets.  1.0hrs.

August 19      BYT, Fax from Pierce, Civil Action No. 02-0268B. Telcom to Receiver. Reviewed Civil Action No. 02-0268B, Declaration of Flores, BoS records, Declaration of T. Schoen, Declaration of B. Douglas Montgomery, Receiver's Position on the Interventions of the Calvos and the JLH Trust. Reviewed documents and distributed same to media.  1.75hrs.

ASSC, MCV Transcription of Appointment of Judge Onerheim and MCV Transcription of Bert Douglas Montgomery's response to Calvo suit.  1.0hr.

STA, Reproduction and distribution of documents.  2.0hrs.

August 20      BYT, Appointment with Lt. Governor regarding the Bank of Saipan and financial reports.  0.50hrs.

August 21      BYT, Telcom to government regarding current financial situation of the Bank of Saipan and government policies affecting the Receiver's work.  0.50hrs.

August 22      BYT, Received from Adams a copy of the Report of Randall T. Fennell, Receiver for the Bank of Saipan with attachments.  Telecom to Receiver to discuss Report of the Receiver. Reviewed material and distributed relevant sections to media outlets.  3.75hrs.

STA, Fax materials to the receiver.  0.25hrs.

August 23      ASSC, MCV Transcript, Taylor, Demapan and Manglona recusals.  Fax to Receiver, AGO reorganization letter.  0.75hrs.

STA, Pick up document from Pierce office.  0.50hrs.

August 26      STA, Reproduction of materials and distribution to the media.  1.0hrs.

August 27      BYT, Appointment with KCNM to provide documents and an explanation of Bank of Saipan matters.  Arrange for interview.  0.75hrs.

ASSC, MCV Transcript, Report of the Receiver.  1.0hrs.

STA, Reproduce and distribute materials for KCNM interview prior to meeting with Receiver. 0.50hrs.

August 29      BYT, Discussion with Receiver regarding future interviews.  0.50hrs.

ASSC, MCV Transcript, Fennell interview.  1.0hrs.

STA, Fax materials to the receiver. 0.25hrs.

August 30,    ASSC, MCV Transcription, O'Connor interview.  1.0hrs.

STA, Fax materials to the receiver. 0.25hrs.

**Consulting Fees and Reimbursable Costs**

| | | | | |
|---|---|---|---|---|
| Principal | 14.50 | hours @$120 | $ | 1,740.00 |
| Associates | 5.75 | hours @ $90 | $ | 517.50 |
| Staff | 3.75 | hours @ $30 | $ | 112.50 |

| | | |
|---|---|---|
| Total Consulting Fees | $ | 2,370.00 |

Total Reimbursable Cost                                   $    181.65
(See attached log)
Reproduction  519 x .35@      $  181.65
Reproduction 0.35@page


Total Fee Due for August 2002:                    **$  2,551.65**

**BYT CONSULTING SERVICES**

**INCOMING/OUTGOING DOCUMENT LOG**

| | | | | |
|---|---|---|---|---|
| 8/1/2002 | Smith | IF-233-3336 | 2 | Letter to Thomas Schoen and Randall T. Fennell |
| 8/1/2002 | Receiver | File | 1 | Draft letter |
| 8/1/2002 | Gen | File | 1 | Draft letter |
| 8/1/2002 | Gen | OHD | 1 | Misc. Materials |
| 8/1/2002 | Gen | OF-322-7826 | 2 | News Articles, PDN 7/31/02 |
| 8/1/2002 | Fennell | OF-323-7435 | 2 | News Articles, PDN 7/31/02 |
| 8/1/2002 | Media | OF-234-9271 | 2 | News Articles, PDN 7/31/02 |
| 8/1/2002 | Media | OF-234-0447 | 2 | News Articles, PDN 7/31/02 |
| 8/2/2002 | Pierce | IF-234-9537 | 5 | Bank of Saipan Receivership: superior court CA# 02-0268B |
| 8/5/2002 | Receiver | IF-323-7435 | 5 | Marianas Public Land Authority Fund at Bank of Saipan |
| 8/13/2002 | Receiver | IF-323-7435 | 2 | Bank of Saipan receivership |
| 8/17/2002 | Fennell | OF-323-7435 | 2 | MCV Transcript, 8/16/02 |
| 8/19/2002 | Receiver | IF-323-7435 | 20 | Order granting motion to disqualify Justice Alexandro C. Castro |
| 8/19/2002 | Receiver | IF-323-7435 | 20 | Filing of superceding indictment 8/16/02 |
| 8/19/2002 | Media | OHD | 40 | Order granting motion to disqualify Justice Alexandro C. Castro |
| 8/19/2002 | Media | OHD | 40 | Filing of superceding indictment 8/16/02 |
| 8/19/2002 | Gen | OHD | 20 | Order granting motion to disqualify Justice Alexandro C. Castro |
| 8/19/2002 | Gen | OHD | 20 | Filing of superceding indictment 8/16/02 |
| 8/19/2002 | Receiver | IF-323-7435 | 16 | Order denying motion to disqualify Justice Pro Tempore Alberto C. Lamorena,111 |
| 8/20/2002 | Media | OHD | 32 | Order denying motion to disqualify Justice Pro Tempore Alberto C. Lamorena,111 |
| 8/20/2002 | Gen | OHD | 16 | Order denying motion to disqualify Justice Pro Tempore Alberto C. Lamorena,111 |
| 8/20/2002 | Receiver | IF-323-7435 | 22 | Declaration of Ronald A. Flores |
| 8/20/2002 | Receiver | IF-323-7435 | 6 | Receiver's position on the interventions of the Calvo's and JHL Pacific Trust |
| 8/20/2002 | Receiver | IF-323-7435 | 4 | Filing of declaration of B. Douglas Montgomery |
| 8/20/2002 | Receiver | IF-323-7435 | 3 | Filing of declaration of Thomas D. Schoen 8/19/02 |
| 8/20/2002 | Receiver | OF-323-7435 | 3 | MCV Transcript 8/19/02 |
| 8/22/2002 | Media | OHD | 16 | Order denying motion to disqualify Justice Pro Tempore Alberto C. Lamorena,111 |
| 8/22/2002 | Media | OHD | 20 | Order granting motion to disqualify Justice Alexandro C. Castro |
| 8/22/2002 | Media | OHD | 22 | Declaration of Ronald A. Flores |
| 8/22/2002 | Media | OHD | 6 | Receiver's position on the interventions of the Calvo's and JHL Pacific Trust |
| 8/22/2002 | Media | OHD | 44 | Declaration of Ronald A. Flores |
| 8/22/2002 | Media | OHD | 12 | Receiver's position on the interventions of the Calvo's and JHL Pacific Trust |
| 8/22/2002 | Gen | OHD | 22 | Declaration of Ronald A. Flores |
| 8/22/2002 | Gen | OHD | 6 | Receiver's position on the interventions of the Calvo's and JHL Pacific Trust |

