

In account with
**SCHWABE WILLIAMSON & WYATT**
P.C.

1211 S.W. FIFTH AVENUE
SUITE 1600
PORTLAND, OREGON 97204-3795
PHONE: (503) 222-9981
FAX: (503) 796-2900

OTHER OFFICES:
BEND, OR
SEATTLE, WA
VANCOUVER, WA
WASHINGTON, D.C.

Invoice # 832533
Page 2
C/M #: 101085-103112

TAX ID # IRS-93-1130272

| | | | |
|---|---|---|---|
| 06/13/02 | DWA | 1.20 | Memo from, memo to Israel; telephone call from, memo from, memo to Fletcher; correspondence with Majors and Clifford re Kanat |
| 06/17/02 | DWA | 1.25 | Correspondence with Moncrieff, Mike/Julie; telephone call from Julian; review Carlsmith complaint and CNMI counter |
| 06/17/02 | MKS | 2.25 | Review escrow agreement; interoffice conference between Sellers and Axelrod; legal research statute of limitations issues; interoffice conference between Sellers and Neda Soofi regarding effect of Form 870 on statute of limitations, claim for refund issues |
| 06/18/02 | DWA | 1.70 | Telephone call from Pennell; work on Pennell brief; telephone call from and telephone to Gallagher; telephone conference with Sellers |
| 06/24/02 | DWA | 2.25 | Telephone to and telephone call from Julian; telephone call from Gallagher; draft response to Israel; conference with Julie Becker |
| 06/25/02 | DWA | 2.75 | Conference with counsel; review e-mail correspondence and telephone conference with DB; telephone conference with Garrick Gallagher |
| 06/26/02 | DWA | .75 | Conference with Homer re resolution of conflict issues |
| 06/26/02 | MCHC | 5.75 | Research possibility of conflict of interest violation |
| 06/27/02 | DWA | 1.50 | Respond to issues re conflicts; meet with Peter Jarvis |
| 06/27/02 | MCHC | 6.20 | Research on procedure and standards for motions as to conflicts of interest |
| 07/08/02 | DWA | 1.25 | Work on conflict issues |
| 07/12/02 | DWA | 1.50 | Work on conflict-related matters |
| 07/15/02 | DWA | 1.40 | Memo from Pennell; analyze director issues |
| 07/17/02 | DWA | 1.00 | Conference with proposed money managers for JC Trust |
| 07/25/02 | DWA | 2.00 | Work re Bank of Saipan receivership questions |
| 07/26/02 | DWA | 1.20 | Review of older things |
| 08/08/02 | DWA | 2.75 | Memo from, letter from Moncrieff, correspondence with Pennell; revisions to Kristin Date and RS materials |
| 08/09/02 | DWA | .85 | Email correspondence with Receiver; memo from, memo to Moncrieff; telephone call from Pennell |
| 08/10/02 | DWA | 1.30 | Study re Nirada correspondence and analysis |
| 08/12/02 | DWA | 2.10 | Work on Nirada developments |
| 08/13/02 | DWA | 1.20 | Telephone conference with Pennell and Moncrieff; e-mail correspondence with insurance |
| 08/14/02 | DWA | 1.30 | Supervise, review Legesch work |
| 08/15/02 | DWA | 2.65 | Telephone call from Pennell; correspondence Scotia re Nirada directorship; e-mail correspondence with Moncrieff; telephone call from Scotia; review MP proposed investment plan |

TERMS: DUE AND PAYABLE UPON RECEIPT

AMOUNTS UNPAID MORE THAN 30 DAYS AFTER INVOICING ARE SUBJECT TO A LATE PAYMENT CHARGE OF 9% PER ANNUM

IOLTA PARTICIPANTS - PROCEEDS SUPPORT PUBLIC INTEREST OBJECTIVES OF THE LAW

COSTS POSTED AFTER THIS INVOICE WILL APPEAR ON SUBSEQUENT INVOICE



In account with
SCHWABE
WILLIAMSON
& WYATT
P.C.

1211 S.W. ██████ AVENUE
SUITE 1600
PORTLAND, OREGON 97204-3795
PHONE: (503) 222-9981
FAX: (503) 796-2900

OTHER OFFICES:     ██████ voice #   832533
BEND, OR          Page   3
SEATTLE, WA       C/M #: 101085-103112
VANCOUVER, WA
WASHINGTON, D.C.  TAX ID # IRS-93-1130272



| 08/16/02 | DWA | .60 | Telephone call from Fennell; telephone call from Bergeron; memo from Ohle |
| 08/22/02 | DWA | 1.70 | E-mail correspondence re Nirada; correspondence to Clifford as protector, correspondence to Moncrieff re insurance for protectors |

|  |  |  |
|---|---|---|
| David W. Axelrod | 51.10 hrs at 295.00 $/hr = $ | 15,074.50 |
| Marc K. Sellers | 3.00 hrs at 260.00 $/hr = $ | 780.00 |
| Neda D Soofi | 1.80 hrs at 150.00 $/hr = $ | 270.00 |
| Marisa C Howe | 11.95 hrs at 105.00 $/hr = $ | 1,254.75 |
| Julie N. Becker | .10 hrs at 75.00 $/hr = $ | 7.50 |
| SUBTOTAL CURRENT FEES | 67.95 hours     =     $ | 17,386.75 |

DESCRIPTION OF COSTS

|  |  |
|---|---|
| Bindery | 15.00 |
| Photocopies | 5.80 |
| Long Distance Calls | 2.59 |
| Outgoing Telefax Charges | 13.30 |
| 06/27/02 Online Research - Check-Lexis Nexis | 114.42 |
| 05/24/02 Shipping charges - Check,Federal Express Corporation | 19.44 |
| SUBTOTAL CURRENT COSTS | $     170.55 |
| TOTAL FEES AND COSTS | $   17,557.30 |

----------------------------TRUST ACCOUNT SUMMARY----------------------------
Portland IOLTA Trust Account

| TRUST ACCOUNT: PDXTR |  | 4000.00 |
|---|---|---|
| BALANCE FROM PREVIOUS STATEMENT . . . . . . . . . . . . . | | 6012634.17 |
| PLUS TOTAL DEPOSITS . . . . . . . . . . . . . . | | |
| DISBURSEMENT(S): | | |
| 02/12/98 SWW - FOR EXPENSES INCURRED AFTER 11-21- | 4000.00 | |
| 03/13/98 SWW - FEES ONLY - INVOICE #708491 | 315403.65 | |
| 12/29/98 WIRE CAME INTO WRONG ACCT - SHOULD BE DEPOSITORY ACCT | 195064.17 | |
| 03/06/00 SWW; pay A/R 101085-111929 | 141643.81 | |
| 03/06/00 Wire out to Wendel, Rosen, Black etal; C Bank of Commerce; Acct # 105021098 | 713484.83 | |
| 04/25/00 SWW; costs | 133498.60 | |
| 05/05/00 SWW - ACCTS REC. | 7513.00 | |
| 05/05/00 SWW - PAYMENT OF FEES | 2422462.12 | |
| 06/14/00 Transfer to C/M # 106821-118467 per DWA correction of 5/16/00; batch # 25922 | 3666.73 | |

TERMS: DUE AND PAYABLE UPON RECEIPT
AMOUNTS UNPAID MORE THAN 30 DAYS AFTER INVOICING ARE SUBJECT TO A LATE PAYMENT CHARGE OF 9% PER ANNUM
IOLTA PARTICIPANTS - PROCEEDS SUPPORT PUBLIC INTEREST OBJECTIVES OF THE L
COSTS POSTED AFTER THIS INVOICE WILL APPEAR ON SUBSEQUENT IN

EXHIBIT A-1
Page 36 of 37

In account with

**SCHWABE**
**WILLIAMSON**
**& WYATT**
P.C.

*ATTORNEYS AT LAW*

1211 S.W. FIFTH AVENUE
SUITE 1600
PORTLAND, OREGON 97204-3795
PHONE: (503) 222-9981
FAX: (503) 796-2900

OTHER OFFICES:
BEND, OR
SEATTLE, WA
VANCOUVER, WA
WASHINGTON, D.C.

