# EXHIBIT 22

1

2

3

4

5                                          IN THE SUPERIOR COURT

6                                              FOR THE

7                          COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

8

9   In Re:                                    )        CIVIL ACTION NO.  02-0268B
                                              )
10                                            )        ORDER APPROVING
    THE MATTER OF THE BANK OF SAIPAN          )        DIRECTORS OF THE
11                                            )        BANK OF SAIPAN, INC'S
                                              )        REHABILITATION PLAN
12                                            )
                                              )
13

14          The above matter came on for a hearing on February 12, 2003, at 9:00 a.m. on the Directors

15  of the Bank of Saipan, Inc.'s Motion to Approve the Rehabilitation Plan.  Assistant Attorneys

16  General Benjamin Sachs and David Hutton appeared on behalf of Secretary of Commerce and ex

17  officio Director of Banking Permin M. Atalig ("Director of Banking").  David Mair, Esq. appeared

18  on behalf of the Bank of Saipan ("Bank"), Robert J. O'Connor, Esq. appeared on behalf of Paul

19  M. Calvo, Edward M. Calvo and Thomas J.M. Calvo, and Brien Sers Nicholas, Esq. appeared on

20  behalf of the JLH Pacific Trust,  Alan L. Lane, Esq. appeared on behalf of intervenor MPLA and

21  Marlo Sarmiento, Esq. appeared on intervenor Northern Mariana Islands Retirement Fund.  S.

22  Joshua Berger, Esq. appeared on behalf of the Receiver who also appeared.  The court having

23  reviewed the briefs, exhibits, affidavits, and having heard and considered the arguments of counsel,

24  now orders the following:

25          1.      The rehabilitation plan presented to the court is hereby approved.

26          2.      The receivership shall continue until dissolved by this Court upon sufficient

27  showing of the Bank's rehabilitation.  Antonio S. Muna shall act as Receiver at all times herein.

28          3.      The Receiver shall make progress reports to the court every sixty days.

4.    The Receiver shall have veto power over the Bank's Loan Committee and Board of Directors who shall only act in an advisory capacity during the pendency of the receivership.

5.    The Receiver shall be an *ex officio* member of the Board of Directors and shall receive notice of and have the opportunity to attend all board meetings until further ordered by this Court.

6.    Pursuant to Part I(G) of the rehabilitation plan, a formal regulatory agreement shall be negotiated between the parties, and implemented within thirty days of the date of this Order. If the parties are unable to reach an agreement, however, they are ordered to submit a statement of differences to the court within thirty days of this Order. At that time, the court will resolve the differences.

7.    The Receiver's Position and Recommendations on the Rehabilitation filed on February 10, 2003, is adopted by the court and incorporated into the rehabilitation plan.

8.    To the extent that all previous orders of this Court are inconsistent with the rehabilitation of the Bank, they are superceded and vacated.

SO ORDERED this _13_ day of February, 2003.

EDWARD MANIBUSAN, Presiding Judge

- 2 -

# EXHIBIT 23

1

2

3

4

5  FOR PUBLICATION

6

7                              IN THE SUPERIOR COURT

8                                      OF THE

9             COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

10

11  THE BANK OF SAIPAN,                    )        CIVIL ACTION NO. 02-0376E
                                            )
12              Petitioner/Plaintiff,       )
                                            )
13                                          )
                                            )
14                                          )        ORDER RE: PETITION FOR JUDICIAL
                 vs.                        )        REVIEW
15                                          )
                                            )
16                                          )
    FERMIN M. ATALIG, in his official and   )
17  personal capacities,                    )
                                            )
18                                          )
                 Respondent/Defendant.      )
19                                          )
                                            )
20  _____      )

21

22                            I. INTRODUCTION

23          This Matter comes before the Court pursuant to the Petitioner/Plaintiff, The Bank of

24  Saipan (hereafter "Bank"), making a Motion to Shorten Time urging the Court to make a

25  decision on issues contained in the pending Petition for Judicial Review.  A trial scheduled to

26  commence in Texas, on or about April 4, 2005, involving the Bank, precipitated this Motion.

27  Oral arguments were heard on March 31, 2005 in Courtroom 223A at 1:30 p.m.  David Mair

28  appeared on behalf of the Bank.  Assistant Attorney General Benjamin Sachs appeared on behalf

                                            -1-

1  of Respondent/Defendant Fermin Atalig (hereafter "Atalig" or "Government").

2

3                              **II. BACKGROUND**

4        On April 30, 2002, the Acting Secretary of Commerce, Fermin Atalig, through his power

5  as the Director of Banking, issued a notice and a determination that the Bank of Saipan was in

6  violation of 4 CMC § 6106(f).  Section 6106(f) gives the Acting Secretary the authority to

7  request a court to invoke a Receivership if either 1) he determines or has reason to believe a bank

8  is unable to continue doing business because of unsound financial condition, or 2) he determines

9  the affairs of the bank are being conducted in a manner that the investor-creditors or the public

10  are in danger of being defrauded.  The Director followed this procedure and, pursuant to the

11  April notice and determination, the Bank was placed into Receivership on April 30, 2002 and the

12  Court certified the April determination.

13        On May 28, 2002, Atalig issued "his support for his determination regarding the financial

14  condition of the Bank"(hereafter "Letter" or "May Letter").  The seven-page letter contained

15  derogatory language regarding the Bank's practices and procedures.  In early June, 2002, the

16  Bank objected to the May Letter becoming part of a legally significant finding, filing a Petition

17  for Judicial Review.  In its Petition for Judicial Review (hereafter "Petition"), the Bank argued

18  that the Banking Director's factual findings contained in the May Letter violated due process

19  requirements, was an improper administrative action, and should be stricken.  In support of its

20  position, the Bank submitted a number of declarations attesting to the significant negative impact

21  on the Bank's rehabilitation efforts and the detrimental effect on the Bank's long-term

22  obligations to its depositors.   The Petition further requested a review of whether a Receiver

23  should be appointed, a determination of who the Receiver should be, and the duration and scope

24  of the Receivership. In response, the Government asserted that the May Letter merely expounded

25  on the April 2002 findings, and as such, was proper and should not be stricken.

26        In September 2002, pursuant to the April 2002 findings and decision to place the Bank

27  into Receivership, a Receiver was appointed.  Withdrawing its opposition to the Receivership,

28  the Bank made a  motion to declare the Receivership issues contained in its June Petition for

-2-

1 Judicial Review moot, but renewed its objection to the May Letter. The Government asserted
2 that "because of the acquiescence of the bank to the continued Receivership ...there is no
3 practical legal effect of the underlying administrative action ...". Government's *Memorandum of*
4 *Points and Authorities*, filed March 12, 2003.

5     The Court subsequently issued an Order disagreeing with the Government regarding
6 mootness, holding that while the Receivership issues were moot, the underlying administrative
7 action, which included the issuance of the May Letter, remained at issue. Accordingly, the
8 parties were directed to enter into negotiations to attempt to resolve the matter without the
9 Court's intervention. In December 2004, the Court called a status conference to ascertain
10 whether the parties had reached an agreement. They reported that no agreement had been
11 reached, and agreed to renew their negotiations. The parties subsequently filed several
12 stipulations for time extensions to negotiate. The parties have been unable to reach such an
13 agreement. The Bank continues to assert that the May Letter improperly bypassed the
14 administrative protections set forth in the Commonwealth Banking Code and Administrative
15 Procedures Act. Further, the Bank has again submitted declarations from Bank officers and
16 directors attesting to the negative impact the May Letter has on the Bank's rehabilitation efforts
17 and long-term obligations to its depositors. The Government asserts that the May Letter was
18 fully within compliance with the APA, and merely expounded on the April 2002 findings.