| 8/23/2002 | McMahon | Pickup | | Reports of Randall T. Fennell receiver for BOS w/ attachment |
|-----------|---------|--------|---|--------------------------------------------------------------|
| 8/24/2002 | Receiver | OF-323-7435 | 2 | MCV transcript, 8/23/02 |
| 8/26/2002 | Media | OHD | 70 | Report of Randall T. Fennell receiver for the Bank of Saipan 8/22/02 |
| 8/27/2002 | Receiver | OF-323-7435 | 3 | MCV transcript, 8/27/02 |
| 8/29/2002 | Receiver | OF-323-7435 | 3 | MCV transcript 8/28/02 |
| 8/30/2002 | Receiver | OF-323-7435 | 4 | MCV transcript 8/30/02 |
| | | | | |
| Total | | | 519 | |
| | | | | |

# B.Y.T. Consulting Services
### P.O. Box 85
### Saipan, MP. 96950
### Tel: (670) 235-9873/72
### Fax: (670) 235-9874

August 7, 2002

Mr. Randall T. Fennell
P. O. Box 500049
Saipan, MP  96950

**Re:**  **Statement for Consulting Services.**
        **June and July Statements**

Dear Randy:

Please find enclosed my statement for consulting services provided in connection with
your dismissal and reappointment as receiver for the Bank of Saipan.

Aside from organizing materials and providing annotations or explanations of the
documents for general consumption, a fair portion of this statement went to reproduction
of materials for distribution to the media and others. Given the gravity of the issues
raised in this case, it is essential that original documents be provided for direct scrutiny
by media representatives and others including key minority shareholders and legislators.

Please make the check payable to BYT Consulting Services.

Let me know if you have any questions.

Sincerely,

Brenda Y. Tenorio
Enclosure:

### A Statement to Provide Media Services in Connection with
### Reappointment as Receiver for BoS
### From July 8 to July 31, 2002

**July 8, 2002**

BYT, Faxes from Adams, reviewed transcripts of 10/1999 and 12/1999 court proceedings. Relevance explained. Prepared explanatory notes. 2.0hrs.

**July 12, 2002**

BYT, Received and reviewed copy of District Court, Civil Action 95-626 and Original Action #02-0002-0A, Transcript from proceedings of 10/28/99. Distribution and explanation of materials. 1.50hrs.

STA, Pick up materials to Adams office and reproduce for distribution. 1.00hrs.

**July 15, 2002**

ASSC, MCV Transcript, 2nd story, 7/15/02. 0.50hrs.

**July 16, 2002**

BYT, Telcom to Client. Reviewed all materials related to motions for disqualification of Client and others. 2.0hrs.

**July 17, 2002**

BYT, circulation of all materials with explanatory notes. 1.0hrs.

STA, Reproduce and distribute. 0.50hrs.

**July 19, 2002**

BYT, Reviewed Real Party in Interest Randall T. Fennell's Response to Declaration; Ex parte Motion and Order for Presentations on the Current Condition of the BoS. Telcom and discussion with Client. 1.50hrs.

**July 22, 2002**

BYT, Telcom from Client, discussion of motions.

**July 23, 2002**

BYT, summarized motions for distribution. 1.0hrs.

**July 24, 2002**

BYT, Obtained copy of offer to purchase shares.

STA, Fax to client BOS materials, reproduce materials for distribution. 0.50hrs.

**July 26, 2002**

**BYT,** Telecom from Client, anticipated schedule of presentations. Discussed the materials. Scheduling and briefing issues outlined. 0.25hrs.

**July 29, 2002**

BYT, Telecom and Fax to Client, outline of document requirements. Multiple discussions about schedule and public education issues. Multiple phone calls to media contacts regarding scheduling and rescheduling issues. Distribution of materials to various points. 3.0hrs.

ASSC, Telecom to media outlets, rescheduling issues. 2.0hrs.

STA, Reproduce and distribute materials to media. 0.50hrs.

**July 30, 2002**

BYT, Presentation and follow up. Telecom to Client. Reviewed financial reports. 4.0hrs.

ASSC, Presentation. MCV Transcript, Second Story 7/30/02. MCV, First Story 7/30/02 KCNM Radio, 7/30/02. 4.0hrs.

STA, Reproduce and distribute materials to media. 0.50hrs.

**July 31, 2002**

STA, Fax to Client, MCV, 2nd Story 7/30/02; MCV, 1st Story 7/30/02 and KCNM Transcripts. Telcom with Client. Fax transcripts to Travis Coffman. 1.0hrs.