Invoice #    832533
Page    4
C/M #: 101985-202117

TAX ID # IRS-93-1130272

|  |  |  |
|---|---|---|
| | | 768.85 |
| 12/21/00 | SWW; Costs | 1400331.81 |
| 12/22/00 | Transfer to Pay fees | 5031.75 |
| 02/13/01 | SWW; Attorney fees | 16709.21 |
| 04/25/01 | Check to SWW; Attorney fees & costs | 13487.46 |
| 08/28/01 | CK TO SWW FOR PAYMENT OF FEES & COSTS | 32606.28 |
| 09/28/01 | Wendell, Rosen, Black & Dean, LLP; Wire transfer to Civic Bank Of Commerce; Acct 121140959 | |
| 11/19/01 | Wendel, Rosen, Black & Dean, LLP; Wire to Civiv Bank of Commerce; Acct # 105051 | 70457.50 |
| 12/12/01 | CK TO SWW FOR HALSON FEE CREDITS | 197756.65 |
| 12/12/01 | CK TO SWW FOR FEES AND COSTS | 219105.50 |
| 02/15/02 | Check to SWW; payment of invoice #817396 | 21681.45 |
| 02/15/02 | Payment of invoice # 817408 | 23623.35 |
| 02/19/02 | Wire to Wendel, Rosen, Black & Dean, LLP | 23144.88 |
| 03/26/02 | Check to SWW; Attorney fees | 7625.75 |
| 05/17/02 | Check to SWW; Attorney fees & costs | 29142.60 |
| 06/28/02 | Check to SWW; Attorney fees & costs | 18423.22 |



|  |  |
|---|---|
| | 6016634.17( 6016634.17) |
| LESS TOTAL DISBURSEMENTS . . . . . . . . . . . | |
| CURRENT BALANCE . . . . . . . . . . | 0.00 |

**FINAL SUMMARY**

|  |  |  |
|---|---|---|
| SUBTOTAL CURRENT COSTS | $ | 170.55 |
| SUBTOTAL CURRENT FEES | $ | 17,386.75 |
| TOTAL CURRENT INVOICE | $ | 17,557.30 |
| TOTAL AMOUNT DUE (CURRENT & PREVIOUS) | $ | 17,557.30 |

TERMS: DUE AND PAYABLE UPON RECEIPT
AMOUNTS UNPAID MORE THAN 30 DAYS AFTER INVOICING ARE SUBJECT TO A LATE PAYMENT CHARGE OF 9% PER ANNUM
IOLTA PARTICIPANTS - PROCEEDS SUPPORT PUBLIC INTEREST OBJECTIVES OF THE
COSTS POSTED AFTER THIS INVOICE WILL APPEAR ON SUBSEQUENT IN

EXHIBIT A-1
Page 37 of 37

# EXHIBIT 2

**Confidential and Privileged**

Thu, Jun 20, 2002   09:44 AM

From: "Axelrod, David" <DAxelrod@SCHWABE.com>
     "Cindy Adams" <cindy.adams@saipan.com>
Cc: "Randy Fennell" <RTFennell@cs.com>
Date: Wed, Jun 19, 2002, 04:30 AM
Subject: Confidential and Privileged

RECEIVED JUN 2 0 2002

000999

---

Cindy,

Per fax from Randy, I am setting out my comments on the draft memorandum and affidavits. Generally it looks good and I think it is compelling.  comments are:

Memorandum

p. 2:  I think it may be a mistake to bring Lifoifoi in to the disqualifying contacts. Lujan can be isolated, but once you start picking up Saipan Chamorro's, I fear you may broaden support for Castro.

p. 3  You bring it up later in detail, but I would point out in this intro part that being involved in charities with persons who have matters pending before him is a clear violation.

pp. 5-6: Probate case is 95-626. The estate was "closed" for tax purposes by a "final" distribution and the creation of a liquidating trust on or before May 8, 2000. That is why they had their luncheon immediately after that. However, the probate case remained open until March 8, 2002 and important matters remained and were determined by Castro. by this time the $20 million issues were settled by agreement entered into under the threat of Castro being the person who would decide the issue and we all knew about that bias (see e.g., Atalig appointment and his refusal to DQ himself). Because of this nuance, it is particularly important to point out the ex parte contacts with Lujan through Bergeron (and directly per the cc's on letters) prior to the final distribution.

Bergeron was an employee of the Hillblom Estate made available to provide assistance to the Court on probate matters. Bergeron draws a clear line between her probate work and this work for the Trust that was basically pro bono and at Castro's suggestion/direction. Bergeron was not an employee of the CNMI judicial system.

p. 7: top—may want to point out that this time frame is basically late-99 and into 2000. What are you citing to for showing esteem? His remarks at the hearing on final distribution in 2000?

p. 8: I believe Lujan is a trustee of Junior's trust and its lawyer. "General counsel" may not be quite the characterization.

p.9: some comments on bringing in Lifoifoi

p. 10: On the disclosure, surely Randy was aware of many of these relationships. It seems to be the promises made to Castro by Lujan and the ex parte contacts that were the secret component.

p.14: I think the salient facts regarding Lomorena should come up earlier in the memo; perhaps where you describe Castro's other rulings on this specific petition. This whole thing is so corrupt.

Fennell Declaration

pra. 10  I think your best evidence is the series of ex parte communications in early 2000 with letters cc'd to Castro and drafts promising him benefits. I thin it might be worthwhile walking the Court through those documents in a bit more detail, either in the memo or the declaration.

Page 1 of 2

**Confidential and Privileged**

Thu, Jun 20, 2002   09:44 AM

 11. "Most" of the ex parte communications? I don't think we were aware of any, except for our strong suspicions.

para 13 I don't think the Walsworth firm became participants in the HMF. Note the nuances of the final distribution date (May 9, 2000) and closing of the probate case (March 8, 2002).

para 25: It's all true so I am not sure what my hesitation is, but the local influence that Lifoifoi and Atalig carry with this judicial system seems grossly disproportionate to anything that we can understand.

That's it. Randy, in a casual conversation (if there is such a thing in this series of cases) Julian dropped the comment that Setbuisan (or whatever the name of the corporation is that Walsworth sent $$ to) is actually "Atalig's company."

good luck. David

# EXHIBIT 3

**Data**

We Jun 12, 2002   10:07 AM

From:  "Axelrod, David" <DAxelrod@SCHWABE.com>
To:  "Randy Fennell" <RTFennell@cs.com>, "Richard Pierce" <rwp45@hotmail.com>, "Cindy Adams" <cindy.adams@saipan.com>
Date: Wed, Jun 12, 2002, 07:09 AM
Subject: Data

RECEIVED  JUN 1 2 2002

000829

to All,

We are faxing and emailing a bunch of stuff.

A spread sheet compiling the payments to Atalig, Mendiola, and Walsworth form the estate or the succeeding liquidating trust. (Estimates in my prior email were low.) I am not sure that the ▮▮▮▮▮▮▮ that details distribution of the ▮▮▮▮▮▮▮ is not confidential, as the hearing on ▮▮▮▮▮▮ was. Accordingly, please consider that as having been issued under seal and maintain its confidentiality directly.  No need to give them something to bitch about.

DB does not want so submit on affidavit but confirms that she will come to Saipan if requested to testify about all of the library issues in a context in which she can respond to accusations rather than simply seeing them filed in court papers. She confirms the date of the pictures that I gave you.