19     Given the extended time period for negotiations and the Texas trial scheduled to
20 commence in the United States District Court for the Northern District of Texas on or about
21 April 4, 2005 (*see The Bank of Saipan, et al. v. CNG Financial Corp.*, Civil Action No. 1:02-
22 CV-117-C), in which the said May Letter will be used by the opposing party to assert a defense
23 of "unclean hands" against the Bank, the Court finds good cause to shorten the time period as
24 requested and issue this decision on the remaining issue contained in the Petition for Judicial
25 Review, the May Letter.

26     Although § 6113 of the Banking Code only provides for judicial action on an order issued
27 by the Banking Commissioner, judicial review of an administrative agency action is governed by
28 the Commonwealth Administrative Procedure Act, codified at 1 CMC § 9101 et seq. (hereinafter

-3-

1   referred to as the "APA"). See *Camacho v. N.M.I. Retirement Fund*,1 N.M.I. 364, 1 N.M.I. 366

2   (1990). Pursuant to the APA, the reviewing court shall decide all questions of law, interpret

3   constitutional and statutory provisions, and determine the meaning or applicability of the terms

4   of an agency action. See 1 CMC § 9112(f). With respect to an agency's actions, findings or

5   conclusions, the law empowers the reviewing court to hold and set aside the same if it determines

6   that any one of six reasons set forth at 1 CMC § 9112(f) exist to warrant such a holding. 1 CMC

7   § 9112(f) states, in pertinent part, that the reviewing court shall:

8

9           (2) Hold unlawful and set aside agency action, findings, and conclusions found to
            be:

10

11                  (i) Arbitrary, capricious, an abuse of discretion, or otherwise not in
                    accordance with law;

12                  (ii) Contrary to constitutional right, power, privilege, or immunity;

13                  (iii) In excess of statutory jurisdiction, authority, or limitations, or short of
                    statutory rights;

14

15                  (iv) Without observance of procedure required by law;

16                  (v) Unsupported by substantial evidence in a case subject to Sections
                    9108 and 9109 or otherwise reviewed on the record of an agency hearing
                    provided by statute; or

17

18                  (vi) Unwarranted by the facts to the extent that the facts are subject to trial
                    de novo by the reviewing court.

19

20   1 CMC § 9112(f).

21          In the instant matter, while the appointment of the Receiver was justified, the Bank

22   asserts that the issuance of the May Letter was arbitrary, capricious, an abuse of discretion, or

23   otherwise not in accordance with law and should be declared unlawful pursuant to 1 CMC §

     9112(f)(2)(i).
24

25                                      **III. DISCUSSION**

26   CNMI statute, 1 CMC § 9108, provides that prior to imposing a sanction on a licensee,

27   reasonable notice must be given and a pre-deprivation hearing is required. The Banking code

28

                                             -4-

1   further requires that the Banking Director hold a hearing before suspending, revoking, limiting or

2   restricting a Bank license. See, 4 CMC § 6110, § 6111. Despite this general legal principle, the

3   Government may initiate certain proceedings without a hearing when warranted by the

4   circumstances. *See e.g.* 4 CMC § 6106(f). The emergency action used in the instant matter was

5   the appointment of a Receiver, which was in effect a restriction or limitation of the Bank's

6   license. As noted above, 4 CMC § 6106(f), provides for the appointment of a Receiver as an

7   extraordinary remedy when necessary to protect the public's interest and investor-creditors.

8       Clearly, in the instant matter, the public's interest could only be protected by prompt action.

9   The Receiver was appointed to prevent violations of law and preserve the Bank's assets for the

10  benefit of the investor-creditors, which included individual citizens and substantial government

11  deposits. In other words, there was authority for Atalig to make his April determination and

12  take action and protect the public against a run on the Bank. The appointment of a Receiver was

13  necessary in light of the circumstances, and the Government correctly followed the procedures of

14  appointing a Receiver.

15      Atalig was empowered to request a Receivership, pursuant to 4 CMC § 6106, if he had a

16  belief that the Bank was in unsound financial condition or was conducting its affairs in a manner

17  that put the investor-creditors at risk of being defrauded. However, while Atalig had authority to

18  make a determination and invoke a Receivership, his actions had to be in compliance with

19  standards set forth in 1 CMC § 9112(f), and in particular subsections 2(i)&(iv). As such, Atalig

20  had statutory authority to act, but that authority was limited to what was necessary to protect the

21  public's interest and did not include the authority to issue subsequent findings without providing

22  the Bank an opportunity to respond.

23      The Court sees no justification or rationale for the May Letter. The May Letter was issued

24  subsequent to findings that had already met statutory requirements to invoke the Receivership,

25  and the Bank had already been placed into Receivership. The May Letter served little purpose

26  other than providing superfluous and derogatory statements which were unnecessary and made

27  without the Bank having the opportunity to reply to the allegations, as required pursuant to 1

28  CMC § 9108, 4 CMC § 6110 and § 6111. As such, the Letter could not be issued absent a

-5-

1  hearing and proper notice in which the Bank had an opportunity to contest the findings.  The

2  Bank was never given that opportunity.

3

4                                    **IV.  CONCLUSION**

5        For the reasons herein, and pursuant to the Court's authority stated above, and in

6  particular § 9112 (f)(2)(i) & (iv), the Court Orders that the May Letter is hereby set aside and

7  stricken from the record.

8

9  **SO ORDERED** this ___ day of **April 2005.**

10

11                                                    David A. Wiseman
12                                                    Associate Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                       -6-

# EXHIBIT 24



By order of the court,  *Judge Juan T. Lizama*



E-filed: Nov 27 2007 10:38AM
Clerk Review: N/A
Filing ID: 17409208
Case Number: 04-0088-CV
N/A

1.
2.
3.                          **IN THE SUPERIOR COURT**
                                      **OF THE**
4.               **COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**
5.  BANK OF SAIPAN,                        )    CIVIL ACTION NO. 04-0088C
6.                                         )
                        Plaintiff,         )
7.                                         )
                  vs.                      )
8.                                         )
9.  BERT DOUGLAS MONTGOMERY, et al.,       )    **ORDER GRANTING**
                                           )    **PLAINTIFF'S MOTION**
10.                                        )    **FOR SUMMARY JUDGMENT**
                        Defendants.        )
11.  _____)
12.
13.         This matter was last before the Court on November 6, 2007 for Plaintiff Bank of Saipan's (the
14.  "Bank's") Rule 56 motion for summary judgment against Defendant Bert Douglas Montgomery on all
15.  five of the Bank's claims (including (1) fraudulent misrepresentation; (2) fraudulent concealment; (3);
16.  fraudulent nondisclosure; (4) conspiracy to commit fraud; and (5) aiding and abetting a breach of
17.  fiduciary duty), based on Montgomery's criminal conviction in *U.S. v. Montgomery*, No. 02-00010 (D.
18.  N. Mar. I.). Montgomery has not submitted an opposition.
19.
20.  I.          **UNDISPUTED FACTS**
21.
22.         Beginning in June of 2001, Montgomery inquired into the Bank's relationship with MasterCard
23.  and Visa, and limitations that might apply. Mtn Sum. Jgm, Stewart Affidavit, Ex. 2 (June 13, 2001
24.  BlueSands LLC letter). During a July 11, 2001 meeting with the Bank's Board of Directors,
25.  Montgomery discussed his plans to implement a Visa card money-transfer system with the Bank
26.  through the help of Sweven, a company run by Michael Wilson. *Id.*, Ex. 3 (July 11, 2001 Bank Board

1

of Directors Meeting Minutes); Ex. 20 (July 10, 2003 Wilson Deposition at 195-200); Ex. 21 (September 9, 2003 Wilson Testimony in *Bank v. CNG Financial Corp.* at 322).