Have not got to the search engine issues yet. Haf'adai

**Payments to Mendiola**
May 1, 1999 through April 8, 2002

| DATE | EXPLANATION | AMOUNT | REPORT |
|---|---|---|---|
| 06/27/99 | Heirship settlement: Guam probate conference | 5,000.00 | Estate: 5/21/95-7/31/99 |
| 05/14/99 | SA Mendiola: Atalig instructions per Castro | 13,000.00 | |
| 07/08/99 | SA Mendiola: fees | 48,249.98 | |
| 05/07/99 | SA Mendiola: legal fees | 25,387.50 | |
| 06/04/99 | SA Mendiola: legal fees | 25,650.00 | |
| 06/07/99 | SA Mendiola: travel expense | 12,000.00 | |
| 08/03/99 | SA Mendiola: fees | 47,262.70 | Estate: 8/1/99-1/31/00 |
| 09/01/99 | SA Mendiola: fees | 44,710.00 | |
| 10/07/99 | SA Mendiola: fees | 54,609.80 | |
| 10/28/99 | SA Mendiola: fees | 350,000.00 | |
| 12/02/99 | SA Mendiola: fees | 72,279.82 | |
| 12/07/99 | SA Mendiola: fees | 160,000.00 | |
| 12/22/99 | SA Mendiola: fees | 84,834.83 | |
| 01/14/00 | SA Mendiola: fees | 68,127.40 | |
| 08/30/99 | SA Mendiola: travel expense | 15,000.00 | |
| 10/08/99 | SA Mendiola: travel expense | 10,000.00 | |
| 11/01/99 | SA Mendiola: travel expense | 15,000.00 | |
| 01/14/00 | SA Mendiola: travel expense | 10,000.00 | |
| 02/01/00 | SA Mendiola: fees | 2,832.70 | Estate: 2/1/00-3/31/00 |
| 02/04/00 | SA Mendiola: fees | 74,509.66 | |
| 03/14/00 | SA Mendiola: fees | 72,392.01 | |
| 03/24/00 | SA Mendiola: fees | 436,018.50 | |
| 02/22/00 | SA Mendiola: travel expense | 15,000.00 | |
| 04/26/00 | SA Mendiola: fees | 117,076.84 | Estate: 4/1/00-4/28/00 |
| 04/20/00 | Guam settlement: agreed payment | 275,000.00 | |
| 04/24/00 | Guam settlement: agreed payment | 105,000.00 | |
| 05/24/00 | Services & expenses April 2000 (45,534.99 ▓▓▓▓▓ final estate admin) Approved by court as affecting ▓▓▓▓▓▓▓▓▓▓; charged equally to these two matters | 168,198.38 | LT: 4/7/00-12/31/01 |
| 07/10/00 | ▓▓▓▓▓▓▓ | 60,000.00 | |
| 07/25/00 | ▓▓▓▓▓▓▓▓ | 78,232.39 | |
| 07/25/00 | ▓▓▓▓▓▓▓▓▓▓ | 6,102.36 | |
| 09/19/00 | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | 79,467.84 | |
| 01/20/01 | ▓▓▓▓▓▓ | 127,500.00 | |
| | | 0.00 | LT: 1/1/02-2/28/02 |
| 03/05/02 | Part of closeout of trust (final estate admin) | 35,000.00 | LT: 3/1/02-4/8/02 |
| 03/20/02 | Pursuant to closing agreement (final estate admin) | 206,539.91 | |
| | SUBTOTAL | 2,919,982.72 | |
| 09/20/01 | ▓▓▓▓▓▓▓▓▓▓▓▓ | ▓▓▓▓▓▓▓▓▓▓▓ | |
| | TOTAL | 4,367,482.72 | |

# EXHIBIT 4

Page 1 of 1

Randall Fennell

| | |
|---|---|
| From: | "Axelrod, David" <DAxelrod@SCHWABE.com> |
| | "Randy Fennell" <RTFennell@cs.com>; "Randy Fennell (office)" <randy.fennell@saipan.com>; "Richard Pierce" <rwp45@hotmail.com> |
| Sent: | Friday, June 14, 2002 4:27 AM |
| Subject: | Library |

Information is:

Atalig and Mendiola and Bermudes had free contact.  Castro told source that Mendiola and Atalig were part of the "Court."  Source got in trouble for suggesting Bermudes shouldn't have such direct contacts with the judge.

No evidence that Lujan had direct ex parte contacts at the courthouse, BUT Lujan hired a Filipino "law clerk" (in law school in the P.I. or a clerk there, reportedly) who worked out of Hill's office but for Lujan personally.  This clerk was seen coming from Judge's chambers, with Hillblom papers, (purportedly visiting Castro's secretary).  Even though source was only infrequently at the courthouse, she regularly saw this clerk coming from Castro's chambers.  Source objected twice but was told to shut up.  The clerk was referred to as "Babe."  (Who could believe this.)  Will not give an affidavit but (again) would testify.

They struck the direct compensation language from the trust instrument but added means for compensating "trustees" by reimbursing them for travel and travel expenses and authorizing them to hire staff and "employees of every kind."



David

6/14/02

# EXHIBIT 5





On CS:  Try CompuServe 8.0    Send an E-Card
        CompuServe.com       Send a Gift
        Instant Messaging    White Pages

Chance to WIN a 2003 FORD EXPEDITION ahead

■ **New Mail:** Message      **Old Mail**      **Sent Mail**                    **Help | Sign Off**

**Get          Create       Address   | Reply   Reply    Forward    Keep As    Delete
Mail          Mail         Book                All                 New**

**Subject:** Your questions last night                              « **Previous** | **Next** »
**Date:** Tue, 11 Jun 2002 09:26:44 -0700
**From:** ♟ "Axelrod, David" <DAxelrod@SCHWABE.com>
**To:** ♟ "Randy Fennell" <RTFennell@cs.com>
**Cc:** ♟ "Richard Pierce" <rwp45@hotmail.com>, ♟ "Cindy Adams"
        <cindy.adams@saipan.com>

1. There are three components: work in the probate (primarily ▇▇▇▇ but,
as you know, also significant other activities: ▇▇▇▇ and relatively minor
amounts for "probate" work that carried on after closing through the
liquidating trust; and their contingent fees for the ▇▇▇▇ litigation
(where they made Atalig local counsel immediately after the probate closed in
May 2000. I believe (will check) that the ▇▇▇▇ contingency payments were
▇▇▇▇ and were ▇▇▇▇ to Atalig and Mendiola each; Walsworth
took out more than ▇▇▇▇ in addition to prior probate and ▇▇▇▇
hourly fees of more than ▇▇▇▇. Apart from these ridiculous ▇▇▇▇
fees (and we are checking to make sure you have conservative numbers) Atalig
received $1.206 MM out of the probate for special master and success fees and
Diego received $2.913 MM as the "special administrator". These numbers include
both the payments from the probate (approx .9MM and 2.25MM) and the probate and
▇▇▇▇ work paid out of the liquidating trust. Most of the data comes form
the probate record of all estate payments, the liquidating trust check ledger
and the ▇▇▇▇ orders distributing the settlement proceeds (these may be
under seal, lol). We will send you our spread sheet but pulling the orders
would take a long long time.

2. Will send the SM report. Yesterday we sent Atalig's odder denying our
motion to disqualify him (what a joke) and telling us to appeal to Castro
(which we did). Ultimately, recall that a final order was not entered on it as
Castro kept postponing the decision until the parties settled it (against the
backdrop of Atalig's bullshit report, of course) in Guam.

3. Diane doesn't want to give an affidavit but is willing to come to Saipan.
Makes no sense. Will try to learn more. Per her advise, the pictures were
taken on or about May 9, 2000. Immediately after the "final" distribution for
the probate and the delivery to the library of the $150,000 that Castro
dispensed to Walsworth as yet another success fee and that Walsworth
contributed to the library while suggesting everyone else should do the same.
that is why Russ is there (to deliver the $150K).

4. We are following up with Ed.

5. We have found only one transcript on the disc. I had thought that we had
ordered the December transcript to have Castro's solicitation but cannot find
it. Neither Mofo, Garrick, nor the foundation have one.

-- CompuServe Mail - Message View

6.  See above.  Directly? No.  Interestingly, Mendiola and Atalig then immediately show up as participants in the library.

7.  Little.  You have his March letter about the library.  DB didn't want to specifically identify those people that had private access to the judge.  I will pursue.

Lujan got very favorable treatment on the contingent fee deduction that was a big dollar allocation. giving Lujan more than $3 MM more than he should have receive if you follow Atalig's "recommendation."  But it will be very difficult to show a direct tie, as they forced settlement of many of these issues by, for example, telling us that if we didn't reach an agreement the estate would not be distributed by May 15--if that didn't happen, the tax consequences to the estate would have been worse that the concessions we were being forced to make to pay these people.   Fun times.   David

« Previous  |  Next »

| **Get Mail** | **Create Mail** | **Address Book** | **Reply** | **Reply All** | **Forward** | **Keep As New** | **Delete** |

©Copyright 2002 CompuServe Interactive Services, Inc.
Legal Notices | Privacy Policy

Help | Sign Off

# EXHIBIT 6

## RANDALL T. FENNELL
### Receiver for Bank of Saipan

2nd Floor Flame Tree Terrace Bldg.
Post Office Box 500049CK
Saipan, MP 96950
Telephone (670) 323-6633
Facsimile (670) 323-7435
E-mail: randy.fennell@saipan.com

Bank of Saipan
Post Office Box
Saipan, MP 96
Telephone (670
Facsimile (670)

000693 to

000698

### TELEFACSIMILE COVER LETTER

**DATE:** 6/11/02

RECEIVED JUN 1 1 2002

**To:** Cindy Adams -
Richard Pierce

000693

**From:** Bank of Saipan, Receivership Files
Attn: Randall T. Fennell, Receiver
AND
Bank of Saipan, Receivership Files
Attn: Cindy Adams, Esq.