In mid-2001, Montgomery represented to the Bank that Sweven had 48,000 credit card merchant accounts grossing close to $5,000,000,000 annually, and an $8,500,000 reserve account to cover any transactional shortfalls in the merchant accounts. *Id.*, Ex. 21 (Wilson Testimony at 322). Montgomery knew of the falsity of these representations and of Sweven's financial statements that he submitted to the Bank. *Id.*, Ex. 20 (Wilson Deposition 201-202). Montgomery and Wilson prevented the Bank loan officer, Lee Francia, from investigating her suspicions of Sweven. *Id.* Ex. 25 (Wilson Deposition 175–176).

From May 2001 to September 2001, Montgomery worked on a plan for the Bank to loan Wilson $5,000,000 to enable Sweven to acquire two credit card processing companies, Finity Corp. and Fi-Script, Inc. *Id.*, Ex. 20 (Wilson Deposition at 194-95), Ex. 21 (Wilson Testimony at 321-22). The loans were to be secured first by reserve accounts that, as Wilson later told Montgomery, did not really exist. *Id.*

In exchange for loan installments of $500,000 and $4,500,000, the Bank was to become a settlement bank for Sweven. *Id.* Ex. 22 (November 21, 2001 Banking and Business Agreement). The parties agreed that a portion of the processing fees would serve to repay the loans, while processing fees exceeding the balance due on the loan would go to Transglobal Equipment Corporation (TEC, Montgomery's company). *Id.*

Montgomery represented to the Bank that he was a successful business man with extensive executive experience. *Id.* Ex. 8 (September 30, 2001 Montgomery Loan Affidavit). These representations included: that he was the CEO of a holding company known as TEC, *id.*; that he had

1.  been a director of a Texas bank for three years and had participated in a bank start-up as a director and

2.  shareholder, *id.*; and that he had amassed sufficient assets to purchase a controlling interest in the Bank,

3.  including assets held in a brokerage account with United Forex Exchange, Inc. ("UFX"). *Id.* Ex. 10-11

4.  (Montgomery's Personal Financial Statements presented to Bank).

5.  In reality, Montgomery did not own the assets in the UFX Account, but was borrowing them

6.  without knowledge or approval of the investor-owners. *Id.* Ex. 12 (September 10, 2003 Lujan

7.  Testimony in *Bank v. CNG Financial Corp.* at 642, 45).

8.  Montgomery gained the support of Bank President Aldan, offering him two percent of the

9.  authorized and issued shares of either TEC or BlueSands, LLC (both companies associated with

10. Montgomery). *See id.* Ex. 5 (October 8, 2001 Letter from Montgomery to Aldan [referring to TEC] and

11. Ex. 4 (September 30, 2001 Aldan Executive Employment Agreement [referring to BlueSands, LLC].

12. In November 2001, although there was no signed promissory note for the loan to Sweven, Bank

13. loan officer Lee Francia caused the first installment of $500,000 to be wired to Sweven based on

14. Montgomery's representation that Aldan had already approved the transaction. *Id.* Ex. 26 (September 8,

15. 2003 Francia Testimony in *Bank v. CNG Financial Corp.* at 227–231). Thereafter, Montgomery and

16. Aldan directed Francia to cause the remaining $4,500,000 be wired to Sweven. *Id.* At the time, the

17. Bank's Board of Directors did not know about or approve the Sweven loans. Ex. 9 at 1 (Fitial

18. Testimony at 101).

19. In late November of 2001, the Board of Directors approved Montgomery's proposed purchase

20. of a controlling interest of the Bank. On or about December 3, 2001, the Bank advanced nearly $3.6

21. million to Montgomery to purchase 61% of the Bank's shares, paying $18 per share. *Id.* Ex. 15

22. (September 27, 2001 Promissory Note); Ex. 12 (Lujan Testimony at 642). This money went directly to

3

the Calvo Directors and JHL Trust for their shares. *Id.*, Ex. 12 (Lujan Testimony at 642). To repay the loan, Montgomery used $2.6 million from the $2.8 million UFX Account, $500,000 belonging to a Bank account holder known as Michelle Hom, and $487,000 of Bank funds. *Id.* at 644; Bargfrede Affidavit at ¶ 2.

From mid-December through mid-February, Montgomery sought to repay (or create an appearance of repaying) UFX and Hom. Montgomery caused Hom's personal account at the Bank to reflect a balance of $209,000 when in fact no sums were actually on deposit. Bargfrede Affidavit at ¶ 4. Montgomery misrepresented that a loan to Hom was pending and caused the Bank to wire her $240,000. *Id.* Montgomery, with Aldan's assistance, transferred Bank assets to a brokerage account at D.A. Davidson & Co. ("Davidson") that Montgomery intended to use to secure a personal loan to repay UFX. *Id.*

During the time that Montgomery was gaining control of the Bank, he and Aldan created the International Affairs Department (for which Montgomery served as President). Mtn Sum. Jgm, Stewart Affidavit, *Id.*, Ex. 16 (January 1, 2002 Executive Employment Agreement for President of International Affairs). Montgomery's business partner DuSean Berkich and his wife Bonnie were named as Vice President, *Id.*, Ex. 17 (January 1, 2002 Executive Employment Agreement for Vice President of International Affairs), and Marketing Manager, *Id.*, Ex. 18 (January 1, 2002 Executive Employment Agreement for Marketing Manager of International Affairs), respectively. The Bank's Board of Directors did not know of or approve the creation of the department, *Id.*, Ex. 7 (Fitial Testimony at 99), or approve of Montgomery acting on behalf of the Bank. *Id.*, Ex. 19 (Lujan Testimony at 637).

On January 25, 2002, Montgomery, acting as President of the International Affairs Department, approved Aldan's application for a $430,000 loan. *Id.*, Ex. 28 (Minutes of February 27, 2002 Special

4

Meeting of Directors). On February 7, 2002, Aldan approved Montgomery's application for a $260,000 loan. *Id.*, Ex. 29 (February 7, 2002 letter from Aldan to Montgomery). Neither of these loans were submitted to or approved by the Bank's Board of Directors. *Id.*, Ex. 9 (Fitial Testimony at 107-108).

In February 2002, the Bank learned of the unauthorized loans to Sweven, Aldan, and Montgomery. *Id.* at 107–110. The Board of Directors called a special meeting in which they removed Aldan as Chairman and CEO; locked out Montgomery; appointed independent counsel; appointed Fitial as Special Administrator; suspended operation of unauthorized International Affairs Department; and reaffirmed that Montgomery, the Berkiches, and James Nava had no authority to act on behalf of the Bank. *Id.* Ex. 28 (Minutes of February 27, 2002 Special Meeting of Directors). The Bank informed the FBI and the Banking Commission of Montgomery's activities, and Montgomery was arrested. *Id.* Ex. 31 (Fitial Testimony at 124).

On April 24, 2002, Montgomery was indicted for defrauding the Bank and Hom in connection with his plan to: (1) acquire control of the Bank; (2) use Bank assets to pay for the acquisition; and (3) cause the Bank to make loans to Sweven, Aldan, and himself. *Id.* Ex. 32 ("Montgomery Indictment"). Montgomery was charged with five counts for wire fraud, conspiracy to commit wire fraud, and wire fraud: deprivation of honest services. *Id.*

On August 14, 2002, the United States filed a Superseding Indictment adding four additional counts for money laundering and money laundering conspiracy. *Id.* Ex. 33 (Superseding Indictment ("SI")).

On December 31, 2003, Montgomery was found guilty on eight counts by the United States District Court for the District of the Northern Mariana Islands. *Id.* Ex. 34 (Montgomery Verdict Form).[1]

---

[1] He was found not guilty of committing one act of wire fraud on December 20, 2001.