### MAKE ALL FAXED CORRESPONDANCE TO BOTH ADDRESSES

**TELEFACSIMILE Nos.:** 234-9316 Office of Cindy Adams
323-7435 Office of Randall T. Fennell

Total number of pages including this cover sheet: 2 2

### COMMENTS

21 pgs - Memos/faxes from Diane K Bergeson
re: Litigation/Costs re: Hillblom Minerual
Fund

*If you do not receive all pages clearly, PLEASE CALL (670) 323-6633*

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

JUN 10 2002 17:23 FR ... E WILLIAMSON  5035756725... TO ...

JUN-18-02 07:22 PM  BERGERON.DIANE.K.  321 757 6999  P.02

Diane K. Bergeron
Attorney at Law
SRA for Ellblam Estate
PMB 184 Box 10001
Saipan, MP 96950
(670) 233-1894

## Fax

**To:** JUSTICE CASTRO

**Fax Number:** (670) 236-9702

**Pages:** 7, including this cover sheet.

**Date:** March 8, 2000

**Regarding:** Letter to Lujan, Atalig & Maniapaz re Memorial Foundation

---

Dear Justice Castro:

I wanted to CC you on this letter so that you would be aware of my contact with these parties and also to request that you edit my letter and let me know if you think it is appropriately written.

Thank you,

Diane K. Bergeron, your SRA

From the desk of...

Diane K. Bergeron
Special Research Attorney
PMB 184 Box 10001
Saipan, MP 96950
Phone: (670) 233-1894
Fax: (670) 233-1895

JUN 10 2002 17:24 FR     BE WILLIAMSON   5037760120 TO

JUN-10-02 07:22 PM     BERGERON.DIANE.K.          821 757 6999          P. 05



Diane K. Bergeron
Attorney at Law
PMB 154 Box 10001, Saipan, MP 96950
Ph: (670) 233-1894  Fax: (670) 233-1895
e-mail: dbergeron550@yahoo.com

March 8, 2000

David J. Lujan, Esq.
Antonio M. Atalig, Esq.
Luz Maniapaz, Esq.
via fax: (671) 477-5297 (Lujan)
via fax: 234-0491 (Atalig & Maniapaz)

RE: Larry Lee Hillblom Memorial Foundation

Dear Mr. Lujan, Mr. Atalig and Ms. Maniapaz:

I am writing in regards to the *Larry Lee Hillblom Memorial Foundation*. I have attached a draft of a Trust Agreement I created. I respectfully submit it to all of you for your comments and suggestions. Of course, you do not have to accept my version, I just hoped to move forward the process. I believe the Foundation should also be incorporated for the protection of the Trustees, Grantors, and the benefit of the peoples of the CNMI. By incorporating the Foundation there would be additional language added to the present document and there would be further documents that would need to be created, ie: Articles of Incorporation, etc. I would be willing to create all of the necessary documents and to obtain the TIN (taxpayers identification number) allowing us to be designated a "charitable trust" for tax purposes. Once this TIN is obtained both the *Junior Larry Hillblom Trust* and the *Mercedita Feliciano Trust* can deduct 100% of these generous donations.

I need written permission from you (presently just Mr. Lujan) to withdraw the minimum amount necessary to obtain the TIN number. I believe it will be less than $500.00, in fact probably much less. Also, I suggest we put the majority of the present funds into a 30 day CD where we can earn 4.25% interest as opposed to the present 2.75% we are earning while waiting to finalize the December 21, 1999 Letter of Agreement. I would also request written permission from Mr. Lujan to make this CD purchase from the Bank of Saipan. (We have already made an additional $1,200.00 in interest and that will increase to nearly $2,000 by the end of the quarter. That can be significantly higher if we move the majority of the funds to 30 day CD's.)

I have not yet received the Feliciano funds. As you may know Mr. Snow did not deduct the $250,000.00 from the last distribution because both he and I needed that request in writing.

JUN 10 2002 17:24 FR S____DE WILL B.____

JUN-10-02 07:23 PM          BERGERON, DIANE. K.          321 757 6999          P.04

When I spoke to Luz in Honolulu she assured me she would discuss this matter with the guardian and if her permission was obtained the monies would be forwarded to the account. If it would be easier for you, you could just write a short note to Mr. Snow giving him the authority to direct $250K from the next distribution into the Memorial Foundation. Again, this is totally up to you to decide, this is, after all, a donation and it is your choice whether it will be honored. As Luz and I discussed in Honolulu, this is truly a legacy these two children will be leaving for their father and themselves. They can look back on this twenty years from now and see that their donations created a lasting and generous endowment for the people of the CNMI and they will, I am sure, be very proud of themselves. I am proud to be a small part of this generous enterprise and I thank you for the opportunity.

I realize we are all very busy, what with the Global Settlement Agreement and the impending March 16 hearing date. However, if it is at all possible, please respond to this correspondence by the end of this week. That will give me time to complete the Trust Agreement, with your changes, before the hearing next Thursday. Please feel free to contact me by phone, fax, letter or e-mail (see letterhead above).

Sincerely yours,

Diane K. Bergeron

cc: Alexandro C. Castro, Judge Pro Tem

P.S.: If we do incorporate the Trust — I will need a list of the "Board of Directors" — all of you will of course be good choices as well as 4 or 5 others.

JUN 10 2002 17:26 FR SO          WILLIAMSON    ...
JUN-10-02 07:27 PM          BERGERON, DIANE K.          · 321. 757 6999          P.00

RECEIVED  JUN 1   2002

### Hillblom Memorial Fund
### Trust Agreement

000695

The purpose of the Hillblom Memorial Fund is to foster the academia and scholarship of the Commonwealth of the Northern Mariana Islands, particularly in the fields of law, science and medical research.

The Junior Larry Hillbroom Trust and the Law Firm of Walsworth, Franklin, Bevins & McCall as Donors, created a Trust Fund with an initial irrevocable gift of $259,104.12 donated by the Junior Larry Hillbroom Trust and an additional $150,000.00 donated by the Walsworth Law Firm. Pursuant to the December 21, 1999 Letter of Agreement Creating the Larry Lee Hillblom Memorial Foundation, Diane K. Bergeron, Esq. was named Temporary Trustee until such time as this Trust Agreement would be prepared.

The Donors and the Temporary Trustee have subsequently decided to rename the Trust the "Hillblom Memorial Fund".

I, Diane K. Bergeron, Temporary Trustee, have established a Trust Account, with the Trust Funds listed above, at the Bank of Saipan, Commonwealth of the Northern Mariana Islands.

I hereby give, transfer, and deliver the funds of that Trust Account to the Trustees in trust for the purposes stated above.

These funds shall be known as the Hillblom Memorial Fund. Donors; Diane K. Bergeron as Temporary Trustee; the Bank of Saipan of the Northern Mariana Islands, as corporate trustee; and Supreme Court Justice Alexandro Castro of the Northern Mariana Islands; Diego Mendiola of the Northern Mariana Islands; David Lujan, Esq. of Guam, USA; as individual trustees, hereby agree as follows:

### SECTION ONE
### TRANSFER OF TRUST FUNDS

Temporary Trustee hereby gives and transfers to above named Trustees the Hillblom Memorial Fund Trust Fund together with its income and profits and any other sums that may be transferred to Trustees or their successors pursuant to the terms of this Agreement, to hold in trust for the uses and purposes set forth in this Agreement.