The jury found beyond a reasonable doubt that Montgomery committed wire fraud, conspiracy to commit wire fraud, wire fraud: deprivation of honest services, money laundering conspiracy, and money laundering. *Id.*

The United States' allegations against Montgomery are based on the same acts and omissions that form the basis of the instant action. Both charging instruments assert that through his fraud, Montgomery misrepresented his experience and background (SI ¶¶ 10, 15, 18; Third Amended Complaint ("TAC") ¶¶ 21, 26, 29); his interest in the UFX Account (SI ¶ 15; TAC ¶ 28); his banking experience (SI ¶¶ 10, 18; TAC ¶ 21); the circumstances by which Hom transferred $500,000 to Montgomery's personal bank account (SI ¶ 17; TAC ¶ 28); and the circumstances causing the Bank to transfer assets to Davidson (SI ¶ 19; TAC ¶ 30). Both documents assert that through fraud, Montgomery misrepresented Sweven's bona fides, financial and tax records, and business intentions (SI ¶¶ 20, 24; TAC ¶¶ 31, 35); that Aldan had approved the $500,000 Sweven loan (SI ¶¶ 21–22; TAC ¶¶ 32–33); and that $4,500,000 Sweven loan was authorized (SI ¶¶ 24–25; TAC ¶¶ 34–35). Both documents similarly allege Montgomery's fraud in obtaining a $260,000 loan (SI ¶ 26; TAC ¶ 51) and approving a $430,000 to Aldan (SI ¶ 28; TAC ¶ 52). Finally, both documents allege Montgomery induced Aldan to assist him in his scheme to defraud the Bank (SI ¶ 11; TAC ¶ 22).

The claims (or counts) are not identical, however. While the instant civil action contains claims for fraudulent misrepresentation, fraudulent concealment, fraudulent nondisclosure, conspiracy to commit fraud, and aiding a breach of fiduciary duty; the criminal action contained one count of conspiracy to commit wire fraud, four counts of wire fraud (including one for deprivation of honest services), one count of conspiracy to commit money laundering, and three counts of money laundering.

## II.   APPLICABLE STANDARDS

Summary judgment is appropriate if the Court finds that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Com. R. Civ. P. 56(c). In responding to a motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Com. R. Civ. P. 56 (c). "If he does not so respond, summary judgment, if appropriate, shall be entered against him." *Oltarzewski v. Ruggiero*, 830 F.2d 136, 138–39 (9th Cir. 1987).

## III.   ANALYSIS

The Bank argues that Montgomery's criminal conviction in the United States District Court preclusively determined the issues presented in the instant action, such that it is entitled to summary judgment on each of its civil claims.

### A.   Application of Collateral Estoppel and Issue Preclusion

Under the doctrine of collateral estoppel or issue preclusion,[2] a judgment in a prior suit precludes re-litigation of issues—of fact or law—actually litigated and necessary to the outcome of the first action. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 n.5 (1979)); *see also Del Rosario v. Camacho*, 2001 N. Mar. I. LEXIS 3, *28–*29 (N. Mar. I. 2001) (adopting the Restatement (Second) of Judgments formulation).

The instant case involves "offensive collateral estoppel," in which the party asserting estoppel

---

[2]   Collateral estoppel (also known as issue preclusion) attaches when a subsequent litigation arises from a different cause of action. *See Weyerhaeuser Co. v. Wyatt*, No. 06-7096, 2007 WL 3105426 (10th Cir. 2007) at *4; *Christo v. Padgett*, 223 F.3d 1324 (11th Cir.2000); 18 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d, § 4402 (1981). Collateral estoppel differs from res judicata (also known as claim preclusion), which attaches when the same cause of action is litigated between the same parties in consecutive cases. *Id.* Res judicata applies to claims that were litigated as well those that could have been litigated. *Christo*, 223 F.3d at 1338 n. 46. Res judicata attaches when the same cause of action is litigated between the same parties in consecutive cases. *Id.*

1. was not a party to the case on which the estoppel was based. *See Parklane*, 439 U.S. at 326. Although
2. the Supreme Court has not endorsed the use of offensive collateral estoppel stemming from a criminal
3. proceeding in a subsequent *criminal* proceeding, *see United States v. Dixon*, 509 U.S. 688, 710 n15
4. (1993), nothing precludes the use of offensive collateral estoppel in a subsequent *civil* experience. *See*
5. *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 568–69 (1951).
6.
7.      *Gelb v. Royal Globe Ins. Co.* sets forth a four-part test for using federal criminal convictions as a
8. basis for collateral estoppel effect in civil actions: "(1) the issues in both proceedings must be identical,
9. (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there
10. must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue
11. previously litigated must have been necessary to support a valid and final judgment on the merits." 798
12.
13. F.2d 38, 42-43, 44 (2d Cir.1986) *cert. denied*, 480 U.S. 948 (1987).

14. **1.    Are the issues identical?**

15.
16.      While the issues litigated in the criminal case are similar to the issues in the instant case, they
17. are not exactly the same. The Court considers each element of each count in the criminal case to
18. determine whether these elements correspond to the bases of claims in the civil case.

19.         a.    <u>Mail Fraud and Conspiracy to Commit</u>

20.      The elements of wire fraud are that the defendant knowingly and willingly entered into a
21. scheme to defraud and that an interstate wire communication was used to further the scheme. *U.S. v.*
22. *Alston-Graves*, 435 F.3d 331, 336-37 (D.C. Cir. 2006).
23.
24.      The elements of a conspiracy to commit wire fraud are that the defendant knowingly
25. participated in the conspiracy with the intent to commit wire fraud, and that at least one overt act was
26. committed in furtherance of the conspiracy. *Id.* A conspiracy to commit wire fraud contains all of the

8

elements of conspiracy to defraud with the additional element of use of wire transmission services in furtherance of the scheme to defraud. *U.S. v. Elkins*, 885 F.2d 775 (11th Cir. 1989).

Defrauding may occur through a knowing, material misrepresentation or concealment of material fact, *U.S. v. Birnie*, 193 Fed. Appx. 528, 535 (6th Cir. 2006), or through nondisclosure of material information where there is a duty to disclose, *American United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1065 (11th Cir. 2007).

> b.    Deprivation of Honest Services

Deprivation of honest services "is perforce an imprecise standard," *U.S. v. Murphy*, 323 F.3d 102, 115 (3rd Cir. 2003), that does not necessarily change the elements of a crime to which it is linked. *See U.S. v. Vinyard*, 266 F.3d 320, 326 (4th Cir. 2001) (elements of a mail fraud scheme involving the deprivation of honest services are identical to those of a normal mail fraud prosecution). Deprivation of honest services does not require an active fraud or deceit. *United States v. Antico*, 275 F.3d 245 (3d Cir.2001).

A breach of fiduciary duty *may* give rise to a deprivation of honest services, in violation of federal mail and wire fraud law, *U.S. v. Segal*, 495 F.3d 826, 834 (7th Cir. 2007).

> c.    Money Laundering and Conspiracy to Commit

The elements of money laundering are met if an individual conducts a financial transaction, such as moving funds by wire through interstate commerce, knowing that the funds are the proceeds of unlawful activity, and with the intent to promote the unlawful activity or to conceal the funds' unlawful source. *U.S. v. Orozco*, No. 06-6278, 2007 WL 2562394 (10th Cir. Sep. 05, 2007) at *3.

The elements of a conspiracy to commit money laundering are (1) an agreement with another person to commit money laundering; (2) knowledge of the essential objectives of the conspiracy; (3)

knowing and voluntary participation; and (4) interdependence among the alleged co-conspirators. *United States v. Chavis*, 461 F.3d 1201, 1208 (10th Cir.2006).

      e.    Analysis of which elements match for purposes of estoppel

"Defrauding" in a criminal mail fraud context appears to parallel the elements of fraudulent misrepresentation or concealment in the civil context. Here, Plaintiff has alleged three different forms of "civil" fraud: misrepresentation, concealment, and nondisclosure. The elements of misrepresentation and concealment, discussed more fully below, were necessarily litigated in the context of proving mail fraud in the criminal case. Issues related to concealment were also litigated with respect to the money laundering counts. Thus, the Court finds that issues litigated in the context of the mail fraud and money laundering counts are identical to issues necessary to prove the civil claims of fraudulent misrepresentation and concealment.