JUN 18 2002 17:27 FR SCHULTE STELITHISON

JUN-18-02 07:28 PM        BERGERON, DIANE.K.        221 757 6999        P.89

## SECTION TWO
### INVESTMENT AND APPLICATION OF TRUST FUND AND INCOME

Trustees shall hold the Trust Fund and, in their discretion, invest it or parts of it in securities in which Trustees are permitted to invest under the laws of the Commonwealth of the Northern Mariana Islands, or retain the fund in cash, and collect the income. Trustees shall, from time to time, and in such amounts as in their discretion Trustees shall deem proper, devote and apply the Trust Fund and income from the Trust Fund exclusively to the charitable uses and purposes described above solely by means of contributions to any charitable corporation, trust, community chest, fund or foundation which at the time of the contribution by Trustees is one of those organizations specified in the Internal Revenue Code of the United States, contributions to which are deductible for income tax purposes. *※ all language of 100K start ...*

Trustees shall make distributions at times and in a manner as not to subject it to tax under Section 4942 of the Internal Revenue Code, as amended, and shall not engage in any act of self-dealing as defined in Section 4941 of the Internal Revenue Code. Trustees shall not retain any excess business holdings as defined in Section 4943 of the Internal Revenue Code and shall not make any investments as defined in Section 4944 of the Internal Revenue Code nor make any taxable expenditure which would subject the Trust or the Corporation Trustee to tax under Section 4945 of the Internal Revenue Code.

## SECTION THREE
### RESTRICTIONS ON THE USE OF TRUST FUND

The Trust Fund and the income of the Trust Fund shall be devoted exclusively to the purposes described above and shall be no part and in no event be given or contributed to or inure to the benefit of any private person or corporation, except to the extent of the compensation of the Corporate Trustee. No part of the Trust Fund shall be used to carry on propaganda or otherwise attempt to influence legislation, or to participate in any political campaign.

## SECTION FOUR
### ADDITIONAL GIFTS TO FUND

Either the Donors or other persons may, from time to time, make additional gifts of money or property to Trustees to become part of the Trust Fund.

## SECTION FIVE
### GOOD FAITH DUTY OF TRUSTEES

Trustees shall be chargeable only with the exercise of good faith in carrying out the provisions of the Trust. Trustees shall not, in the absence of bad faith, be responsible or accountable for errors of judgment in making the contributions and gifts pursuant to the provisions of Section Two.

JUN 10 2002 1Y:28 FR SU    WILLIHSON    ...   TO ...

JUN-10-02 07:28 PM    BERGERON, DIANE K.    221 757 6999    P.11

## SECTION SIX
### REIMBURSEMENT AND COMPENSATION OF TRUSTEES

Trustees shall be reimbursed for all expenses reasonably incurred by them in the administration of the Trust Fund. The Corporate Trustee shall be entitled to such reasonable compensation for its services as may be from time to time agreed upon with the Trustees. Such compensation shall be paid out of and charged to the Trust Fund. The individual Trustees shall serve without compensation.

## SECTION SEVEN
### DISSEMINATION OF INFORMATION AND EMPLOYMENT OF PERSONNEL

In properly carrying out and aiding the purposes and objects of the Trust, the Trustees shall have full power and authority:

(a) To employ and pay attorneys, lecturers, writers, investigators, and such assistants and employees of every kind as they may deem necessary;

(b) To buy, print, publish, and/or distribute, by mail or otherwise, to whom they may think proper, appropriate pamphlets, cards, notices and information;

(c) To buy and distribute, by mail or otherwise, to whom they may think proper, copies of appropriate newspapers, magazines, and books.

(d) To disseminate by all lawful means such information as in the judgment of the Trustees may be useful in carrying out the purposes of this Trust.

## SECTION EIGHT
### DECISION OF MAJORITY OF TRUSTEES

The act of a majority of Trustees on all matters pertaining to this Trust, including the investment and distribution of funds, shall be conclusive. Evidence of such majority actions shall be in writing and shall be filed with the Corporate Trustee.

## SECTION NINE
### CORPORATE TRUSTEE CONTROLS FUNDS

The Corporate Trustee shall have exclusive custody of the securities, cash, and other property of the Trust Fund . The Corporate Trustee shall have the right to register securities or other property held under and pursuant to this instrument in the name of its nominee.

## SECTION TEN
### APPOINTMENT OF SUCCESSOR TRUSTEE

In case of the death, resignation or replacement of any of the Trustees, the successor of such Trustee may be appointed by the remaining Trustees. Until such time as such successor trustee is appointed, the remaining Trustees shall have full power to act under and pursuant to this instrument.

JUN 10 2002 17:27 FR    BE WILLIAMSON   5031/567290 TO 5430168

JUN-10-02 07:29 PM    BERGERON, DIANE. K.    821 757 6999    P.18

### SECTION ELEVEN
### GIFTS IRREVOCABLE

Gifts made in trust to Trustees under this Agreement shall be irrevocable. If it shall be determined by the Internal Revenue Service, subsequent to the creation of this Trust and the transfer of any funds to Trustees by the Donors or other person, that the Trust Fund is not exempt from the payments of income tax upon its income or that the Donors to the fund may not be entitled to charitable deductions for income tax purposes for contributions made thereto in the manner and to the full extent provided by the Internal Revenue Code, then such gifts as remain in the Fund at the time of such determination shall be given by Trustees to a qualified tax exempt charitable organization selected by Trustees to best carry out the purposes of this Trust. This Trust shall thereupon terminate.

### SECTION TWELVE
### QUALIFICATION AS TAX EXEMPT

The creation of this Trust is contingent on a determination prior to its inception by the Internal Revenue Service that its purpose, organization and proposed operation qualify it as a tax exempt trust. If no such tentative or advance determination can be obtained, this Trust Instrument shall be void and of no force or effect and no trust shall be created.

### SECTION THIRTEEN
### NUMBER OF TRUSTEES

Except during periods following the death, removal, or resignation of a Trustee, there shall always be one Corporate Trustee and a minimum of three and a maximum of five individual Trustees.                                                         SEVEN

### SECTION FOURTEEN
### GOVERNING LAW

The operation of the Trust shall be governed by the laws of the Commonwealth of the Northern Mariana Islands. However, the Trustees are prohibited from exercising any power or discretion granted under such laws that would be inconsistent with the qualification of the Trust under the Internal Revenue Code and the corresponding regulations.

### SECTION FIFTEEN
### LIMITED POWER OF AMENDMENT

The Trust is irrevocable. However, the Trustees shall have the power to amend the Trust in any manner required for the sole purpose of ensuring that the Trust qualifies and continues to qualify as a charitable trust within the meaning of the Internal Revenue Code.

## SECTION SIXTEEN
### DIRECTION TO INCORPORATE

On the acceptance of this Trust, Donors direct that the Trustees incorporate as a non-profit corporation under the provisions and laws of the Commonwealth of the Northern Mariana Islands, and that the title to all property in this Trust be transferred to and held by the corporation in the corporate name. The execution by the Trustees of the Articles of Incorporation shall operate as an assignment and delivery to that corporation of all the property in the Trust. The name of the Trust created hereby and the corporation shall be the Hillblom Memorial Fund.

The powers of the Trustees and of the corporation shall be exercised by the Trustees by not less than two-thirds majority vote of all the Trustees. Two-thirds of all the Trustees shall constitute a quorum for the transaction of business at the meeting of the Trustees. The Chairperson of the Board, the President, and the Vice-President must be members of the Board of Trustees; other officers may be elected or appointed who are not members of the Board of Trustees.

## SECTION SEVENTEEN
### INTERPRETATION OF TRUST AGREEMENT

This Trust is intended, through its purpose, organization, and proposed operation, to qualify as a tax-exempt charitable trust as provided for in the Internal Revenue Code of the United States. Any ambiguities or questions concerning this instrument shall be resolved in accordance with that end.

## SECTION EIGHTEEN
### PUBLIC INSPECTION OF TRUST AGREEMENT

It shall be the duty of the corporate trustee to keep one copy of this Trust Agreement, bearing the date of its adoption duly certified by an executive officer of the corporate trustee, on file permanently at the office of the Bank of Saipan, Chalan Kanoa branch. The Trust Agreement shall be open to public inspection at such office of the corporate trustee during business hours.