Nondisclosure is *not* necessarily an element of mail fraud unless it is paired with a specific duty to disclose. As the Court does not have evidence that the parties in the criminal case litigated the specific issue of Montgomery's duty arose in the context of the criminal mail fraud litigation, it cannot say that issues in the criminal case are identical to issues forming the basis of the civil claim of fraudulent nondisclosure.

The elements of deprivation of honest services do not completely match any of the Plaintiff's civil claims. While the count may be similar to breach of fiduciary duty, the Court does not have evidence that the parties in the criminal case specifically litigated the issue of whether Montgomery assisted Aldan in the breach of his fiduciary duty. Thus, the Court finds that the issues litigated with respect to deprivation of honest services are not identical to issues forming the basis of the civil claim of breach of fiduciary duty.

As stated in the Court's October 23, 2006 Order Dismissing Amended Complaint with Respect to Defendant D. A. Davidson & Co., there is no written law in the Commonwealth recognizing the tort of civil conspiracy, nor does the Restatement or common law specifically recognize civil conspiracy. *See I.G.I. Contractor & Dev., Inc. v. Pub. Sch Sys.*, 1999 N.M.I. 3, 7 (1999).

The closest approximation is Section 876(a) of the Second Restatement of Torts, providing that a person is liable for the harm resulting to a third person for the tortious conduct of another if "he does a tortious act in concert with the other or pursuant to a common design with him." Restatement (Second) of Torts § 876(a); *see also* Comment b ("It is in connection with these common designs or plans that the word "conspiracy" is often used.").

While the parties in the criminal case did not litigate the issue of whether any Defendants' action was tortious, it established criminal fraud, the elements of which correspond to civil fraud. *See S.E.C. v. Haligiannis*, 470 F. Supp. 2d 373 (S.D.N.Y. 2007) (all elements necessary for collateral estoppel to apply against defendant in subsequent securities fraud civil proceeding were satisfied by a guilty finding in a prior securities fraud criminal proceeding, where civil proceeding fraud claims were based on misrepresentations made by defendant in marketing materials, newsletters, and account statements issued to investors). Thus, the issues litigated in the context of a criminal conspiracy are the same as those that form the basis of a claim under Section 876(a).

## 2.   Were the issues actually litigated and decided?

Issues relating to fraudulent misrepresentation and concealment were actually litigated in the criminal action in a 30-day jury trial in the U.S. District Court for the Northern Mariana Islands, and a verdict was issued June 20, 2003.

### 3.     Was there a full and fair opportunity to litigate?

Montgomery had competent private legal counsel assisting him in the criminal action. He had significant incentive to litigate in the criminal action (the risk of a 20-year prison sentence).

### 4.     Were the issues necessary to support a final judgment on the merits?

Issues relating to fraudulent misrepresentation, concealment, and conspiracy were necessary to support Montgomery's conviction for wire fraud and money laundering and for conspiracies to commit these crimes.

In sum, the Court finds that collateral estoppel applies to the Bank's civil claims for fraudulent misrepresentation, concealment and concerted action. Plaintiff may prevail on its summary judgment motion for other claims if proof of these claims does not require any additional factual determination beyond that made in the criminal trial (i.e., the facts are indisputable).

### B.     Further Analysis of Elements of Civil Claims

As discussed above, the collateral estoppel applies to claims of fraudulent misrepresentation, concealment, and concerted action. Other claims may still be suited to summary judgment if there are no disputed facts and the legal questions can be resolved in Plaintiff's favor.

### 1.     Fraudulent Misrepresentation

To establish fraudulent misrepresentation in a civil case, the plaintiff must show: (1) there was a representation; (2) that was false; (3) material; (4) defendant knew or was reckless as to the falsity; (5) defendant intended plaintiff to act on the representation; (6) plaintiff's ignorance of the falsity; (7) plaintiff's reliance on the representation's truth; (8) plaintiff's right to rely; and (9) resulting damage. *Del Rosario*, 2001 MP at 38–39.

Based on the verdict of the criminal trial as well as the evidence submitted in support of this

1.
2.
3.
4.
5.
6.
7.
8.
9.
10.
11.
12.
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.
26.

motion, it is undisputed that Montgomery knowingly made false representations to the Bank regarding his banking experience, the sufficiency of his funds, his ownership interest in the UFX Account, Sweven's accounts, and Sweven's financial statements and tax returns; and that Montgomery knowingly misrepresented to Francia that Aldan had approved the Sweven loans such that the $500,000 installment would be released. According to Fitial, the Bank was not aware of the truth and reasonably relied on Aldan's attestment of Montgomery's credibility. The Bank suffered substantial losses to its assets and reputation, and ultimately went into receivership.

Accordingly, summary judgment against Montgomery and in favor of Plaintiff on Plaintiff's claim for fraudulent misrepresentation is GRANTED.

**2.      Fraudulent Concealment**

Under the Restatement, "[o]ne party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering." Restatement (Second) of Torts § 550.

Based on the verdict of the criminal trial as well as the evidence submitted in support of this motion, it is undisputed that Montgomery repeatedly concealed material information from the Bank regarding his contract with Aldan (such that he was able to gain access to Bank funds and circumvent the Board), the nature of the UFX Account, his establishment of the International Affairs Department, and his loans to Sweven, Aldan, and himself.

The information Montgomery concealed was material to the Bank, because, had it been disclosed, the Bank would not have endorsed the sale of the majority of its shares to Montgomery, issued Montgomery a loan to buy these shares, or issued the loan to Sweven. As discussed above, the

Bank sustained damage as a result of Montgomery's fraud.

Accordingly, summary judgment against Montgomery and in favor of Plaintiff on Plaintiff's claim for fraudulent concealment is GRANTED.

### 3. Fraudulent Nondisclosure

The criminal action has already established concealment, but did not discuss any duty on the part of Montgomery. Plaintiffs' memorandum in support of summary judgment does establish this duty, based on Restatement (Second) of Torts § 551:

A party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated all of the following:

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them;

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading;

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so;

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts. Montgomery engaged in several business transactions with the Bank, most significantly his

14

attempted acquisition of the majority of Bank shares and his participation in loans to himself, Aldan, and Sweven. Throughout these transactions, Montgomery had duties to disclose. He breached these duties by failing to disclose material information to the Bank in connection with his stock purchase from the Bank. Montgomery also failed to disclose to the Bank his activities under the auspices of the International Affairs Department. Nor did he disclose that the Sweven qualifications were completely fabricated; and that he and Aldan made $5,000,000 in loans to Sweven without any security or authorization; that he caused the Bank to transfer its assets to Davidson so that Montgomery could use those assets as security for a personal loan; or that he and Aldan were approving loans of Bank funds to each other without any oversight.

As a result of Montgomery's non-disclosure of information to the Bank at a time when Montgomery owed the Bank a duty of reasonable care, the Bank sustained significant damages. Accordingly, summary judgment against Montgomery and in favor of Plaintiff on Plaintiff's claim for fraudulent nondisclosure is GRANTED.

### 4.   Conspiracy to Commit Fraud

As discussed above, the CNMI does not specifically recognize the tort of conspiracy, although a person is liable for the harm resulting to a third person for the tortious conduct of another if "he does a tortious act in concert with the other or pursuant to a common design with him." Restatement (Second) of Torts § 876(a). The Court looks beyond the conspiracy heading of Plaintiff's claim and considers the allegations in light of the proper categorization of a claim for concerted tortious action.