In Witness Whereof, the parties hereto have signed and sealed this instrument on the _____ day of _____, 2000.

| | |
|---|---|
| _____ | _____ |
| Junior Larry Hillbroom Trust | Justice Alexandro Castro |
| _____ | _____ |
| Walsworth Law Firm | Diane K. Bergeron, Esq. |
| _____ | _____ |
| David Lujan, Esq. | Diego Mendiola |

JUN 10 2002 17:29 FR SCHLRBE WILLIAMSON 5437 6672540 TO

JUN-10-02 07:55 PM     BERGERON, DIANE, K.     321 757 6999     P.13

TO:     David Lujan, Tony Atalig, Diego Mendiola, Joe Bermudes, Wadsworth/Sigler
CC:     Alexandro C. Castro, Judge Pro Tem
FROM:   Diane K. Bergeron, Temporary Trustee
DATE:   May 9, 2000
RE:     Larry Lee Hillbloom Memorial Foundation

RECEIVED JUN 1 1 2002
000696

## MEMORANDUM

Dear Gentlemen:

Justice Castro ask me to contact all of you and invite you to a luncheon meeting on Friday, May 12, 2000 from 11:30am until 1:30pm at the Grand Hotel's private dining room. The purpose of this meeting will be to determine the present status of the *Larry Lee Hillbloom Memorial Foundation* and the creation of a final trust instrument. As you are all aware I have lost my full time job in Saipan as the Special Research Attorney to the Hillbloom Estate. Since I am the "Temporary Trustee" and the only signatory on the trust account and the CD on file at the Bank of Saipan; it is imperative that we create the final instrument and make all the transfers prior to my departure from Saipan. Be prepared to input ideas and make decisions on who the Directors of the Trust will be, who the permanent Trustee will be, how the Trust is to operate and what are the parameters of this Trust. There are also administrative issues that need to be handled, particularly, obtaining a TIN (tax identification number) and the establishment of a non-profit charitable entity with a proper business license in Saipan.

Justice Castro and I look forward to meeting with all of you at 11:30 at the Grand Hotel.

Sincerely yours,

Diane K. Bergeron

JUN 10 2002 17:38 FR SO.....L WILL.....  .........  .. ..

JUN-10-02 07:54 PM        BERGERON,DIANE.K.        321 TST 6999        P.14

RECEIVED   JUN 1 1 2002

000697

## Hillblom Memorial Fund
### Trust Agreement

The purpose of the Hillblom Memorial Fund is: 1) to foster the academia and scholarship of the Commonwealth of the Northern Mariana Islands, particularly in the fields of law, science and medical research; 2) to promote the practice of law in the Northern Mariana Islands by lending support to the CNMI Judicial Branch Law Library so that justices, judges, law clerks, attorneys, and the general public will have access to necessary legal research and materials.

The Junior Larry Hillbroom Trust, the Mercedita Feliciano Trust and the Law Firm of Walsworth, Franklin, Bevins & McCall as Donors, created a Trust Fund with initial irrevocable gifts of $259,104.12 donated by the Junior Larry Hillbroom Trust; $250,000.00 still to be donated by the Mercedita Feliciano Trust, pledged to in the December 21, 1999 Letter of Agreement and an additional $150,000.00 donated by the Walsworth Law Firm.  Pursuant to the December 21, 1999 Letter of Agreement Creating the Larry Lee Hillblom Memorial Foundation, Diane K. Bergeron, Esq. was named Temporary Trustee until such time as this Trust Agreement would be prepared.

The Donors and the Temporary Trustee have subsequently decided to rename the Trust the "Hillblom Memorial Fund".

I, Diane K. Bergeron, Temporary Trustee, have established a Trust Account, with the Trust Funds listed above, at the Bank of Saipan, Commonwealth of the Northern Mariana Islands.

I hereby give, transfer, and deliver the funds of that Trust Account to the Trustees in trust for the purposes stated above.

These funds shall be known as the Hillblom Memorial Fund.  Donors; Diane K. Bergeron as Temporary Trust; Supreme Court Justice Alexandro C. Castro of the Northern Mariana Islands; Diego D. Mendiola of the Northern Mariana Islands; and David J. Lujan, Esq. of Guam, USA; as individual trustees, hereby agree as follows:

### SECTION ONE
### TRANSFER OF TRUST FUNDS

Temporary Trustee hereby gives and transfers to above named Trustees the Hillblom Memorial Fund Trust Fund together with its income and profits and any other sums that may be transferred to Trustees or their successors pursuant to the terms of this Agreement, to hold in trust for the uses and purposes set forth in this Agreement.

JUN 10 2002 17:30 HK        WILLIAMS

JUN-10-02 07:35 PM        BERGERON, DIANE K.        321 757 6999        P.15

## SECTION TWO
### INVESTMENT AND APPLICATION OF TRUST FUND AND INCOME

Trustees shall hold the Trust Fund and, in their discretion, invest it or parts of it in securities in which Trustees are permitted to invest under the laws of the Commonwealth of the Northern Mariana Islands, or retain the fund in cash, and collect the income. Trustees shall, from time to time, and in such amounts as in their discretion Trustees shall deem proper, devote and apply the Trust Fund and income from the Trust Fund exclusively to the charitable uses and purposes described above solely by means of contributions to any charitable corporation, trust, community chest, fund or foundation which at the time of the contribution by Trustees is one of those organizations specified in the Internal Revenue Code of the United States, contributions to which are deductible for income tax purposes.

Upon execution of this document, $100,000.00 will be segregated for the benefit of the CNMI Judicial Branch Law Library to be disbursed at the direction of Trustee Castro.

For as long as this Trust Fund's principal remains under $1,000,000.00, as much as 100% of the income from investments may be used for the intended purposes of the Fund. At such time as the principal is increased to exceed $1,000,000.00, the Trustees shall determine at that time whether limits will be set on distributions of both income or principal.

Trustees shall make distributions at times and in a manner as not to subject it to tax under Section 4942 of the Internal Revenue Code, as amended, and shall not engage in any act of self-dealing as defined in Section 4941 of the Internal Revenue Code. Trustees shall not retain any excess business holdings as defined in Section 4943 of the Internal Revenue Code and shall not make any investments as defined in Section 4944 of the Internal Revenue Code nor make any taxable expenditure which would subject the Trust or the Corporation Trustee to tax under Section 4945 of the Internal Revenue Code.

## SECTION THREE
### RESTRICTIONS ON THE USE OF TRUST FUND

The Trust Fund and the income of the Trust Fund shall be devoted exclusively to the purposes described above and shall in no part and in no event be given or contributed to or inure to the benefit of any private person or corporation. No part of the Trust Fund shall be used to carry on propaganda or otherwise attempt to influence legislation, or to participate in any political campaign.

JUN 18 2002 17:31 FR
JUN-19-02 07:56 PM          BERGERON. DIANE. K.          321 757 6999          P.16

## SECTION FOUR
### ADDITIONAL GIFTS TO FUND

Either the Donors or other persons may, from time to time, make additional gifts of money or property to Trustees to become part of the Trust Fund.

## SECTION FIVE
### GOOD FAITH DUTY OF TRUSTEES

Trustees shall be chargeable only with the exercise of good faith in carrying out the provisions of the Trust. Trustees shall not, in the absence of bad faith, be responsible or accountable for errors of judgment in making the contributions and gifts pursuant to the provisions of Section Two.

## SECTION SIX
### REIMBURSEMENT AND COMPENSATION OF TRUSTEES

Trustees shall be reimbursed for all expenses reasonably incurred by them in the administration of the Trust Fund. The Designated Bank shall only be entitled to such reasonable fees for its services as are customarily charged for similar services and as may be from time to time agreed upon with the Trustees. Such reimbursement and fees shall be paid out of and charged to the Trust Fund. The individual Trustees shall serve without compensation.

## SECTION SEVEN
### DISSEMINATION OF INFORMATION AND EMPLOYMENT OF PERSONNEL

In properly carrying out and aiding the purposes and objects of the Trust, the Trustees shall have full power and authority:
(a) To employ and pay an Administrator of the Trust, attorneys, lecturers, writers, investigators, and such assistants and employees of every kind as they may deem necessary;
(b) To buy, print, publish, and/or distribute, by mail or otherwise, to whom they may think proper, appropriate pamphlets, cards, notices and information;
(c) To buy and distribute, by mail or otherwise, to whom they may think proper, copies of appropriate newspapers, magazines, and books.
(d) To disseminate by all lawful means such information as in the judgment of the Trustees may be useful in carrying out the purposes of this Trust.