In order to establish the liability under § 876(a), a conspiracy claim must contain the following elements:

1.      D or X commits tortious acts;

2.      Pursuant to a common design or plan between D and X;

3.      For cooperation in a tortious line of conduct or to accomplish a tortious end;

4.      P is harmed by the tortious acts.

As discussed above, the criminal action resulted in a finding that Montgomery and other Defendants committed criminal (and tortious) acts (namely fraudulent misrepresentation and concealment) pursuant to a common plan to improperly obtain Bank assets. Agreements to commit fraud are evidenced by Aldan's and Montgomery's concerted actions with respect to loans to themselves; Aldan's, Berkich's and Montgomery's and the establishment of the Department of International Affairs; Montgomery's, Aldan's, and Wilson's agreement to obtain the Sweven loan; Berkich's and Montgomery's use of and representations regarding the UFX Account; and representations made by other Defendants attesting to Montgomery's good reputation. These actions furthered the group's common plan with Montgomery.

Accordingly, summary judgment against Montgomery and in favor of Plaintiff on Plaintiff's Court-modified claim for liability under Restatement 876(a) is GRANTED.

## 5.      Aiding and Abetting a Breach of Fiduciary Duty

Under the Restatement (Second) of Torts, § 874, "one standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." Section 876(b) extends this liability to a person who "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."

To succeed on a Section 876(b) claim, the Bank's allegations must indicate that (1) certain defendants violated a duty to the Bank; (2) Montgomery aided and abetted in this violation; (3) the

Bank sustained damages; and (4) the breach was the proximate cause of those damages. October 23, 2006 Order Dismissing Amended Complaint with Respect to Defendant D. A. Davidson & Co, citing *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 245 (S.D.N.Y. 1996).

Although this claim was not established by collateral estoppels, Plaintiffs have provided sufficient evidence and legal arguments that Aldan had a fiduciary duty to the Bank by virtue of his position as Chairman and CEO, *see, e.g., In re Edgewater Medical Center*, 373 B.R. 845 (N. D. Ill. 2007); *Gentile v. Rossette*, 906 A.2d 91 (Del. Supr. 2006), and that he breached his duty when he took actions to promote his and Montgomery's interests ahead of and to the detriment of the Bank. Specifically, Aldan signed a contract with Montgomery pledging to assist in Montgomery's take-over of the Bank in exchange for Aldan's personal enrichment; was instrumental in advancing $3,600,000 of Bank money for Montgomery's purchase of the Bank's stock without obtaining any objective assurance that Montgomery had assets to cover the advance; misrepresented Montgomery's qualifications and ability to pay for his acquisition of the Bank; was instrumental in transferring Bank assets to the Davidson Account to be used as security for a personal loan to Montgomery, putting Bank assets at risk; knew of and permitted Montgomery to establish the International Affairs Department under which Montgomery made unauthorized loans; ordered the Bank loan officer to wire $4,500,000 to Sweven knowing that the loan was not approved pursuant to Bank policies and that Sweven was extremely unlikely to repay the loan; approved a $260,000 loan to Montgomery without authorization and contrary to Bank policy and CNMI law; and received a similarly unauthorized $430,000 loan from the Bank.

Montgomery knew of, and his plan depended on, Aldan's position with the Bank. As a necessary outcome of helping Montgomery, Aldan acted to the detriment of the Bank, thus breaching

Aldan's fiduciary duty. Montgomery substantially encouraged Aldan's breach by promising Aldan shares in TEC, partial ownership in the Bank, and a higher salary, and by giving Aldan a $430,000 loan from the Bank.

1.

2.

3.     Without Aldan's active assistance, Montgomery's plan to defraud the Bank could not have succeeded. As a result of Aldan's breach of fiduciary duty, and Montgomery's aid and encouragement thereof, the Bank sustained substantial damages.

4.

5.     Thus, as a matter of law, the Court grants Plaintiff summary judgment against Montgomery on the issue of aiding and abetting Aldan's breach of fiduciary duty.

6.

7.                          IV.     **CONCLUSION**

8.     The criminal trial conclusively resolved issues and facts necessary for the Court to find that

9.

Plaintiff must prevail as a matter of law on its civil claims against Defendant Montgomery. There is no

10.

dispute of fact and no opposition to Plaintiff's summary judgment motion. Accordingly, the Court

11.

grants in full Plaintiff's motion for summary judgment against Montgomery and in favor of Plaintiff.

12.

13.

14.     SO ORDERED this 27th day of November, 2007.

15.

16.

17.

18.                                        _____
                                           Juan T. Lizama
19.                                        Associate Judge, Superior Court

20.

21.

22.

23.

24.

25.

26.                                          18

# EXHIBIT 25

4+,

FOR PUBLICATION

SUPERIOR COURT

2??  NOV 11  PM 1: 46

BY _____

IN THE SUPERIOR COURT
OF THE
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

ACTING SECRETARY OF COMMERCE,
FERMIN M. ATALIG, in his official capacity
as the CNMI DIRECTOR OF BANKING
UNDER 4 CMC 6105(a),

           Plaintiff,

    v.

THE BANK OF SAIPAN, INC.,

           Defendant.

CIVIL ACTION NO.  02-0268

ORDER TERMINATING
RECEIVERSHIP

---

    The instant Order governs the termination of the Bank of Saipan's ("the Bank's"),

Receivership, which has been in place since August 30, 2002. The Order addresses the June 2, 2006

Stipulation to Terminate Receivership Proceedings ("the Stipulation," signed by all of the parties[1] to

the litigation), as well as the right to be heard of David W. Axelrod and Schwabe, Williamson &

Wyatt (collectively, "the Schwabe Firm").[2]

## I.   REQUISITES FOR TERMINATING RECEIVERSHIP

    Under older jurisprudence, a party whose assets are controlled by a receiver has a right to

have the receiver discharged and his property restored if he satisfies the debt upon which the

receivership is based. *Milwaukee & M.R. Co. v. Soutter*, 69 U.S. 510, 521-22 (1864). This

---

[1]    The parties are the Bank of Saipan, through counsel David Mair; the Receiver Antonio Muna (who replaced the prior Receiver, Randall Fennell), through counsel Joshua Berger; and the Secretary of Commerce (the initiator of the receivership), through counsel Marie Martinez.

[2]    The Schwabe Firm served as counsel for Mr. Fennell during his tenure as Receiver.

1

ENTERED
DATE: _____

jurisprudence vests the party who instituted the receivership with some degree of authority to terminate the receivership. *See Decker Bros. v. Berner's Bay Min. Co.*, 3 Alaska 280 (1907) (discontinuance of the suit operates to discharge the receiver); *Whiteside v. Prendergast*, 2 Barb.Ch. 471 (N.Y.Ch.1847) (discontinuance of a suit will entitle the receiver to apply for his discharge, unless the interests of the defendants require the continuance of the receivership to protect their rights). *See also De Leonis v. Walsh*, 82 P. 1047 (Cal. 1905) (if the party with the right to request the appointment of a receiver no longer desires a receiver, another person cannot compel the appointment of a receiver).

More recent cases suggest that a trial court may, in the interests of equity, exercise its discretion to continue a receivership, even though the original debt has been satisfied. *Consol. Rail Corp. v. Fore River Ry. Co.* 861 F.2d 322, 328 (1st Cir.1988) (the trial court may continue the receivership for the benefit of other creditors even though the judgment of the petitioning creditor has been satisfied if there is a risk of unfair prejudice to warrant the continuance); *Dixie-Land Iron & Metal Co., Inc. v. Piedmont Iron & Metal Co.*, 213 S.E.2d 897 (Ga.1975)(voluntary dismissal of complaint does not automatically discharge receiver who has qualified and taken possession of funds); *Hanno v. Superior Court of Santa Barbara County*, 87 P.2d 50 (Cal. App. 2 Dist. 1939) (the end of suit gives cause for discharge of receiver but does not, *ipso facto*, effect his discharge, which results only from order of court which appointed him so directing).