## SECTION EIGHT
### DECISION OF MAJORITY OF TRUSTEES

The act of a majority of Trustees on all matters pertaining to this Trust, including the investment and distribution of funds, shall be conclusive. Evidence of such majority actions shall be in writing and shall be filed with the Designated Bank or the Administrator of the Trust.

JUN 10 2002 17:31 FR SUPREME COURT

JUN-10-02 07:27 PM    BERGERON.DIANE.K.    321 757 6999    P.17

## SECTION NINE
### DESIGNATED BANK HAS EXCLUSIVE CUSTODY OF FUNDS

The Designated Bank shall be the Bank of Saipan, the Bank of Saipan shall have exclusive custody of the securities, cash, and other property of the Trust Fund. The Designated Bank shall have the right to register securities or other property held under this instrument and invest these Funds pursuant to the direction of the Trustees.

## SECTION TEN
### APPOINTMENT OF SUCCESSOR TRUSTEE

Each Trustee sits as the representative of each Donor, with the exception of Justice Alexandro C. Castro, whom sits as a representative of the CNMI Supreme Court, which shall always be a source of one of the Trustees. In case of the death, resignation or replacement of any of the Trustees whom sit as the representative of a Donor, the successor of such Trustee shall be appointed by the Donor or successor to the Donor. In the case of death, resignation or replacement of the Trustee sitting as a representative of the Supreme Court, the Court will determine who will be the successor Trustee.

## SECTION ELEVEN
### GIFTS IRREVOCABLE

Gifts made in trust to Trustees under this Agreement shall be irrevocable. If it shall be determined by the Internal Revenue Service, subsequent to the creation of this Trust and the transfer of any funds to Trustees by the Donors or other person, that the Trust Fund is not exempt from the payments of income tax upon its income or that the Donors to the fund may not be entitled to charitable deductions for income tax purposes for contributions made thereto in the manner and to the full extent provided by the Internal Revenue Code, then such gifts as remain in the Fund at the time of such determination shall be given by Trustees to a qualified tax exempt charitable organization selected by Trustees to best carry out the purposes of this Trust. This Trust shall thereupon terminate.

## SECTION TWELVE
### QUALIFICATION AS TAX EXEMPT

The creation of this Trust is contingent on a determination prior to its inception by the Internal Revenue Service that its purpose, organization and proposed operation qualify it as a tax exempt trust. If no such tentative or advance determination can be obtained, this Trust Instrument shall be void and of no force or effect and no trust shall be created.

JUN 18 2002 17:32 FR SUNRISE WILLIAM...

JUN-18-02 07:33 PM        BERGERON, DIANE, K.        321 757 6999        P.18

## SECTION THIRTEEN
## NUMBER OF TRUSTEES

Except during periods following the death, removal, or resignation of a Trustee, there shall always be a minimum of three and a maximum of seven individual Trustees. In addition to the three Trustees presently named in this instrument, one additional Trustee can be named by each future Donor that gives a gift of at least $250,000.00; in no event shall the total number of Trustees ever exceed seven.

## SECTION FOURTEEN
## GOVERNING LAW

The operation of the Trust shall be governed by the laws of the Commonwealth of the Northern Mariana Islands. However, the Trustees are prohibited from exercising any power or discretion granted under such laws that would be inconsistent with the qualification of the Trust under the Internal Revenue Code and the corresponding regulations.

## SECTION FIFTEEN
## LIMITED POWER OF AMENDMENT

The Trust is irrevocable. However, the Trustees shall have the power to amend the Trust in any manner required for the sole purpose of ensuring that the Trust qualifies and continues to qualify as a charitable trust within the meaning of the Internal Revenue Code.

## SECTION SIXTEEN
## DIRECTION TO INCORPORATE

On the acceptance of this Trust, Donors direct that the Trustees incorporate as a non-profit corporation under the provisions and laws of the Commonwealth of the Northern Mariana Islands, and that the title to all property in this Trust be transferred to and held by the corporation in the corporate name. The execution by the Trustees of the Articles of Incorporation shall operate as an assignment and delivery to that corporation of all the property in the Trust. The name of the Trust created hereby and the corporation shall be the Hillblom Memorial Fund.

The powers of the Trustees and of the corporation shall be exercised by the Trustees by not less than two-thirds majority vote of all the Trustees. Two-thirds of all the Trustees shall constitute a quorum for the transaction of business at the meeting of the Trustees. The Chairperson of the Board, the President, and the Vice-President must be members of the Board of Trustees; other officers may be elected or appointed who are not members of the Board of Trustees.

## SECTION SEVENTEEN
## INTERPRETATION OF TRUST AGREEMENT

This Trust is intended, through its purpose, organization, and proposed operation, to qualify as a tax-exempt charitable trust as provided for in the Internal Revenue Code of the United States. Any ambiguities or questions concerning this instrument shall be resolved in accordance with that end.

## SECTION EIGHTEEN
## PUBLIC INSPECTION OF TRUST AGREEMENT

It shall be the duty of the Designated Bank to keep one copy of this Trust Agreement, bearing the date of its adoption duly certified by an executive officer of the bank, on file permanently at the office of the Bank of Saipan, Chalan Kanoa branch. The Trust Agreement shall be open to public inspection at such office during business hours.

In Witness Whereof, the parties hereto have signed and sealed this instrument on the ____ day of _____, 2000.

_____        _____
Junior Larry Hillbroom Trust        Justice Alexandro C. Castro

_____        _____
Walsworth Law Firm        Diane K. Bergeron, Esq.

_____        _____
David J. Lujan, Esq.        Diego D. Mendiola

_____        _____
Mercedita Feliciano Trust        Antonio M. Atalig

JUN 10 2002 17:33 FR SCHUME WILLIAMSON

JUN-10-02 07:48 PM        BERGERON, DIANE K.        321 757 6990        P.28

RECEIVED JUN 1 2002

000698

# RESIGNATION OF TEMPORARY TRUSTEE

On the 29th day of June, 2000, I, Diane K. Bergeron, Temporary Trustee of the "Larry Lee Hillblom Memorial Foundation"; created by the "Letter of Agreement" executed on December 21, 1999; do hereby resign my position as Temporary Trustee and relinquish all Trust Documents, correspondence and Funds over to Joe Hill, Esq., a resident of Saipan, Northern Mariana Islands.

The original donation of $259,104.12 from the Junior Larry Hillbroom (JLH) Trust; the additional $150,000 donation from the Law Firm of Walsworth, Franklin, Bevins & McCall; and all interest that has accrued, for a total of $413,167.17, has been received by Joe Hill as evidenced by his signature hereto.

A passbook savings account at the Bank of Saipan; Acct. #0200-301884, with a balance of $13,167.17; and two Certificates of Deposit; Acct. No. 0200-409898 for $150,000 and Acct. No. 0200-410153 for $250,000, both of which mature on July 13, 2000 have all been transferred to Joe Hill.

The $250,000.00 pledged donation of the Mercedita Feliciano (MF) Trust referred to in the December 21, 1999 "Letter of Agreement" was never transferred to the Temporary Trustee.

With this instrument, I, Diane K. Bergeron relinquish and designate all my responsibilities and duties with regard to the charitable purposes of the Larry Lee Hillblom Memorial Foundation to the capable protection of Joe Hill, Esq.

I, Diane K. Bergeron, disclaim, surrender and assign all interest I have as Temporary Trustee and hereby temporarily appoint Joe Hill, Esq. as the "Interim Trustee" until such time as the Donors create the Trust Agreement.

1

The validity, effect and construction of this document shall be determined in accordance with

the laws of the CNMI.

DIANE K. BERGERON, Esq., Temporary Trustee

June 29 2000
Date

Receipt acknowledged by:
JOE HILL, Esq.

6-29-2000
Date

_____
Witness

June 29, 2M
Date

_____
Witness

_____
Date

2

# EXHIBIT 7

FENNELL                          ID:670 323 7035          PAGE   1/2

# RANDALL T. FENNELL
### Receiver for Bank of Saipan

*2nd Floor Flame Tree Terrace Bldg.*
*Post Office Box 500049CK*
*Saipan, MP 96950*
*Telephone (670) 323-6633*
*Facsimile (670 323-7435*
*E-mail: randy.fennell@saipan.com*

*Bank of Saipan, CK*
*Post Office Box 500690 CK*
*Saipan, MP 96950*
*Telephone (670) 235-6290*
*Facsimile (670) 235-6294*

## TELEFACSIMILE COVER LETTER

DATE: 6/11/02

To: David Axelrod

RECEIVED JUN 1 1 2002
000827

From:   Bank of Saipan, Receivership Files
        Attn.: Randall T. Fennell, Receiver
                AND
        Bank of Saipan, Receivership Files
        Attn.: Cindy Adams, Esq.