The trial court has broad discretion in determining whether the receivership should be terminated. *Securities and Exchange Commission v. An-Car Oil Co., Inc.*, 604 F.2d 114 (1st Cir. 1979) (district court possesses broad range of discretion in deciding whether to terminate an equity receivership); *Jones v. Vill. of Proctorville, Ohio*, 290 F.2d 49, 50 (6th Cir. 1961) (discharge of a receiver is ordinarily a matter resting within the sound discretion of the appointing court). The

Court has a duty to make this determination using its own analysis of the pertinent facts and legal theories. *See Crow v. Nationwide Mut. Ins. Co.*, 824 N.E.2d 127 (Ohio App. 2004). In order to safeguard the interests of those with a stake in the Bank's financial condition, the Court must consider the rights and interests of all parties concerned. 65 Am. Jur. 2d *Receivers* §§ 6,141.

One court has suggested that the burden of proving whether termination is appropriate is on the party whose assets are subject to the receiver's control. *Milo v. Curtis*, 651 N.E.2d 1340, 1344 (Ohio App. 9 Dist. 1994). This party must demonstrate that, in the interests of equity, the receivership should be terminated and control over the property restored. *Id.*

The Stipulation states that termination is appropriate where there are no grounds for continuance of the receivership under 4 CMC § 6106(f). Stipulation at ¶ 6. However, this statute does not refer to the continuance or termination of a receivership. It refers only to the power of Bank Directors to *initiate* a receivership upon a determination "that a bank is not in sound financial condition to continue doing business or that its affairs are being conducted in such a manner that the public or the persons having securities or funds under its custody are in danger of being defrauded." 4 CMC § 6106(f). Rather than restricting its analysis to the Bank's capacity for doing business without defrauding the public and investors, the Court will consider whether the Bank is capable of restoring its creditors' funds, and whether terminating the receivership would result in an unfair prejudice to creditors and depositors.

## II.   CONSIDERATION OF AMICUS CURIE INPUT

### A.   Qualifications for an Amicus Curie

Black's Law Dictionary (8th Ed.) defines *amicus curie* as "a person who is not a party to a lawsuit but who petitions the court or is requested by the court to file a brief in the action because that person has a strong interest in the subject matter." Amicus curie participation is appropriate

3

where the applicant has special knowledge of the subject matter or issues before the court. *See Ellsworth Assocs. v. United States*, 917 F. Supp. 841, 846 (D.D.C. 1996).

While the partiality of an amicus is a factor to consider in deciding whether to allow participation, "there is no rule ... that amici must be totally disinterested." *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir.1982). "[B]y the nature of things an amicus is not normally impartial." *United States v. Gotti*, 755 F. Supp. 1157, 1158 (E.D.N.Y.1991);

The decision to permit amicus participation is well within the court's discretion. *See U.S. v. Providence Journal Co.*, 485 U.S. 693 (1988); *Pennsylvania Environmental Defense Foundation v. Bellefonte Borough*, 718 F.Supp. 431, 434 (M.D.Pa.1989); *Gotti*, 755 F.Supp. at 1158; *Leigh v. Engle*, 535 F. Supp. 418, 420 (N.D.Ill.1982). This discretion extends to a court's decision to allow the amicus to participate in oral argument. *Gerritsen v. de la Madrid Hurtado*, 819 F.2d 1511 (9th Cir. 1987); *Cooper v. City of Picayune*, 511 So.2d 922, (Miss. 1987)

## B. The Schwabe Firm's Role as Amicus

To the extent that it may later pursue an action against the Bank, the Schwabe Firm has a tangential interest in the Bank's financial well-being. *See In re Bank of Saipan*, No. 05-0525 (N.M.I. Supr. Ct. Mar. 23, 2006) (Order Denying Randall Fennell, David Axelrod, and Schwabe, Williamson, & Wyatt's Request for Appellee Status at ¶ 1). If this were the only association of the Schwabe Firm with the instant action, it would be insufficient to warrant amicus.

As counsel to the prior receiver, however, the Schwabe Firm may have insight into the affairs of the Bank. The Schwabe Firm's input may provide an additional perspective as to whether termination poses a risk to the Bank's depositors and creditors.[3] For this reason, the Court accepts the Schwabe Firm's input as an amicus curie.

---

[3] The Court agrees with the Schwabe Firm's assertion that the Court's duty is ultimately to protect the depositors and creditors. None of these persons, who appear to have a valid interest in this litigation, have chosen to intervene.

4

The Supreme Court similarly admitted the Schwabe Firm's amicus brief in the Bank's appeal of this Court's Spending Cap Order,[4] but cautioned against the participation in a manner calculated to disrupt the Bank's lawsuit against Mr. Fennell.[5] "If the Receivership stays open, presumably, it will be more difficult for the Bank to pursue the Fennell litigation." Order Denying Request for Appellee Status, at ¶ 6. This Court agrees that the receivership case must not be used as a sword to seek advantage in the Fennell case. For this reason, the Court will only consider the Schwabe Firm's factual arguments regarding whether the Bank has met the requisites for terminating the receivership. The Schwabe Firm's statements at the August 1, 2006 hearing and its briefs submitted in anticipation of the hearing have provided the Court with sufficient information to make its decision. Thus, the Schwabe Firm's role as amicus will be limited to what it has already submitted.

### III. ANALYSIS

**A.    The Stipulation is persuasive but not decisive, particularly as a wholesale indemnification of the parties is inappropriate at this time.**

As discussed above, the termination of the receivership and the terms of termination must be decided by the Court, not the stipulating parties. The Stipulation is influential on the Court's consideration, as it reflects the belief of all parties that the Bank is prepared to resume the management of its affairs. The parties, particularly the Receiver, are in the best position to assess the Bank's status. For the most part, the Bank is willing to give the stipulating parties the benefit of the doubt. *See Crites, Inc. v. Prudential Co.*, 322 U.S. 408, 414-15 (1944) (noting that a court has

---

[4]    *See In Re Bank of Saipan*, No. 05-0025-GA, (Supr. Ct. May 24, 2006) (Order Vacating the October 14, 2005 "Spending Cap Order"). No oral arguments were held.

[5]    *Bank of Saipan v. Randall T Fennell*, No. 04-0449.

5

right to expect that receivers "would not make undisclosed private agreements . . . or use their official positions to further the interests of themselves.").

Nevertheless, the Court cannot ignore the possibility that the parties may be motivated by self-interest. As the Schwabe Firm points out, the Stipulation offers the Receiver the personal benefit of exoneration without further review of his action. *See* Stipulation at ¶ 9. It allows the Bank Directors to immediately regain control of the Bank. It provides "key government depositors" with the Bank's promise to attempt to accelerate the payment schedule set forth in a prior agreement with these parties. *See* Stipulation at ¶ 7.

A wholesale indemnification of any of the parties at this time is inconsistent with the Supreme Court's reversal of the Superior Court's complete exoneration of the former Receiver. As the Supreme Court explained in *In re Bank of Saipan, Inc.*, 2005 MP 03, ¶ 14 (2005), exoneration is inappropriate outside of a case or controversy on the matter. A receiver is entitled to immunity only after a determination in the suit against him that "his acts were done honestly, in [] good faith, and in the exercise of the authority derived from his appointment." *Id.; see also Federal Sav. and Loan Ins. Corp. v. PSL Realty Co.*, 630 F.2d 515 (7th Cir. 1980) (when receiver in obedience to court order has disposed of property in receivership, his liability and responsibility as receiver of that property ceases; however, in personam action against receiver concerning breach of his fiduciary duties to receivership property may nevertheless be maintained subsequent to his discharge).

Thus, while the Court takes notice of each signatory-party's desire to terminate the receivership, it will not incorporate verbatim the terms of the Stipulation into the instant order.

**B.**     **Review of existing records and the submissions of the parties to the Stipulation suggest that the Bank is capable of restoring its creditors' funds, and that terminating the receivership will not result in an unfair prejudice to creditors and depositors.**

The Schwabe Firm has raised legitimate concerns regarding the parties' forthrightness in determining the Bank's readiness to terminate its receivership. The Court shares some of these concerns, but finds that they have been adequately addressed in the submissions of the stipulating parties.