### MAKE ALL FAXED CORRESPONDANCE TO BOTH ADDRESSES

TELEFACSIMILE Nos.:   234-9316 Office of Cindy Adams
                      323-7435 Office of Randall T. Fennell

Total number of pages including this cover sheet: 2

### COMMENTS

*If you do not receive all pages clearly, PLEASE CALL (670)323-6633*

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.



# RANDALL T. FENNELL

2nd Floor Flame Tree Terrace Bldg.
Post Office Box. 500049CK
Saipan, MP 96950
Telephone (670) 323-6633
Facsimile (670 323-7435
E-mail: randy.fennell@saipan.com

Bank of Saipan, CK
Post Office Box 500690 CK
Saipan, MP 96930
Telephone (670) 235-6290
Facsimile (670) 235-6294

Dear Dave,

Need the following:

1. How much money did Mendiola and Atalig get?
   a. Dates of orders
   b. Copies of orders if possible

2. Copy of Ataligs SM report allocating tax refund monies, and final order implementing it.

3. We need Diannes affidavit, as strong as she can make it, ASAP. If she won't what can we do with pictures? When, where and for what occasion was it taken?

4. Alexis Fallons brother, Ed, will call you with info on the search engine application for existing discs, or you can call him at 978-681-9641.

5. Are there transcripts on the discs? If so, can we search for library reference?

6. How much did Walsworth get? Can we show any relation to his "gift" of money?

7. What proof do we have about ex-parte meetings of Castro & Lujan?

What we are obviously trying to do is to tie Lujan and Juniors donations, both to the Rota Collegio fund and to the library, to favorable treatment. Any helpful thoughts on that line are needed. For example, did most Lujan favorable treatment occur after the donations? Can you recall exactly how and when we got screwed? We are up against a wall, time wise. And the local court is not having any luck finding any of the audio transcripts we have requested. Missing log book!

Can you or Bill Ohle (preferably you as you know more history) give me a draft of my affidavit showing violation of the local cannons (copy being faxed) by Castro, and Lujan favoritism. Also, the April 9, 2000 transcript you faxed me has a good line where Walsworth gives the money and then goes on to say "thank you, thank you, thank you!" (Pg. 29) Also, Castro demanding desks and chairs be given to library (pg. 20-21) Call and wake me - 670-287-6633 if you need to.

cc:   Cindy Adams
      Richard Pierce

# EXHIBIT 8



Law Offices of
**Brian W. McMahon**
Post Office Box 1267
Saipan, MP 96950
Telephones: (670) 234-9314/9315
Facsimile: (670) 234-9316

# IN THE SUPREME COURT
## OF THE
## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| **ACTING SECRETARY OF COMMERCE, FERMIN M. ATALIG,** in his official capacity as the CNMI DIRECTOR OF BANKING under 4 CMC/ 6105(a) <br><br> Plaintiff, <br><br> vs. <br><br> **BANK OF SAIPAN,** <br><br> Defendant. | ORIGINAL ACTION NO. 02-0002-0A <br><br> **DECLARATION OF RANDALL T. FENNELL** |

I, Randall T. Fennell, under penalty of perjury, hereby state:

1. I make this declaration from my own personal knowledge, on the facts that are contained in the documents and records attached hereto, and where indicated, on information and belief.

2. I was appointed receiver of the Bank of Saipan by the Honorable Edward Manibusan at the petition and request of the Acting Secretary of Commerce and CNMI Attorney General.  My appointment took place effective April 30, 2002. The petition and appointment were necessitated by

1



the potential loss of many millions of dollars to the CNMI government and other depositors of the Bank of Saipan when the Bank collapsed.

3. The Acting Secretary had placed the bank under receivership by stipulation. The bank remains under receivership pursuant to a finding by the acting Secretary that the bank is financially unsound and that its customers are in danger of being defrauded. Further findings by the Acting Secretary relate his belief that $3.5 million in funds were wrongfully removed from the bank by the Junior Larry Hillblom Trust and members of the Calvo Family. Board members at the time of the collapse of the Bank of Saipan included David Lujan and Joe Lifoifoi. The findings of the Acting Secretary which are the basis for the bank being currently in receivership are detailed in the Continued Receivership Determination dated May 28, 2002, attached as Exhibit 1A.

4. This declaration is given in support of my Motion to Disqualify Justice Castro from sitting on this or related matters that may arise in the receivership of the Bank of Saipan. It is based on the fact that Justice Castro is a personal friend of two current or former Bank of Saipan board members, Joe Lifoifoi and David Lujan. All bank directors or witnesses may be liable for the failure of the bank and are almost certain to be included as defendants in cases to be brought by the receivership. It is also based on the fact that the Junior Larry Hillblom Trust (JLH Trust) is the largest shareholder in the Bank of Saipan and is the largest donor to the Hillblom Memorial Fund ("HMF"), providing 62.5% of its funding to date. Justice Castro was one of the founders of the HMF, and expended great amounts of time and effort to assure its viability. The JLH Trust is likely to be a defendant in an action for wrongful removal of funds from the Bank of Saipan.

2

5. In late 1999, in open court during a hearing on a Hillblom Estate matter, C.A. 95-626, Mr. Lujan announced that Junior Larry Hillblom's guardian had approved using $750,000 of Junior's money to fund a CNMI charitable foundation which would benefit, among other things, the CNMI judicial law library. Mr. Lujan called on the other parties to the case to likewise contribute. Mr. Lujan stated Junior would contribute $250,000 immediately with the rest to follow over a period of a few years. He asked Justice Castro to participate in the creation of the HMF. I was present at this hearing.

6. I believe Mr. Lujan also was the one to inform Judge Castro, at this same hearing, that the guardian for Mercidita Feliciano, another minor heir claimant, had also agreed to likewise donate, although to date no money has been received from Mercidita's trust according to the public tax records of the HMF. See, Exhibit 1 attached.

7. Justice Castro indicated that he would be happy to participate, and told the other attorneys for the Hillblom heir claimants to check with their guardians concerning a donation to the foundation. He thereafter inquired in open court several times of counsel for the other heir claimants of their progress in procuring donations from their clients. I represented Jellian Cuartero, through her guardian in the Estate litigation.

8. When this offer of Junior's money was made through Mr Lujan there were numerous issues being hotly contested in the Hillblom estate. Millions of dollars were at stake, including the benefit of the allocation of potential tax deductions for contingent attorney fees, which would be allocated among the heir claimants.

3

9. I declined to permit my client in the Hillblom probate to contribute to the HMF, because it was my legal opinion that contributions to a court sponsored charity, funded with money from a client that had important matters pending before that court, was a clear violation of the code of ethics and the rules of judicial conduct.   I also believed that it would be a breach of fiduciary duty for any trustee guardian or lawyer representing a minor child to take it upon themselves to select a charity and give the child's money to that charity.

10. After  December 21, 1999, when Justice Castro ordered over $250,0000 transferred from Junior's account to that of the HMF, (Exhibit 2)  Justice Castro and his Special Research Assistant ("SRA")  Dianne Bergeron, worked closely with Mr. Lujan on organizing and funding the HMF.  Attached hereto as Exhibit 3 through 36 are different letters, e-mail and faxes between these parties concerning the formation and funding of the HMF Trust.   These documents were provided to my attorneys within the last two weeks by Dianne Bergeron, Judge Castro's former SRA.

11. Until recently, I was unaware of most of the ex-parte communications between Mr. Lujan and Justice Castro that are referenced herein.

12. On April 8, 2000, again in open court in a Hillblom Estate matter, Justice Castro awarded several "bonuses" of estate money to different participants in the estate.  A transcript of that hearing is attached hereto.  Among other bonuses, Special Administrator Diego Mendiola's legal counsel, Jeffrey Walsworth  received a bonus of $150,000.   Mr. Walsworth thereupon donated his "bonus" to the HMF. Transcript, Exhibit 37 at pp 28-29.

4