The Schwabe Firm notes that the Bank has not submitted the 2005 Bank Examination, which could provide this Court with direct insight on the Bank's condition. The Bank argues that the report contains confidential information about depositors and borrowers with the Bank and the disclosure of the document by the Bank is prohibited by 4 CMC § 6451. The Bank asserts that the Receiver has a copy of the Bank Examiner's Report, and has apparently examined it to his satisfaction.[6]

The Receiver did provide the Court with a Declaration of its Chief Financial Officer, indicating that (1) the deposit level has increased in the last year; (2) there is sufficient liquidity to pay retail deposits; (3) the Bank has continued making timely payments of the government agency deposits; (4) the Bank is currently profitable; (5) the Bank meets the CNMI capital earnings requirement; (6) the Bank has reserved funds that it believes will be sufficient to cover litigation costs; (7) the Bank's loans have increased and there are currently no delinquencies; and (8) the Bank has been able to sponsor community activities. The Court takes notice that the Bank, under the current receiver has been able to recover 100% of depositors' investments.[7]

---

[6]     The Court is dismayed by the Bank's unwillingness to facilitate the termination proceedings by taking the necessary steps to provide the Court with the pertinent information contained in the Bank Examination. Because the Court has sufficient information from other sources, however, it declines to exercise its power under 12 U.S.C. § 3407 to subpoena the Bank Examination.

[7]     The previous receiver was prepared to liquidate bank for a 15% return on investments.

7

**C.      Termination is timely.**

The receivership is a stigma to Bank. The depositors are better served by terminating the receivership now and determining outstanding fees and other issues at a later time.

The Schwabe Firm notes that the CNMI Supreme Court's November 9, 2005 order stayed this action and held in abeyance the Bank Directors' request for a Writ of Mandamus to terminate the Receivership. It argues that the Supreme Court's May 24, 2006 order vacating the spending cap did not explicitly lift the stay or refer to the Writ of Mandamus. In fact, the May 24, 2006 order implies that these matters are within the realm of the Superior Court's jurisdiction: "The Bank has requested remedies that are unavailable and untimely, and thus we decline any invitation to go beyond our jurisdiction or intrude in matters that are not properly before us." *Id.* at ¶ 9.

Further, it appears that the stay was largely based on the excessive filing of briefs in the Supreme Court: "These filings have produced a plethora of responses that mount each day ... Having reviewed the voluminous and mounting filings to date in support of, or opposition to, various matters concerning the parties, the Court has come to a decision regarding the procedure in this case." *Id.* at ¶¶ 5-6. This reasoning no longer applies.

Finally, any failure on the part of the Supreme Court to address these matters does not affect this Court's ability to resolve the case, as the issuance of the order effectively returned jurisdiction to the Superior Court.

The Court is not persuaded to prolong the receivership by the Schwabe Firm's argument that continuing the receivership will assure that the Receiver remains responsive to discovery requests from Fennell and the Schwabe Firm in related suits. Again, these entities are not entitled to use the receivership as a sword in related cases.

8

The Schwabe Firm refers to the role of the Bank Directors, their counsel, and the majority shareholders in the sale of the Bank and the subsequent mismanagement that gave rise to the receivership, and suggests that the termination of the receivership will foreclose the possibility of holding these parties liable for any misconduct. The Court does not find this argument convincing, as the minority shareholders or other investors remain free to bring a derivative action against these parties.

**D.     The terms of the Rehabilitation Plan will adequately govern the Bank's return to the private sector.**

The Bank of Saipan Report and Rehabilitation Plan, prepared by the Andela Consulting Group and filed with the Court on January 29, 2003, was approved by the Court's February 13, 2003 order. This Plan must govern the Bank's actions following the termination of the receivership. In adhering to the Plan, the Bank must do the following:[8]

1.     <u>Management</u>

- Put aside partisianship and adopt an attitude that best serves the Bank's depositors, the CNMI government, and the CNMI's people.

- Recruit new, well qualified banking professionals to serve as the CEO, Chief Lending Officer, and CFO. Consult with the FDIC, OCC and OTS officials before hiring these officials.

- Ensure the enforcement of Bank policies and procedures.

- Include additional independent and qualified members on the Board of Directors.

- Minimize the amount of credit and loan values that Bank officers may give.

- Continue regular Board and Loan Committee meetings.

---

[8]     This list is not all-inclusive. The Plan contains 52 pages of targets for the Bank, some of which may have already been achieved, and some of which need more development.

2.   <u>Reduction</u>

- Close any unnecessary premises.

- Liquidate any investments that are not U.S. treasury grade.

3.   <u>Customer relations</u>

- Develop strategic business plans to expand the Bank's customer base and service.

4.   <u>Recovery of funds</u>

- Recover fraudulent loans and pursue claims against wrongdoers.

- Establish repayment programs with existing qualified borrowers whose payments ceased subsequent to the establishment of the Receivership.

- Negotiate a guaranty loan swap or in lieu of payment demand a borrower deficit supplemental payment program with the CDA.

- Increase the Bank's liquidity by negotiating early repayment of select large loans.

5.   <u>Retention of funds</u>

- Provide existing depositors with financial incentives tied to the retention of their deposits for a specific period of time.

- Negotiate the conversion of qualified and willing individual and business depositor-related deposit accounts into capital or capital notes

- Retain performing loans for income purposes

6.   <u>Application of funds</u>

- Contribute collections from loans to a capital note sinking fund and/or to dividends on depositor-related stock.

10

- Settle Bank bond and insurance claims as quickly as possible.
- Reduce classified assets to specified levels by certain deadlines.

7.  <u>Acquisition</u>

- Acquire capital infusion from the current major shareholders.

8.  <u>Other</u>

- Establish a deadline for obtaining FDIC insurance and develop a plan to meet that deadline.
- Regularly report compliance matters to dept of commerce and director of banking.

The Plan anticipates litigation against those who have caused harm to the Bank. While the need to rectify wrongdoing is undisputed, the need for cost controls on litigation has been a point of contention. This Court's imposition of a spending cap of $200,000 and bond requirement of $2,000,000 was reversed in the Supreme Court's May 24, 2006 order. The Schwabe Firm points out that the reversal order did not take away the Court's power to impose reasonable cost controls. *See* the May 24, 2006 order at ¶ 11. The Schwabe Firm seems particularly concerned with the contingency fee agreement that controls the Bank's litigation against the Schwabe Firm and other persons.

The Court has reviewed the contingency fee agreement, and shares some of these concerns. However, the agreement does not appear to be so inadequate as to set the Bank up for failure. While the Court does not cede its power to impose cost controls, it must avoid micromanaging the Bank's affairs. The Supreme Court's May 24, 2006 opinion suggests that this Court would not be in a position to impose cost controls until and unless it obtains and evaluates all the pertinent facts. The Receiver and Bank Directors are currently privy to these facts, and believe that the contingency fee

11

will enable the Bank to control its costs while pursuing its claims. The Bank is a sophisticated business entity capable of making such a decision.

### IV.   CONCLUSION

The Court hereby orders the termination of the receivership. Management of the Bank must proceed according to the terms of the Rehabilitation Plan, as described in the Report and outlined above.

The Bank must file a report with the Court within six months of this order, demonstrating its compliance with the above outline for rehabilitation.

A second report must be submitted within one year of this order.

The Bank Directors have some discretion in the implementation of the outline, e.g., in seeking compensation for any mismanagement of the bank by former directors or receivers.

Any entity that feels it has suffered harm from any failure of the Bank to comply with this order may move the Court for an order of contempt.

SO ORDERED this __ day of August, 2006.

JUAN T. LIZAMA, Associate Judge

12